**UNITED STATES DISTRICT COURT**
**DISTRICT NEW YORK**

McGREGOR, et al.,

               Plaintiffs,

     v.

SUFFOLK COUNTY, et al.,

               Defendants.

Case 2:23-cv-01130


**DECLARATION OF ROBERT J. SPITZER**

1

## DECLARATION OF ROBERT J. SPITZER

I, Robert J. Spitzer, declare that the following is true and correct:

1.      I have been asked to render an opinion by the Office of the Attorney General of New York on the history of weapons restrictions, focusing in particular on weapons licensing.

2.      This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached as Exhibit A to this Declaration.

4.      I have been studying, teaching, and writing about gun policy and the history of weapons regulation for over thirty years.  My first publication on the subject appeared in 1985. Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995.  It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and international media on gun-related matters. For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). I have provided written testimony as an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the

constitutionality of Massachusetts' restrictions on assault weapons. I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012). I have also been retained to submit written testimony and serve as an expert witness in the following cases: Hanson v. District of Columbia, Civil Action No. 1:22-cv-02256-RC, United States District Court for the District of Columbia, 2022; Brumback v. Ferguson, No. 22-cv-3093 (E.D. Wash.); Sullivan v. Ferguson, No. 3:22-cv-05403-DGE (W.D. Wash.); Miller v. Bonta, No. No. 3:19-cv-1537 (S.D. Cal.); Duncan v. Bonta, No. 17-cv-1017 (S.D. Cal.); Fouts v. Bonta; Rupp v. Bonta; Gates et al. v. Polis (U.S.D.C. Colo. Case No. 1:22-cv01866-NYW-SKC); Oakland Tactical Supply LLC v. Howell Township, Case No.: 18-cv-13443; State v. Misch, No. 173-2-19 Bncr (Bennington County Criminal Case) in Vermont Superior Court; National Association for Gun Rights, Inc. v. City of Highland Park, 22-cv-4774 (N.D. Ill.); National Association for Gun Rights & Capen v. Campbell, U.S. District Court No. 22-cv-11431-FDS; Abbott et al. v. Connor, Civil Action No. 20-00360 (RT), In The United States District Court for The District Of Hawaii; National Association for Gun Rights v. Shikada, U.S. District Court District of Hawaii, No. 1:22-cv-00404-DKW-RT; Santucci v. Honolulu, U.S. District Court District of Hawaii, No. 1:22-cv-00142-DKW-KJM; Yukutake v. Shikada, U.S. District Court District of Hawaii, No. 1:22-cv-00323-JAO-KJM; Nat'l Ass'n for Gun Rights v. Lopez, U.S. District Court District of Hawai'i (Civil No. 1:22-CV-00404-DKW-RT); Abbot v. Lopez, U.S. District Court District of Hawai'i (Civil No. 20-00360 RT); Santucci v. City & County of Honolulu (Civil No. 1:22-cv-00142-DKW-KJM); Yukutake v. Lopez (Civil No. 1:22-cv-00323-JAO-KJM); Baird v. Bonta (E.D. Cal.); Nichols v. Newsom (C.D. Cal.); Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security (C.A. No. 1:22-cv-00951-RGA); Mark Fitz, Grayguns, Inc. v. Ellen Rosenblum, Attorney General of the State of Oregon; Harrel v.

3

Raoul (Case No. 23-141-SPM, Southern District of Illinois); Mitchell, et al. v. Atkins, et al., Court/Cause No.: 3:22-cv-5403; 1:22-cv-03093; Gates et al. v. Polis (U.S.D.C. Colo. Case No. 1:22-cv01866-NYW-SKC); Keneally et al., v. Raoul, et al., 23-cv-50039 (N.D. Ill.); McGregor v. County of Suffolk.

5.      I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## SUMMARY OF OPINIONS

6.      Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states, and localities enacted literally thousands of gun laws of every imaginable variety.[1] In this document, I focus on weapons laws related to licensing. This extends to licenses issued to those seeking firearms to carry (and sometimes other weapons), the licensing of firearms discharging, licensing related to hunting, to the commercial sale or transport of weapons, gunpowder licensing, licensing through dealer registration of purchasers, and licensing related to named groups.

---

[1] Robert J. Spitzer, *Guns across America* (NY: Oxford University Press, 2017), chap. 2.

# I. LICENSING

7.      Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[2] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

8.      State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances became wide-ranging and widespread in the 1800s and early 1900s. These laws mostly addressed those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

9.      At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits F and G); 17 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

---

[2] Henry C. Black, *Black's Law Dictionary,* 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

10.     At least 14 states imposed licensing on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

11.     Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

12.     These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature government form of regulation of the activities in question.

13.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[3] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria and discretionary judgment of local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary

---

[3] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67. See also Exhibit B.

6

for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

14. Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[4] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below. All of these types of laws are detailed in Exhibits F and G.

### A.      Licensing of Weapons Carrying or Possession

15. In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[5] St. Louis enacted its own municipal version of this law in 1892.[6] A similar measure was enacted for

---

[4] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

[5] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[6] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

Kansas City, Missouri, in 1880.[7] Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[8]  As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[9]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[10]

16.     The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[11]

---

[7] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[8] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[9] https://www.thefreedictionary.com/fowling+piece.

[10] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[11] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

17.     Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[12] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[13]

18.     New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[14]

19.     This provision also allowed for non-residents who had occasional business in the city to apply for permits as well. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so. Licenses could only be granted for up to one year and

---

[12] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[13] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[14] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

were subject to revocation "at the pleasure of the mayor."[15] A year later, the law was extended to all cities in the state and included "any pistol or other firearms of any kind."[16] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[17]

20.     Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[18] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[19]

21.     An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[20] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a

---

[15] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

[16] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[17] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[18] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[19] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[20] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

permit either from the mayor or police superintendent.[21] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[22] The California cities of Stockton (1891)[23] and Fresno (1896)[24] did the same.

22.     A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[25] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such

---

[21] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[22] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[23] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[24] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[25] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.

license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[26]

23.     In the Memorandum of Law in Support Of Plaintiffs' Application For A Preliminary Injunction for this case, the authors dismiss this Florida law calling it an "outlier regulation,"[27] citing an article by David Kopel who says that it is "a dubious precedent."[28] Kopel cites a concurring opinion in a 1941 Florida case, *Watson v. Stone*.[29] In the case, the court reversed the conviction of a man found guilty of having an unlicensed pistol in the glove compartment of the motor vehicle in which he was riding. Since the law under which the man was convicted "was enacted prior to the advent of the automobile" and had not been updated, "and the rule of strict construction applicable to penal statutes precludes or fails to bring the petitioner within the spirit or letter of the statute,"[30] the court reversed his conviction. In a concurring opinion, Judge Buford claimed knowledge of the 1893 law.

24.     The Memorandum in Support of Plaintiffs, quoting Judge Buford, says that "The original Act of 1893 was passed 'for the purpose of disarming the negro laborers…[it] was never intended to be applied to the white population and in practice has never been so applied.'"[31]

---

[26] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

[27] Memorandum of Law in Support Of Plaintiffs' Application For A Preliminary Injunction, *McGregor v. Suffolk County*, Case 2:23-cv-01130-GRB-ARL Document 6-10, Filed 02/17/23, 14, footnote 24.

[28] David Kopel, "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/

[29] 148 Fla. 516, 524, 4 So. 2d 700, 703 (1941).

[30] *Watson v. Stone*, 148 Fla. 516, 523.

[31] Memorandum of Law in Support Of Plaintiffs' Application For A Preliminary Injunction, 14,

This, however, omits much of Judge Buford's explanation, and therefore does not tell the full story. First, Judge Buford's full quote is this: "The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security."[32]

25.    Second, in support of his claim, Judge Buford writes this: "We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute."[33] Clearly, the judge is writing off the cuff and without any evidence to support his claim. Still, one may nevertheless assume that the law was utilized invidiously against Blacks, though even the judge admits that some licensees were whites.

26.    Third, while racism is undoubtedly woven into the implementation of the 1893 Florida law, the law itself makes no mention of race, and therefore must be taken to apply to people of all races—even if in its implementation it was applied with special force to Blacks. Fourth, in addition, assuming Judge Buford was correct that the law was enacted to address an upsurge in homicides, then that criminality has to be considered as an additional reason for the law's enactment, aside from race animus. This would be entirely consistent with the historical enactment of weapons laws throughout the U.S. in history as being spurred by general concerns

---

footnote 24.

[32] *Watson v. Stone*, 148 Fla. 516, 524.

[33] *Watson v. Stone*, 148 Fla. 516, 524.

about criminality and public safety. Finally, whatever one may say about systemic racism in Florida or the rest of the country, it is a mistake to somehow dismiss this law because it was tainted by racism, which was and arguably still is woven into the very fabric of American life.

27.     Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[34]

28.     A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[35] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[36] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[37]

---

[34] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[35] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[36] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[37] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-

29.     In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[38] Licensing was extended to long guns—machine guns and automatic rifles—in New Jersey in 1927[39] and 1934.[40] (A number of the 32 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing. See Exhibit D.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[41] It extended licensing to a variety of guns in 1927.[42] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[43] It extended the permitting process in 1926.[44] Georgia enacted a detailed handgun permitting system in 1910.[45] Thereafter, permitting was enacted in states (not including those

---

93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[38] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[39] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[40] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[41] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[42] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[43] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[44] 1926 Va. Acts. 285-87, CHAP. 158.

[45] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3,

that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[46] Indiana,[47] Michigan,[48] New Hampshire,[49] North Carolina,[50] North Dakota,[51] Ohio,[52] Oregon,[53] Pennsylvania,[54] Rhode Island,[55] and South Carolina.[56]

---

Carrying pistols without license, § 348(a)-(d). 1910.

[46] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[47] 1925 Ind. Acts 495, 495-98.

[48] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[49] 1923 N.H. Laws 138.

[50] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[51] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[52] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[53] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[54] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[55] 1927 (January Session) R.I. Pub. Laws 256.

[56] 1934 S.C. Acts 1288.

**B.      Permits for Firearms Discharge or Use of Explosives**

30.      As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms discharging licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various city activities including "firing a Gun without license."[57] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[58] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[59] A 1750 law did the same for the District of Southwark,[60] as did a colony-wide law

---

[57] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[58] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[59] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[60] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

17

also in 1750.[61] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[62]

31.     Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[63] New Hampshire enacted a discharge permit system for Portsmouth in 1823.[64] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[65] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[66] New London, Connecticut singled out "some public day of review" in an 1835

---

[61] 1750 Pa. Laws 208.

[62] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[63] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[64] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[65] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[66] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

law as a permissible reason for issuing a discharge permit,[67] and New Haven enacted a similar law in 1845.[68] The same was enacted for Quincy, Illinois in 1841,[69] Jeffersonville, Indiana in 1855,[70] and Richmond, Virginia in 1859.[71] Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits F and G).

## C.      Commercial Licensing

32.      As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[72] A century later, a Chicago

---

[67] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[68] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[69] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[70] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[71] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

[72] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler

ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[73] An 1854 law for San Francisco, California licensed commercial shooting galleries.[74] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

### D.  Licensing Restrictions on Gunpowder

33.    Gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[75] One element of this regulation was gunpowder licensing; at least 21 states enacted such licensing from the 1700s through the early 1900s.

### E.    Weapons Sellers Recording Purchases

34.    Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be

---

commerce; it was not a law that licensed Natives to engage in commerce.

[73] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[74] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[75] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), Available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.

maintained and subject to possible later examination. This regulatory mechanism put the burden

of information collection and maintenance on the seller or dealer, rather than directly on the

government, though it served the same purpose: to acquire and maintain information about those

who obtained the weapons in question and when, for future reference or inspection by

government officials or others. In some instances these requirements existed along with direct

governmental licensing.

35.    In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[76]

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado

law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[77]

A 1911 New York law required every person selling any handgun to maintain a register "at the

time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a

---

[76] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

[77] 1911 Colo. Sess. Laws 408, Section 3.

pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number

or other mark of identification on such pistol, revolver or other firearm."[78] The purchaser also

had to produce a permit at the time of the transaction, with the seller to note the permit

information.

### F.    Licensing Pertaining to Named Groups

36.    The licensing of "Named Groups" referenced in Exhibit G includes the granting

of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who

stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of

weapons to Native Americans might seem paradoxical, since white leaders fought protracted

conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also

traded arms with Natives throughout this entire period, as they sought profitability, access to

highly desired goods made available by Indians, and security alliances with some Indians

through the supplying of weapons. This steady and enduring trade revealed "the high degree of

interdependence between Indians and Euro-Americans."[79]

37.    As for licensing related to enslaved persons and free persons of color (listed

separately in Exhibit G), it is well understood that white racist regimes before the Civil War were

frantic to keep weapons out of the hands of enslaved persons. The laws listed here, however, are

all instances when enslaved persons or free persons of color were allowed to have possession of

weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some

---

[78] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and
Carrying of Dangerous Weapons. ch. 195, § 2.

[79] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16
and passim.

whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

38.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## G.    The Lessons of Licensing

39.     The Plaintiffs' Complaint pertaining to this action says that "Requiring a license to purchase, take possession of give, sell, and/or exchange a rifle is *wildly inconsistent* with this Nation's historical tradition of firearm regulation. . . ."[80] That document goes on to say that there is "no historical tradition requiring a license or imposing criminal sanctions against ordinary individuals who exercise the presumptively protected right to possess, purchase, give, exchange, receive, sell, and/or carry long guns."[81] While these statements narrow their reference to long guns, the discussion and analysis in this Declaration disproves these claims in two important respects.

40.     First, the foregoing analysis demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as every aspect of sales. With some exceptions, the primary

---

[80] McGregor et al. v. Suffolk County, Complaint for Declaratory and Injunctive Relief, Case 2:23-cv-01130 Document 1 Filed 02/10/23, 6-7, ¶ 29. Emphasis in original.

[81] McGregor et al. v. Suffolk County, Complaint for Declaratory and Injunctive Relief, 15, ¶ 76.

focus was on handguns for the obvious reason that they were the weapons that posed the most significant threat to public safety and good order from the 1700s through the early 1900s. Long guns posed no similar threat during this time, even though some anti-carry/licensing laws extended to all firearms, not just concealable handguns. (Note that firearm discharge licensing laws generally applied to all guns, not just handguns.)

41.     Second, when long guns did appear in civil society and began to pose a criminal and public safety problem, prohibitions and licensing were rapidly enacted. The long guns in question—the Tommy gun, the BAR, and sawed-off shotguns (i.e. long guns modified after purchase)—were restricted in at least 32 states in the 1920s and early 1930s, and between 8 and 11 states imposed similar restrictions on semi-automatic long guns during this same time (see Exhibits B and D). Given the wide-ranging and extensive nature of licensing in America in the 1800s and early 1900s, the notion of extending licensing to long guns when the need or demand to do so arose is, in regulatory terms, an incrementally small step. Far from being "wildly inconsistent" with America's tradition of firearms regulation, licensing was an integral component of that tradition.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 17, 2023, at Williamsburg, Virginia

_/s/Robert Spitzer_____

Robert Spitzer