UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
MICHAEL MCGREGOR, ZACHARY GIAMBALVO,
PAUL FELICE, MATTHEW OLIVIERI, EDWARD
NEWMAN, and DARK STORM INDUSTRIES, LLC,

                         Plaintiffs,                    23 Civ. 1130 (GRB) (ARL)

      -against-

SUFFOLK COUNTY, New York,
Police Commissioner RODNEY HARRISON,
in his Official Capacity, and Acting Superintendent
STEVEN NIGRELLI, in his Official Capacity,

                         Defendants.
--------------------------------------------------------------------x

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
# OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**info@bellantoni-law.com**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................... i

I. SUFFOLK COUNTY DOES NOT ISSUE ANY LICENSE THAT AUTHORIZES THE PURCHASE, SALE, ETC. OF SEMIAUTOMATIC RIFLES .................................... 2

II. PLAINTIFFS ARE SUFFERING AN INJURY-IN-FACT ................................... 3

III. THE STATE CONCEDES MCGREGOR HAS STANDING ................................ 4

    A. State Concedes McGregor Complied With The Licensing System ............................. 4

    B. State Concedes McGregor Demonstrated Injury-In-Fact................................ 4

IV. GIAMBALVO, FELICE, AND OLIVIERI ALSO HAVE STANDING ............... 5

V. ALL PLAINTIFFS ARE SUFFERING AN INJURY-IN-FACT: PURCHASING RIFLES.... 6

VI. GIAMBALVO IS SUFFERING A CREDIBLE THREAT OF ENFORCEMENT................. 7

VII. INJURIES ARE TRACEABLE TO ACTING SUPERINTENDENT NIGRELLI ............... 9

    A. Threat of enforcement Against Plaintiffs is Traceable to Nigrelli............................. 9

    B. Threat of enforcement Against New York Gun Dealers is Traceable to Nigrelli........ 9

VIII. DARK STORM INDUSTRIES AND ED NEWMAN HAVE STANDING ..................... 10

    A. Edward Newman.................................................................................... 10

    B. Dark Storm Industries ........................................................................... 11

    C. "Individual" Right Analysis Was Not Directed Toward Manufacturers and Sellers. 12

    D. Actual and Potential Customers Are Not Just The Plaintiffs Named Herein ........... 12

IX. THE RIFLE BILL IS REPUGNANT TO THE SECOND AMENDMENT......................... 13

X. "POST-RATIFICATION" (1791) REGULATIONS MUST BE REJECTED......................... 14

    A. Supreme Court Jurisprudence Looks to the Founding Era, Not 1868 ...................... 14

    B. No Supreme Court Cases Look to 1868 to Interpret the Bill of Rights .................... 16

    C. The State and Spitzer's Post-Ratification Regulations Must Be Rejected................. 18

XI. NYSP GUIDELINES DO NOT ALTER THE PLAIN LANGUAGE OF THE STATUTE . 19

XII. PUBLIC INTEREST FAVORS AN INJUNCTION ............................................................. 19

CONCLUSION............................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................................................ 12

*Antonyuk v. Hochul,*
   2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ............................................................ 5

*Antonyuk v. Hochul,*
   2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ......................................................... 8

*Babbitt v. United Farm Workers Nat. Union,*
   442 U.S. 289 (1979) ................................................................................................ 7

*Balintulo v. Daimler AG,*
   727 F.3d 174 (2d Cir. 2013) .................................................................................. 17

*Benton v. Maryland,*
   395 U.S. 784 (1969) .............................................................................................. 16

*Brenntag Int'l Chem., Inc. v. Bank of India,*
   175 F.3d 245 (2d Cir. 1999) .................................................................................... 3

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ................................................................................................ 7

*Cayuga Nation v. Tanner,*
   824 F.3d 321 (2d Cir. 2016) ............................................................................ 7, 8, 9

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter,*
   492 U.S. 573 (1989) .............................................................................................. 17

*Craig v. Boren,*
   429 U.S. 190 (1976) .............................................................................................. 11

*Crawford v. Washington,*
   541 U.S. 36 (2004) ................................................................................................ 15

*D.C. v. Heller,*
   544 U.S. 570 (2008) ................................................................................................ 7

*Dark Storm Indus. LLC v. Cuomo,*
   471 F. Supp. 3d 482 (N.D.N.Y. 2020) .................................................................. 11

i

*Davis v. Federal Election Comm'n*,
  554 U.S. 724 (2008) ................................................................................. 5

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
  46 F.4th 226 (5th Cir. 2022) ............................................................... 15, 17

*Dred Scott v. Sandford*,
  19 How. 393 (1857) .............................................................................. 14

*Drummond v. Twp.*,
  361 F. Supp. 3d 466 (W.D. Pa.) ......................................................... 11

*Duncan v. Louisiana*,
  391 U.S. 145 (1968) .............................................................................. 16

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................ 3

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ................................................................ 12

*Forty-Second St. Co. v. Koch*,
  613 F. Supp. 1416 (S.D.N.Y. 1985) .................................................... 12

*Friedman v. City of Highland Park, Ill.*,
  577 U.S. 1039 (2015) .............................................................................. 7

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021) ........................................................................... 16

*Gamble v. United States*,
  139 S.Ct. 1960 (2019) ........................................................................... 16

*Hardaway v. Nigrelli*,
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ............................... 6, 7, 8

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ........................................................... 20

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
  565 U.S. 171 (2012) .............................................................................. 16

*In re Oliver*,
  333 U.S. 257 (1948) .............................................................................. 16

*Klopfer v. North Carolina*,
  386 U.S. 213 (1967) ............................................................................................ 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................. 6

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) ............................................................................................ 16

*Malloy v. Hogan*,
  378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)............................................ 17

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010) ..................................................................................... 4, 7, 15, 18

*Near v. Minnesota*,
  283 U.S. 697 (1931) ............................................................................................ 16

*Nevada Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ............................................................................................ 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022)...................................................Passim

*NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*,
  974 F.3d 1106 (9th Cir. 2020) ............................................................................ 17

*Picard v. Magliano*,
  42 F.4th 89 (2d Cir. 2022) ................................................................................ 8, 9

*Pierce v. Soc'y of Sisters*,
  268 U.S. 510 (1925) ............................................................................................ 11

*Powell v. Alabama*,
  287 U.S. 45 (1932) .............................................................................................. 16

*Ramos v. Louisiana*,
  140 S.Ct. 1390 (2020)..................................................................................... 16, 17

*Reynolds v. United States*,
  98 U.S. 145 (1878) .............................................................................................. 16

*Rhode Island v. Massachusetts*,
  37 U.S. (12 Pet.) 657 (1838)............................................................................... 15

iii

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ................................................................................ 3

*South Carolina v. United States*,
  199 U.S. 437 (1905) .............................................................................. 15

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................ 6

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ................................................................................ 8

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................ 6, 7, 9

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ............................................................... 11

*Timbs v. Indiana*,
  586 U.S. ——, 139 S.Ct. 682 (2019) .................................................... 17

*Virginia v. Moore*,
  553 U.S. 164 (2008) .............................................................................. 15

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................ 6

*Washington v. Texas*,
  388 U.S. 14 (1967) ................................................................................ 16

*Wilson v. Arkansas*,
  514 U.S. 927 (1995) .............................................................................. 16

*Wyoming v. Houghton*,
  526 U.S. 295 (1999) .............................................................................. 16

**Statutes**

New York Penal Law § 265.65 ............................................................... 14
New York Penal Law § 265.66 ............................................................... 14
New York State General Business Law § 898 ......................................... 1

## I.  SUFFOLK COUNTY DOES NOT ISSUE ANY LICENSE THAT AUTHORIZES THE PURCHASE, SALE, ETC. OF SEMIAUTOMATIC RIFLES

Lt. Komorowski's Declaration - the only evidence submitted by Suffolk County -  does not refute the fact that SCPD will not issue a Rifle License nor endorse the face of an existing pistol to authorize the purchase, sale, etc. of semiautomatic rifles. A Rifle License, or a rifle endorsement of an existing pistol license, is required to purchase a semiautomatic rifle. Under Penal Law § 400.00(2)(f), a rifle license is a separate category of licenses - a *pistol license does not serve as a semiautomatic rifle license*. See, § 400.00(2)(f); Newman Dec. at ¶¶ 11-16; McGregor Dec. at ¶¶ 5-17; Olivieri Dec. at ¶ 10; and Giambalvo Dec. at ¶¶ 14-16. Stated differently, New York gun stores **cannot** sell or transfer a semiautomatic rifle based solely on a showing of a NYS pistol license.

Paragraph 3 of Komorowski's declaration is a conclusory statement with no substantive information refuting Plaintiffs' sworn declarations. In ¶ 4 Komorowski generally asserts "pistol license holders may add a rifle to their license." But adding a semiautomatic rifle to one's *pistol* license requires acquisition of a semiautomatic rifle in the first instance. Komorowski's statement is based on the false premise that a pistol license authorizes the **purchase** of a semiautomatic rifle – which it does not. See, Part B *infra*;  § 400.00(2)(f); Newman Dec. at ¶¶ 11-16; McGregor Dec. at ¶¶ 5-17; Olivieri Dec. at ¶ 10; and Giambalvo Dec. at ¶¶ 14-16.[1]

In ¶ 5, Komorowski claims anyone who does not have a pistol license "may obtain a rifle license by going through the same application process as utilized for pistol license applications." But the most recent edition of SCPD's "***Pistol*** License Handbook", provided to the undersigned

---

[1] There isn't even an exemption under Penal Law §§265.65 and 265.66 for transferring a semiautomatic rifle between immediate family, as there is under New York State General Business Law § 898. So, without a rifle license, ***no*** semi-automatic rifles can be added to an existing pistol license.

by Suffolk County on May 11, 2023, confirms that SCPD does not have any process for issuing the Rifle License required by § 400.00(2)(f). See, Reply Dec. of Amy L. Bellantoni at Ex. 1.

Chapter 1 of the Handbook - "Types of **_Pistol_ Licenses**"- lists (i) dwelling; (ii) business; (iii) statutory employment; (iv) carry concealed; (v) **_semiautomatic rifle_**; and (vi) collector.

**First**, a semiautomatic rifle is, by definition, not a pistol. **Second**, no section of the Handbook covers obtaining a Rifle License. **Third**, SCPD's describes the "semiautomatic rifle pistol license" as: "This license entitles a licensee to **_possess_** a semiautomatic rifle when transfer of ownership occurs." (emphasis added).

**But transfer of ownership cannot occur in the first instance without a Rifle License.** Komorowski does not aver that the "semiautomatic rifle pistol license" authorizes the licensee to purchase, take possession, sell, give, exchange, etc. semiautomatic rifles. In fact, **_nothing_** about SCPD's "semiautomatic rifle pistol license" – an oxymoron in its own right – allows the **_purchase or transfer_** of a semiautomatic rifle to the licensee.

No part of sections 265.65 and 265.66 criminalizes the mere possession of a semiautomatic rifle. Stated differently: SCPD's "semiautomatic rifle pistol license" is **_absolutely useless._** And even if it were not, Komorowski avers that obtaining such a license requires submitting to the "same application process as utilized for pistol license applications" [Komorowski Dec. At ¶ 5] – a process that takes **_2-3 years_** as averred in the uncontested declarations of Michael McGregor at ¶ 19 and Edward Newman at ¶ 13. And a search of SCPD's newly revised Application Instructions reveals that word "rifle" is nowhere to be found. See, Bellantoni Reply Dec. at Ex. 2.

**McGregor Attempted to Apply for a Rifle License – But SCPD Has No Process**

McGregor informed the Licensing Bureau that gun stores will not sell him a semiautomatic rifle without a Rifle License; he informed that SCPD will not issue Rifle Licenses or amend

handgun licenses to reflect semiautomatic rifle authorization because SCPD considers a handgun license "good enough to purchase rifles" despite the plain language of the Penal Law. [McGregor Declaration at ¶¶ 5-17]. McGregor has tried to identify a process with SCPD for subjecting himself to the challenged regulations, but he cannot because SCPD does not issue any license that authorizes the purchase of a semiautomatic rifle. Applying would be futile. See, McGregor Declaration at ¶¶ 5-17 and accompanying recorded conversations with SCPD.

FFLs will not sell a semiautomatic rifle to an individual based solely on a pistol license. [McGregor Dec. at ¶¶ 5-17]. Plaintiffs and all other Suffolk County residents under the jurisdiction of SCPD are ***absolutely barred*** from purchasing, taking possession of, selling, exchanging, giving and/or disposing of semiautomatic rifles.

## II.  PLAINTIFFS ARE SUFFERING AN INJURY-IN-FACT

Plaintiffs are suffering an injury-in-fact by the absolute bar to their exercise of the right to purchase, take possession of, sell, exchange, give and/or dispose of semiautomatic rifles.

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) citing, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Likewise, the loss of Plaintiffs' Second Amendment freedoms for even minimal periods of time, unquestionably

constitutes irreparable injury because, as the Supreme Court declared in *McDonald*, and again in *Bruen*, "The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111, 2156 (2022) (quoting, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (plurality opinion).

There is no other right that requires government permission before it is exercised – that is not how the First, Fourth, Fifth, Sixth, or Eighth Amendments work when it comes to the rights protected thereunder and it is not how the Second Amendment works when it comes to the right to possess, purchase, take possession of, transfer, sell, purchase, or give semiautomatic rifles. See, e.g., *Bruen*, at 2156.

## III.  THE STATE CONCEDES MCGREGOR HAS STANDING

### A.  State Concedes McGregor Complied With The Licensing System

Pressing this Court to find that Plaintiffs Giambalvo, Felice, and Olivieri lack standing because they have not complied with the requirements of the requisites of the licensing system, the State concedes that McGregor did all he could to comply. [State MOL at p. 9-10], as set forth in Part I (c) *supra*.

### B.  State Concedes McGregor Demonstrated Injury-In-Fact

The State also concedes that McGregor meets the injury-in-fact requirement. [State MOL at p. 11]. McGregor attempted to purchase a Ruger 10/22 semiautomatic rifle from RT Smoke 'N Gun in Westchester County and was informed that they cannot sell a semiautomatic rifle to anyone who merely holds a pistol license – a "Rifle License" is required under the Penal Law. See, McGregor Dec. at ¶ 6-10. McGregor also contacted LI Ammo and Camp-Site in Suffolk County was told the same thing –  purchasers of semiautomatic rifles need a rifle license to purchase  and

take possession of semiautomatic rifles, or an existing handgun license that specifically indicates on its face an endorsement for "semiautomatic rifle"; a handgun license is not sufficient. [McGregor Dec. at ¶¶ 10, 15, and Ex. 1 and Ex. 4 (recorded conversations)]. McGregor's likelihood of success remains substantial because there is no Rifle License available from SCPD.

## IV.  GIAMBALVO, FELICE, AND OLIVIERI ALSO HAVE STANDING

While only "one plaintiff [need] have standing to seek each form of relief requested in the complaint"[2], which the State concedes is satisfied by McGregor[3], Plaintiffs Giambalvo, Felice, and Olivieri also have standing. Their objections to having to obtain a Rifle License are overshadowed by the futility of applying to SCPD in the first instance, which defeats the State's standing argument. If Giambalvo, Felice, and Olivieri changed their minds, no Rifle License would be available to them or anyone else – as borne out by the McGregor's Declaration and the recorded conversations with the Licensing Bureau. Like McGregor, their likelihood of success remains substantial.

But even if SCPD had a process, Komorowski avers that such applications must proceed through the regular pistol licensing process, which takes *2-3 years*; this exorbitant delay establishes futility. Waiting 2-3 years to exercise a protected right constitutes irreparable harm. [Part I above].

Giambalvo, Felice, and Olivieri have also described concrete plans to purchase a semiautomatic rifle. But for the licensing requirement and criminal penalties, Giambalvo would have purchased a World War II era semi-automatic rifle from an FFL outside of New York, which he would have completed in New York through DSI [Giambalvo Dec. at ¶ 14]; Felice would have

---

[2] *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 5239895, at *7 (N.D.N.Y. Oct. 6, 2022), appeal withdrawn, No. 22-2379, 2022 WL 19396512 (2d Cir. Nov. 14, 2022) quoting, *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008).
[3] The State argues only that Giambalvo, Felice, and Olivieri lack standing for failure to apply for a rifle license. [State MOL at p. 9-10].

purchased a <u>Black Rain Ordnance</u> (semiautomatic rifle), which would be <u>transferred to him through Dark Storm Industries</u> after passing a NICS background check [Felice Dec. at ¶ 7] and Olivieri would have purchased a <u>New York-compliant AR-15 platform semiautomatic rifle</u> from <u>Dark Storm Industries</u> in Suffolk County [Olivieri Dec. at ¶¶ 8-10], but none of those purchases can occur because the Rifle Bill is an absolute bar to their right to purchase semiautomatic rifles and SCPD has no process to issue a Rifle License.

Plaintiffs' plans are "concrete"; they cannot take any additional steps to purchase the rifles they seek to own because no FFL can or will sell them a semiautomatic rifle without a Rifle License.[4] Attempting to receive/purchase any of the aforementioned semiautomatic rifles from DSI would be futile because, like McGregor, Plaintiffs Giambalvo, Felice, and Olivieri do not have a Rifle License; Newman, DSI and all other New York State FFLs are prohibited by § 265.66 from selling/transferring a semiautomatic rifle to any individual without a Rifle License. [Newman Dec. at ¶¶ 8-18].

## V. ALL PLAINTIFFS ARE SUFFERING AN INJURY-IN-FACT : PURCHASING RIFLES

The injury-in-fact requirement helps to ensure that the plaintiffs have a "personal stake in the outcome of the controversy"[*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) quoting, *Warth v. Seldin*, 422 U.S. 490, 498 (1975)] and exists where a plaintiff suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4 (W.D.N.Y. Nov. 3, 2022) quoting, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 336 (2016), as revised (May 24, 2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) (cleaned up).

---

[4] The State claims Plaintiffs did not indicate "from whom they intended to purchase said rifle" – but perhaps the State did not actually read their Declarations.

As with the plaintiffs in *Heller* and *Bruen*, each Plaintiff is suffering a concrete, particularized, and actual injury – the absolute barrier to conduct protected by the Second and Fourteenth Amendments – and each plaintiff has a stake in the outcome of this controversy. Plaintiffs are barred from taking possession of, purchasing, giving, selling, and exchanging specific semiautomatic rifles, which are "weapons in common use" protected by the scope of the Second Amendment. See, *D.C. v. Heller*, 544 U.S. 570, 625 (2008) (handguns); *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (stun guns); *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J. on denial of cert) ("The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting...that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons.") (cleaned up) citing, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767-768 (2010); *Heller*, at 628–629.

## VI. GIAMBALVO IS SUFFERING A CREDIBLE THREAT OF ENFORCEMENT

Pre-enforcement challenges to criminal statutes are cognizable under Article III. *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *4 (W.D.N.Y. Nov. 3, 2022) citing, *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). The Supreme Court has made it clear that a plaintiff suffers an injury-in-fact sufficient to establish standing when he or she faces "threatened enforcement of a law" that is "sufficiently imminent." *Id.* citing, *Susan B. Anthony List*, 573 U.S. at 158-59, 134 S.Ct. 2334. When challenging a law prior to its enforcement, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' " *Id.* quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

The standard articulated by the Supreme Court sets a low threshold and is quite forgiving to plaintiffs seeking such pre-enforcement review, because courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund. *Hardaway*, at *4 quoting, *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (cleaned up); *Cayuga Nation*, 824 F.3d at 331; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (no need for plaintiff to first expose himself to actual arrest or prosecution).

In his appearance at Governor Hochul's Press Conference "Gun Violence Prevention," (https://www.youtube.com/watch?v=gC1L2rrztQs at 36:10), Nigrelli publicly thanked Governor Hochul for her "leadership on this topic…laser-like focus on ***eradicating guns***, illegal guns, and gun crimes...we appreciate that at the State Police"  and publicly promised Hochul: "Governor, it's an easy message. I don't have to spell it out more than this. We'll have zero tolerance. If you violate this law, you will be arrested. Simple as that. Because the New York State Troopers are standing ready to do our job to ensure ... all laws are enforced." *Id.* (emphasis added).

The *Hardaway* court found that these public warnings by Nigrelli demonstrates that all New York residents face "threatened enforcement" of New York firearms laws by the NYSP that is "sufficiently imminent." See, *Hardaway*, at *5. The court in *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *14 (N.D.N.Y. Nov. 7, 2022), reconsideration denied sub nom. *Antonyuk v. Nigrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022), noted that Nigrelli did not limit his YouTube message to Plaintiffs, as the defendants did in *Cayuga Nation v. Tanner*, and found that the fact that Nigrelli's threat, specifically mentioning arrests, occurred by video increased its potency because it can be replayed. (finding credible threat of enforcement by Nigrelli).

Giambalvo announced detailed and concrete plans to give and exchange semiautomatic rifles to his unlicensed friends and to take possession of his friends' semiautomatic rifles at Calverton Range in Suffolk County, New York without a Rifle License, which subjects him to enforcement of Penal Law sections 265.65 and 265.66 by the NYSP. Giambalvo is at particular and substantial risk of enforcement because he has publicly announced his plans in this lawsuit.

Giambalvo faces "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014); *Cayuga Nation*, 824 F.3d at 331 (credible threat of prosecution exists when Defendant has "announced its intention to enforce the [law] against the [plaintiffs]"). Given the recency of the law and lack of any indication that it will be repealed, the Court should be "willing to presume" that Nigrelli will enforce" it. *Picard*, 42 F.4th 89 (quoting *Cayuga Nation*, 824 F.3d at 331).

## VII. INJURIES ARE TRACEABLE TO ACTING SUPERINTENDENT NIGRELLI

### A. Threat of enforcement Against Plaintiffs is Traceable to Nigrelli

The threat of enforcement of Penal Laws sections 265.65 and 265.66 is directly traceable to Nigrelli and the NYSP, as he has publicly threatened all New York residents that all firearms laws will be enforced by his troopers. The recent passage of the Rifle Bill by Governor Hochul – whom Nigrelli swore his allegiance to in his prior position and was thereafter made Acting Superintendent after Bruen left – demonstrates a credible and imminent risk of enforcement.

### B. Threat of enforcement Against New York Gun Dealers is Traceable to Nigrelli

Likewise, a New York gun store that sells or transfers a semiautomatic rifle to an individual who does not hold a Rifle License, the business, the license holder, and the seller will be guilty of a Class E felony for violating Penal Law section 265.66 – Criminal Sale of a Semiautomatic Rifle.

Nigrelli's threat of enforcement prevents every NY gun store from selling and/or transferring semiautomatic rifles to anyone who does not hold a Rifle License – like Plaintiffs. [Newman Dec.].

It is axiomatic that with Nigrelli's threatened enforcement of criminal laws against all New Yorkers, including the gun stores, no sales, purchases, and/or transfers of semiautomatic rifles will take place unless the purchaser/receiver obtains a Rifle License. Because NYSP troopers will enforce sections 265.65 and 265.66 against all New Yorkers – including gun stores like Dark Storm Industries, RT Smoke 'N Gun, Camp-Site, and LI Ammo – all unlicensed people including Plaintiffs are absolutely barred from selling, purchasing, giving, exchanging, and/or taking possession of semiautomatic rifles – a harm directly traceable to Nigrelli.

Similarly, Plaintiffs' harms can be redressed through enjoining Harrison (SCPD), Nigrelli (NYSP), and all those working in concert with them, from enforcing Penal Law sections 265.65 and 265.66.[5] Enjoining the enforcement of the challenged criminal statutes will allow gun stores to sell and transfer to Plaintiffs and other New Yorkers– as they were able to just months ago.

## VIII.  DARK STORM INDUSTRIES AND ED NEWMAN HAVE STANDING

### A.    Edward Newman

The State misreads Plaintiffs' complaint and moving papers, which assert Second and Fourteenth Amendment claims on behalf of Edward Newman, as well as Dark Storm Industries.

Mr. Newman has an obvious Second Amendment right to sell and transfer semiautomatic rifles to third parties, including Plaintiffs. The State concedes as such. [State MOL at p. 15, n. 13]. Plaintiffs' Memorandum of Law in support of this motion provides, "Edward Newman and Dark Storm Industries LLC (DSI) also have standing - directly and derivatively." [Plaintiffs' MOL at p.

---

[5] Nigrelli does not need to "cure" SCPD's licensing deficiencies ; if the enforcement of sections 265.65 and 265.66 by NYSP and SCPD is enjoined, SCPD's refusal to issue Rifle Licenses would be moot. [State MOL at p. 15].

10-11]. Mr. Newman has direct standing and DSI has derivative standing on behalf of its actual and potential customers to challenge sections 265.65 and 265.66.

### B.    Dark Storm Industries

DSI has derivative standing to assert the subsidiary right to acquire arms on behalf of its actual and potential customers. In *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 493 (N.D.N.Y. 2020), Judge Kahn, Senior District Judge, held that DSI "as the ...operator of a gun store...has derivative standing to assert the subsidiary right to acquire arms on behalf of [its actual and] potential customers." "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." quoting, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense "wouldn't mean much" without the ability to acquire arms).

In *Craig v. Boren*, 429 U.S. 190, 195 (1976), a beer regulator vendor was entitled to challenge alcohol regulation based on its patrons' equal-protection rights - concomitant rights of third parties that would be "diluted or adversely affected should her constitutional challenge fail and the statutes remain in force." The Supreme Court "repeatedly has recognized that such injuries establish the threshold requirements of a case or controversy mandated by Art. III." *Craig*, at 194 (cleaned up); see also, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (allowing private schools to assert parents' rights to direct the education of their children and citing "other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers"); *Drummond v. Twp.*, 361 F. Supp. 3d 466, 480 (W.D. Pa.) (would-be operators of a commercial shooting range, have standing to sue on behalf of their potential

customers), aff'd in part, vacated in part on other grounds, remanded sub nom. *Drummond v. Twp. of Robinson*, 784 F. App'x 82 (3d Cir. 2019); cf. *Forty-Second St. Co. v. Koch*, 613 F. Supp. 1416, 1422 (S.D.N.Y. 1985) (rejecting defendants' argument that movie theater companies did not have standing to assert the rights of their customers); see also, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to act as an advocate of the rights of third parties who seek access to its services); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

*Ex se intellegitur* that manufacturers and sellers of weapons and ammunition, and "the People" for whom the Second Amendment was ratified, are inextricably coupled. The People are entitled to obtain the "Arms" for which they are guaranteed the right to possess and carry.

### C.  "Individual" Right Analysis Was Not Directed Toward Manufacturers and Sellers

The State's argument is misguided and ill-informed. [State MOL at pp. 15-18]. The term "individual right" was not coined by *Heller* vis-à-vis manufacturers and sellers. The Supreme Court determined the Second Amendment protected an "individual right" from the false belief held by the District of Columbia (like New York) that the Second Amendment applied only to a collective "militia." *Heller*, at 2877 (holding that the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia). The State's position conflicts with Supreme Court precedent.

### D.  Actual and Potential Customers Are Not Just The Plaintiffs Named Herein

Mr. Newman avers that he and DSI are unable to sell or transfer any semiautomatic rifles to any of their actual and potential customers in Suffolk County because SCPD has no process for

12

Suffolk County residents to apply for or obtain a Rifle License. [Newman Dec. at ¶¶ 9-18].  The State is incorrect in its assertion that the only people harmed are the named Plaintiffs who have raised their own claims herein. [State MOL at p. 17]. But the sworn Declarations submitted in support of Plaintiffs' motion – including Dr. McGregor's - unequivocally establish that no Suffolk County residents can obtain a semiautomatic rifle from *any* FFL – whether in Suffolk County or another county. Neither the State nor Suffolk County have overcome this fact.

## IX. THE RIFLE BILL IS REPUGNANT TO THE SECOND AMENDMENT

Under the *Bruen* test, no set of circumstances exists under which the Rifle Bill would be valid. **First,** New York is <u>still</u> not a shall-issue licensing jurisdiction. The State touts *Bruen*'s nod toward shall-issue concealed carry licensing regimes. But New York **remains** a discretionary, may issue licensing regime – nothing has changed in that regard despite *Bruen*; *a fortiori*, New York's licensing regime violates the Second Amendment. **Second,** to the extent that shall-issue licensing schemes are allowed to continue, *Bruen* only addressed licensing the <u>concealed carriage of handguns</u>. The State's attempt to enlarge the Supreme Court's lenience toward a very specific and narrow category of conduct is misplaced and inappropriate. Even the State acknowledges that the *Bruen*  majority and Justice Kavanaugh's concurrence address only the concealed carriage of **handguns** – not the mere possession or purchase of handguns – and certainly not rifles. [State MOL at p. 19].

And, Plaintiffs have **no burden at all** under the *Bruen* test to "put forth any reason" why a licensing requirement to purchase rifles would offend the Second Amendment" [State MOL at p. 19] – that's not the *Bruen* test. The government **alone** must identify an historical analogue from the Founding Era [*Bruen*, at 2126], which Defendants have failed to do.[6] The only "concession"

---

[6] *States v. Saleem* from the Western District of North Carolina was limited to short-barreled rifles and short-barreled long guns, which are outlawed entirely in New York.

made by Plaintiffs is that *Bruen* allowed the continuance of (i) shall-issue licensing (ii) for the concealed carriage of handguns. Neither apply here. And *Bruen* did not contemplate rifle licensing.

### Licensing Rifles is Inconsistent with the Plain Text of the Second Amendment

Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. *Bruen*, at 2120. Even then, the regulations were limited to handguns – and even more specifically, to the public carriage of handguns. As noted by amicus Second Amendment Foundation, Founding Era licensing regulations (in a handful of southern states – certainly not a "national tradition") only applied to blacks, Indians, and persons of color – there was no licensing requirement on the rest of society. Indeed, the right of "the People" to freely possess and peaceably carry weapons is made patently clear in *Dred Scott v. Sandford*, 19 How. 393, 15 L.Ed. 691 (1857) where Chief Justice Taney "offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, ***including the right to keep and carry arms wherever they went***." *Bruen*, at 2150–51 (emphasis added).

It follows then that "the People" at the ratification – everyone who was not black, Indian, or a "person of color" - was "***entitled to keep and carry arms wherever they went***." And, because "to the extent later history contradicts what the text says, the text controls"[7], New York Penal Law sections 265.65 and 265.66 are modern day regulations contradicting the plain text of the Right.

## X.  "POST-RATIFICATION" (1791) REGULATIONS MUST BE REJECTED

### A.  Supreme Court Jurisprudence Looks to the Founding Era, Not 1868

Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, at 2136 (emphasis supplied) citing, *Heller*, at 634–635 (2008); see

---

[7] *Bruen*, at 2137.

also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the *same standards* that protect those personal rights against federal encroachment.") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied); *Bruen*, 142 S.Ct. 2111 (same). "Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now*." *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the *meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838)." [8]

Recognizing that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*," *Bruen* pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, at 2137–38 (emphasis added). Justice Thomas may have acknowledged an "ongoing scholarly debate" concerning 1868, but the *Bruen* Court adhered to Supreme Court jurisprudence, which "looks to the Founding era as the period of sole or primary relevance." Bellantoni Ex. 3 at 11-15.

---

[8] Smith, Mark W., "Not All History Is Created Equal," October 1, 2022 [Bellantoni Reply Dec. at Ex. 3 at p. 9 (emphasis supplied). Professor Smith's biography can be found here: https://www.tkc.edu/people/mark-w-smith/

Professor Smith goes on to discuss just a few of the "numerous cases involving all of the amendments in the Bill of Rights that have been incorporated" in which the Founding Period was the temporal focal point, *not* when the amendments were incorporated into the Fourteenth Amendment in 1868. [Bellantoni Ex. 3 at 17-30 discussing First Amendment: *Near v. Minnesota*, 283 U.S. 697 (1931)*, Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); Fourth Amendment: *Wyoming v. Houghton*, 526 U.S. 295 (1999), *Wilson v. Arkansas*, 514 U.S. 927 (1995): Fifth Amendment: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); Sixth Amendment: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); Eighth Amendment: *Timbs v. Indiana*, supra.].

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding." The intention was to ensure that newly freed slaves had the same right to possess and carry firearms as citizens in general and prevent their disarmament by the states. [Bellantoni Ex. 3 at 42-45, discussing the debates leading to the Freedmen's Bureau Act and the Civil Rights Act of 1866].

**B. No Supreme Court Cases Look to 1868 to Interpret the Bill of Rights**

Professor Smith "has not found, and litigants in post-*Bruen* litigation have not pointed to, a single Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or meaning of a provision of the Bill of Rights." [Bellantoni Ex. 3 at p. 27]. The State's witness –

Robert Spitzer, fails to identify <u>any</u> Supreme Court Case that looks to 1868. Indeed, the Bill of Rights does not have one meaning at its ratification but another, different meaning in 1868. This Court is constrained to follow *Bruen* and adhere to Supreme Court jurisprudence for interpreting the Bill of Rights.[9] The 1868 theory "candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights." [Bellantoni Ex. 3 at 46].

"But the Supreme Court has held on numerous occasions that, whether we define the right as it existed in 1791 or in 1868, the right is the same against the federal government and the states alike. *Douglass v. Nippon*, at 245. "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the *same scope* as against the Federal Government." *Ibid.* (emphasis supplied) quoting *Bruen*, at 2137 citing, *Ramos v. Louisiana*, 590 U.S. ——, ——, 140 S.Ct. 1390 (2020) ("This Court has long explained ... that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government.") (emphasis added); *Timbs v. Indiana*, 586 U.S. ——, ——, 139 S.Ct. 682, 203 L.Ed.2d 11 (2019) ("[I]f a Bill of Rights protection is incorporated, there is *no daylight* between the federal and state conduct it prohibits or requires.") (emphasis supplied); *Malloy v. Hogan*, 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.") (quotations omitted). *Douglass*, at 245.

---

[9] "Lower court judges don't have license to adopt a cramped reading of a case in order to functionally overrule it." *Douglass*, at 246, quoting, *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116 (9th Cir. 2020). As Justice Kennedy has stated, courts are bound to adhere not only to results of cases, but also to their explications of the governing rules of law. *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., dissenting); see also *Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013) (Lower courts are bound and are without authority to "reinterpret" the Supreme Court's binding precedent).

### C.  The State and Spitzer's Post-Ratification Regulations Must Be Rejected

The Supreme Court has "[n]ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."[10] *McDonald* made clear that the Supreme Court "decades ago abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *McDonald*, at 785–86. Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.,* at 765 (internal quotation marks omitted). [Bellantoni Ex. 3 at 7-8].

"But to the extent later history contradicts what the text says, the text controls. *Bruen*, at 2137.

The regulations identified by the State and its witness Robert Spitzer were enacted in the late-1800s and into the 20th century; and many only regulate the carriage of handguns, fireworks/firing guns/ranges, or 'commercial licensing', which have nothing to do with the claims herein. [Spitzer at pp. 7-24].

But "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (citation omitted). "As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, at 2137 citing, *Heller*, at 614.

---

[10] Bellantoni Ex.3 at 3.

18

Plaintiffs' likelihood of success on the merits is substantial – the State has failed to identify any historical tradition justifying the criminalization of conduct protected by the Second Amendment or the licensing of rifles in common use – discretionary or otherwise.

## XI.  NYSP GUIDELINES DO NOT ALTER THE PLAIN LANGUAGE OF THE STATUTE

The NYSP cannot override the plain language of a criminal statute. No language of 265.65 or 2675.66 restricts penalized conduct to a "transfer of ownership." The State has made clear, "without the Rifle Law, these dangerous weapons may end up in the wrong hands" [State MOL at p. 25], a fear consistent with the statutory language prohibiting anyone from "taking possession", "giving", "exchanging", and "disposing" of a semiautomatic rifle – a change in "ownership" is not required under the statute.

However, if that is the interpretation reached by this Court, Plaintiffs request a judicial declaration that Penal Law § 265.65 and 265.66 do not criminalize the temporary use, giving, taking possession of, exchanging, and possession of a semiautomatic rifle to and/or from individuals who do not hold a Rifle License.

## XII. PUBLIC INTEREST FAVORS AN INJUNCTION

Never before in New York State have rifles been subject to a discretionary licensing scheme or any licensing at all. Shotguns (semiautomatic, pump action, break action, etc.) and non-semiautomatic rifles (break action, lever action, pump action, bolt action) remain unlicensed even after the enactment of the Rifle Bill. The Rifle Bill has ground Second Amendment protected activity to a halt for Suffolk County residents. The public interest  favors  the  adherence to and exercise of all constitutionally protected rights, including the Second  and Fourteenth Amendments because "it is always in the public interest to prevent the violation of a person's constitutional

rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, ––– U.S. –––, 134 S.Ct. 2751 (2014).

Gen. Bus. Law § 898 already covered the State's public safety "fears" [State MOL at p. 25] by requiring every sale, exchange, and disposal of a rifle, shotgun, and/or handgun in New York State proceed through an FFL and only after a NICS background check. The Rifle Bill harms the public by placing commonly used rifles under the discretion of a government official in a may-issue licensing scheme – entirely inconsistent with the plain text of the Second Amendment.

## CONCLUSION

Plaintiffs' motion should be granted in its entirety.

Dated: May 15, 2023
      Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By:     *Amy L. Bellantoni*
      Amy L. Bellantoni (AB3061)
      2 Overhill Road, Suite 400
      Scarsdale, New York 10583
      abell@bellantoni-law.com