# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MICHAEL MCGREGOR**, *et al.*, | : |
| Plaintiffs, | : Case No.: |
| v. | : 2:23-cv-01130(GRB)(ARL) |
| **SUFFOLK COUNTY, NEW YORK**, *et al.*, | : |
| Defendants. | : |

## AMICUS BRIEF OF THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

Edward Andrew Paltzik
Andrew Bochner
Serge Krimnus
BOCHNER IP, PLLC
295 Madison Avenue, 12th Floor
New York, NY 10017
(516) 526-0341
edward@bochnerip.com

Adam Kraut
SECOND AMENDMENT FOUNDATION
12500 N.E. Tenth Place
Bellevue, WA 98005
(800) 426-4302
AKraut@SAF.org

*Counsel for Amicus Curiae*
SECOND AMENDMENT FOUNDATION

May 24, 2023

# CORPORATE DISCLOSURE STATEMENT

The Second Amendment Foundation has no parent corporations. It has no stock; hence no publicly held company owns 10% or more of its stock.

Table of Contents

**CORPORATE DISCLOSURE STATEMENT** ..................................................................i
**INTEREST OF AMICUS CURIAE** ........................................................................ 1
**INTRODUCTION** ...................................................................................................... 2
    I.      **The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791** ............. 2
    II.    **The Historical Analogues** ........................................................................ 6
        *a.*   *Founding Era* ......................................................................................... 7
        *b.*   *Pre-Civil War 19th Century Laws* ....................................................... 8
        *c.*   *Post-Civil War 19th Century Laws* .................................................. 10
        *d.*   *The How and the Why* ....................................................................... 11
**CONCLUSION** ....................................................................................................... 13

# Table of Authorities

**Cases**

*Brown v. Bd. of Ed. Of Topeka*, 347 U.S. 483 (1954) ..................................................... 11

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................... 2, 3, 6, 8

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) ........................................................................ 6

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ....................... 4, 6

*Furman v. Georgia*, 408 U.S. 238 (1972) ............................................................................. 4

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ............................................................... 3

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ............................................................................. 3

*Marsh v. Chambers*, 463 U.S. 783 (1983) ........................................................................... 4

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................................... 5

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ................................................................................................................................... passim

*United States v. Watson*, 423 U.S. 411 (1976) ................................................................... 3

*Virginia v. Moore*, 553 U.S. 164 (2008) .............................................................................. 5

**Statutes**

1804 Miss. Terr. Laws 90-91 .................................................................................................. 7

**Other Authorities**

*Smith, Mark W., Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022) ...................... 2

**State Law Compendia**

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE, vol. 1 (2d ed. 1814) ............. 7

A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE LAWS OF A PUBLIC AND GENERAL NATURE, IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY 1833 (John G. Aikin ed., 2d. ed. 1836) ................. 8

A DIGEST OF THE STATUTE LAW OF KENTUCKY, vol. 2 (William Little & Jacob Swigert eds., 1822) ........................................................................................................................ 8

ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA PASSED AT THE SESSIONS OF 1864-65 (1866) .............................................................................................. 12

Geyer, Henry S., A DIGEST OF THE LAWS OF THE MISSOURI TERRITORY (1818) ........... 10

Iredell, James, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR 1846, INCLUSIVE (1847) ...... 10

LAWS OF THE STATE OF MISSISSIPPI, PASSED AT THE REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865 (1866) .................................................................................... 12

Sheperd, Samuel, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806 (1836) .................................................................. 9

THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION (1866) ............................................................................... 12

THE REVISED STATUTES OF THE STATE OF MISSOURI, REVISED AND DIGESTED BY THE EIGHTEENTH GENERAL ASSEMBLY, DURING THE SESSION OF ONE THOUSAND EIGHT HUNDRED AND FIFTY-FOUR AND ONE THOUSAND EIGHT HUNDRED AND FIFTY-FIVE, vol. 2 (Charles H. Hardin ed., 1856) ........................................................................ 11

# INTEREST OF AMICUS CURIAE

The Second Amendment Foundation, Inc., ("SAF") is a non-profit membership organization founded in 1974 with over 720,000 members and supporters, in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms. SAF has an intense interest in this case because it has many members who reside in the State of New York, including Suffolk County, who are prevented from purchasing semiautomatic rifles due to the indefinitely long delay presented by the County's backlog of application processing and burdens associated with the application process.

**INTRODUCTION**

The State of New York's requirement to obtain a "rifle license" before an individual may acquire a semiautomatic rifle is repugnant to the plain text of the Second Amendment and this nation's history and tradition. This brief serves to provide two important points for this Court's consideration. First, an overview of the relevant historical period that this Court must examine in determining whether there are any historical analogues the State Defendants may draw upon to justify the license requirement. After the relevant period is established, this brief will then explore the relevant history and metrics that the State Defendants may use to justify the license and why those are not enough to save the license requirement.

**I. The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791**

For this Court to properly apply the test spelled out in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), it is imperative that it look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Defendants may rely upon to justify their rifle license. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* at 2136 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008))(emphasis in *Bruen*). The Second Amendment was adopted in 1791. *See generally* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868,* HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), *available at* https://bit.ly/42BmRX3.

While the State Defendants direct this Court to look at a litany of laws, most adopted in the nineteenth century and beyond, to justify its rifle license, State Def. Br., ECF Doc. 21 at 20-24, the Supreme Court has already dismissed such as improper. Moreover, as explained further *infra*, two metrics to apply when undertaking the historical analogue analysis are "how and why" the regulations burden the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2133.

To begin, Supreme Court precedent has made clear that with respect to the federal government, 1791 is the proper period for interpreting the Bill of Rights. *See, e.g.*, *Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (The Second Amendment's "meaning is fixed according to the understandings of those who ratified it."); *United States v. Watson*, 423 U.S. 411, 421 (1976) (citing the Second Congress's understanding and grant of arrest powers for a felony without a warrant to federal marshals as consistent with the Fourth Amendment)*; cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). Of course, New York is not the federal government, but that is of no concern as it relates to this analysis.

Undoubtedly, proponents of firearms regulations would prefer that this Court, and others, look to 1868 as the guidepost for interpretations of the relevant

3

history. But that is improper because "when it comes to interpreting the Constitution, *not all history is created equal.*" *Bruen*, 142 S. Ct. at 2137. (emphasis added). "[I]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id*. (internal citations omitted). "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. Indeed, the Court has done more than assume this proposition. In *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), for example, the Court rejected the relevance for interpreting the Free Exercise Clause of *more than 30* state-law provisions barring aid to religious schools enacted in the second half of the 19th Century, *id*. at 2258–59. That evidence, the Court held, came too late to create an "early practice" that would inform the meaning of the Free Exercise Clause, *id* at 2259. *See also Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983) (discussing prayer before legislative sessions and referencing practices of the First Continental Congress, First Congress, Senate and House Committees, and payment of Chaplains to perform such services just three days prior to the agreement on the language of the Bill of Rights); *Furman v. Georgia*, 408 U.S. 238, 319-20 (1972) (tracing history of the Founder's understanding of cruel and unusual punishment from English law through the adoption of the Eighth Amendment); and *Virginia v. Moore*, 553 U.S. 164, 168

4

(2008) (discussing that the Court looks "to the statutes and common law of the founding era to determine the norms that the Fourth Amendment" protects).

While Defendants may prefer to rely on history from a later period, there is no basis in the caselaw for that preference. In *McDonald*, the Court was exactingly clear when it stated that it has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (internal quotation marks omitted). And of course, this makes sense. To find that the 1868 understanding controls and that the meaning of the Bill of Rights provision is the same against the states and the federal government, a court would necessarily need to conclude that adopting the Fourteenth Amendment and extending Bill of Rights protections to the states somehow also changed the meaning of those protections when applied to the federal government. This would be counterintuitive and lacks support in precedent. *See Bruen*, 142 S. Ct. at 2163 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.") (Barrett, J., concurring).

No matter which path one travels, all roads lead to 1791. Having set the stage for the proper historical period, attention must be turned to this nation's history and tradition of firearms regulation.

5

## II. The Historical Analogues

Because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126.

To be sure, there were a handful of colonial, founding era, and 19th Century laws which required the licensing of an individual to acquire/possess firearms. But those laws were systemically racist in nature and applied to a small subset of individuals who were persons without recognized rights and would never withstand constitutional scrutiny today. The Second Amendment refers to a right of "the people" to keep and bear arms without mentioning race. U.S. CONST. amend. II. The "normal and ordinary meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581. And to be sure, the text is devoid of any mention of a requirement that government give its permission so that an individual may exercise this right. Unfortunately, at earlier times in our Nation's history members of certain groups were not considered part of "the people" who enjoyed the protections of our Constitution. *See, e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393 (1857). Bigoted laws that resulted from those now-rejected views should be condemned, not used as a basis for modern-day legislation. They "hardly evince a tradition that should inform our understanding" of the Second Amendment. *Espinoza*, 140 S. Ct. at 2259.

6

*a. Founding Era*

A survey of Founding Era licensing laws reveals an inconvenient truth. These laws applied only to slaves, freedmen, and Indians, which were commonly understood to be outside the scope of "the people." *See Bruen,* 142 S. Ct. at 2150-51 (Describing Justice Taney's "parade of horribles that would result from recognizing free blacks were citizens of the United States," including the right "to keep and carry arms *wherever they went*.").

Virginia's 1792 law provided that "[n]o negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive" with an exception that freed "negro[es] or mulatto[es] being a house-keeper, may be permitted to keep one gun…and all negros and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns…by license from a Justice of Peace of the County wherein the plantation lies…" 1 A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE 263 (2D ED. 1814). Kentucky passed a law in 1798, similar in nature, but also included Indians as a group which could not keep firearms unless they were a house-keeper or by license of the justice of the peace. 2 A DIGEST OF THE STATUTE LAW OF KENTUCKY 1150 (William Little & Jacob Swigert eds., 1822).

Just after the turn of the century, Mississippi enacted a law that allowed a justice of the peace to grant "permission in writing, to any slave, on application of his master, or overseer to carry and use a gun…within his said master's or owner's

plantation…" 1804 Miss. Terr. Laws 90-91. Alabama followed suit with a similar law the following year, which allowed a justice of the peace to grant a slave, on application of his master or overseer, permission to use a gun. A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE LAWS OF A PUBLIC AND GENERAL NATURE, IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY 1833, at 391 (John G. Aikin ed., 2d. ed. 1836).[1] In 1806, Virginia law required a license to keep "any fire-lock of any kind" or "any military weapon" for every freed "negro or mulatto". 3 SAMUEL SHEPERD, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, at 274 (1836).

Justification for New York's licensing regime cannot be found in a handful of discriminatory laws that targeted individuals who were not protected by the Second Amendment.

  b. *Pre-Civil War 19th Century Laws*

Pre-Civil War 19th Century history lends no favors to New York's licensing regime as it is the *public's understanding* of the right after its ratification that informs the correct interpretation. *Heller*, 554 U.S. at 605. "[T]o the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137. In any event, the laws from this period do not contradict the earlier history—they

---

[1] Amicus believes these two laws are of little utility in lending themselves to a historical inquiry, as they deal with the use and not possession of a firearm but include them in an abundance of caution and to highlight the consistent theme that certain groups of individuals were selected for inclusion in these licensing schemes based on nothing more than race.

8

likewise only required licenses for individuals who were not, at the time, considered to be part of the national community covered by "the people" in the Amendment.

In 1818, Missouri enacted a law that prohibited any "slave or mulatto" from "keep[ing]…a gun…" with the same exceptions as found in Virginia's 1792 law – "housekeeper[s]" and those who were "bond or free, living at any frontier plantation" having obtained a "license from the justice of the peace." Henry S. Geyer, A DIGEST OF THE LAWS OF THE MISSOURI TERRITORY 374 (1818).

Fourteen years later, in 1832, Delaware passed a law that allowed a "free negro or free mulatto" to "have use and keep in his possess[ion] a[] gun…" if a justice of the peace issued a license based on the written certificate of "five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun…" 8 LAWS OF THE STATE OF DELAWARE 208 (1841).

Similar laws requiring the licensing of "negros," "mullatoes," and "persons of color" were enacted by North Carolina in 1841 and Missouri in 1845. James Iredell, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR 1846, INCLUSIVE 73 (1847), 2 THE REVISED STATUTES OF THE STATE OF MISSOURI, REVISED AND DIGESTED BY THE EIGHTEENTH GENERAL ASSEMBLY, DURING THE SESSION OF ONE THOUSAND EIGHT HUNDRED AND FIFTY-FOUR AND ONE THOUSAND EIGHT HUNDRED AND FIFTY-FIVE 1094 (Charles H. Hardin ed., 1856).

As time wears on, the laws adopted mirror less of the public's understanding at the time of the ratification. In any event, as evidenced by the laws enacted pre-Civil War but post-ratification, none of the laws implement any licensing scheme against those considered to be "the people."

    *c. Post-Civil War 19th Century Laws*

Straying further in time from the ratification of the Second Amendment, more licensing laws were established after the Civil War, with the continuing theme of inherent discrimination against "negros," "mullatoes," and "persons of color."

In 1865, South Carolina enacted a law that prevented "[p]ersons of color…without permission in writing from the District Judge or Magistrate, [from] keep[ing] a fire-arm…" ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA PASSED AT THE SESSIONS OF 1864-65, at 275 (1866). That same year, Florida passed a law reminiscent of Delaware's 1832 law, which made it unlawful for a "negro, mulatto, or other person of color to own, use or keep in his possession or under his control, any…fire-arms…" without a license from the Judge of Probate having had the "recommendation of two respectable citizens of the county certifying the peaceful and orderly character of the applicant." THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION 25 (1866). Mississippi also enacted a law that precluded any "freedman, free negro or mulatto" from keeping firearms unless they obtained a license from "the board of police." LAWS OF THE STATE OF MISSISSIPPI, PASSED AT THE REGULAR SESSION OF THE

MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865, at 165 (1866).

These laws, targeted at curtailing the rights of free people of color are better evidence of the *unconstitutionality* of the present restrictions than they are informative about the proper scope of the Second Amendment. *See Brown v. Bd. of Ed. Of Topeka*, 347 U.S. 483, 489 (1954) (noting that opponents of the Civil War amendments "just as certainly, were antagonistic to both the letter and spirit of the Amendments and wished them to have the most limited effect"). Licensing laws after those discussed here continued to be passed, even after the federal government stepped in to put an end to the overtly racist nature of them. As Plaintiffs recount in their Memorandum of Law in Support of Plaintiffs' Application for a Preliminary Injunction, ECF Doc. 6-10, at 14, Florida's 1893 law requiring owners of Winchester or other repeating rifles to obtain a license from the county commissioners, while racially neutral, was racist in application and purpose.

### d. *The How and the Why*

*Bruen* guides the analysis for useful analogues to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. Put simply, does today's modern regulation impose a comparable burden on the right to armed self-defense? In this context, the answer is a resounding no.

To obtain a license in Suffolk County, an individual must submit an application, their mental health history, obtain four affidavit of character references

that must be filled out in full and notarized by the character reference, have their fingerprints taken, include two passport style photos, provide a copy of their birth certificate or current US passport, and pay a fee totaling $98.25.[2] Similarly, the Suffolk County Police Department charges the same amount, but waives their fee for "retiring Peace Offices and Police Officers".[3] Even after complying with the onerous requirements of the permitting process, the Suffolk County Sheriff's Office's FAQ states that one should "expect it to take a *minimum* of six (6) to seven (7) months from the time of the application until a license is either granted or denied."[4]

This modern-day licensing regime is a far cry from those enacted from the time of the founding through the tail end of the 19th Century. No such licensing was required for anyone that was not an "Indian, Negro, Mulato, or Person of Color" until Florida passed its "neutral" in name but not in fact licensing law in 1893. And to be sure, 1893 is far beyond a time which can inform this Court of what would have been a compatible practice with the public's understanding of the scope of the right.

Even if one were to conclude that the "how" is similar – and it is not – the "why" remains uncompelling. Historically, the "why" was not based on some desire to ensure the entire population sought and received permission from the government to keep arms. The "why" was couched entirely in terms of prevent

---

[2] https://www.suffolkcountysheriffsoffice.com/pistol-licensing (last visited May 9, 2023).
[3] https://suffolkpd.org/Precincts-and-Specialized-Units/Specialized-Units/Pistol-License-Bureau/Pistol-License-Fees (last visited May 9, 2023).
[4] https://www.suffolkcountysheriffsoffice.com/pistol-licensing (last visited May 9, 2023). (emphasis added).

specific subsets of the population, who were not considered to be protected by the Second Amendment *at all*, based solely on their race, from obtaining arms without a license in an effort to ensure that those groups remained subservient and/or unthreatening by virtue of their inability to openly acquire arms absent permission.

New York's requirement that an individual obtain a license prior to acquiring a long gun is simply incompatible with the text of the Second Amendment as informed by this nation's history and tradition.

**CONCLUSION**

For these reasons, this Court should grant the Plaintiffs' Application for a Preliminary Injunction.

DATED: May 24, 2023

Respectfully submitted,

/s/ Edward Andrew Paltzik
Edward Andrew Paltzik
Adam Kraut
Andrew Bochner
Serge Krimnus
295 Madison Avenue, 12th Floor
New York, NY 10017
(516) 526-0341
edward@bochnerip.com

Adam Kraut
SECOND AMENDMENT FOUNDATION
12500 N.E. Tenth Place
Bellevue, WA 98005
(800) 426-4302
AKraut@SAF.org

*Counsel for Amicus Curiae*
SECOND AMENDMENT FOUNDATION