UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MICHAEL MCGREGOR, ZACHARY GIAMBALVO,
PAUL FELICE, MATTHEW OLIVIERI, EDWARD
NEWMAN, and DARK STORM INDUSTRIES, LLC,

                              Plaintiffs,

                    -against-                              Case No.: 2:23-CV-01130

                                                          (Brown, J.)(Lindsay, M.J.)

SUFFOLK COUNTY, New York, Police Commissioner
RODNEY HARRISON, in his Official Capacity, and
Individually, MICHAEL KOMOROWSKI, Individually,
and Acting Superintendent STEVEN G. JAMES,
in his Official Capacity,

                              Defendants.
-------------------------------------------------------------------X


# DEFENDANT SUPERINTENDENT JAMES'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT


                              LETITIA JAMES
                              Attorney General of the
                                    State of New York
                              300 Motor Parkway, Suite 230
                              Hauppauge, New York   11788
                              (631) 231-2424



PATRICIA M. HINGERTON
ROBERT E. MORELLI
       OF COUNSEL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................2

STANDARD OF REVIEW ..............................................................................3

ARGUMENT ..................................................................................................4

POINT I: THE COURT LACKS JURISDICTION TO GRANT CERTAIN RELIEF
AS AGAINST THE SUPERINTENDENT .....................................................4

    A. Eleventh Amendment Immunity Bars Plaintiffs' Claims for Damages ..........5

    B. McGregor Lacks Standing to Bring Any Claims Against the
       Superintendent ....................................................................................5

    C. The Remaining Plaintiffs Lack Standing to Bring a Challenge to the
       Purported Registration Requirement for Semiautomatic Rifles
       Against the Superintendent ...................................................................7

POINT II: PLAINTIFFS DARK STORM AND NEWMAN HAVE NO VIABLE
SECOND AMENDMENT CLAIM ..................................................................8

    A. Regulations of the Commercial Sale of Firearms Do Not Burden the
       Second Amendment Rights of Individuals .............................................9

    B. Dark Storm and Newman Have Not Made the Requisite Showing to
       Derivatively Assert their Customers' Second Amendment Rights ...............12

POINT III: THE RIFLE LAW IS CONSTITUTIONAL .................................14

    A. Plaintiffs Bring a Disfavored Facial Challenge .............................14

    B. This Pre-Discovery Facial Challenge Must Be Resolved As a Pure
       Question of Law ..............................................................................15

    C. The Rifle Law is a Presumptively Constitutional Shall-Issue Licensing
       Statute ..........................................................................................16

    D. The Rifle Law is Supported By the Nation's History and Tradition of
       Firearm Regulation ..........................................................................19

CONCLUSION ...........................................................................................24

**TABLE OF AUTHORITIES**

**Cases**

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)……………………………………18, 19, 22

*B&L Prods. v. Newsom*, __ F.4th __, 2024 U.S. App. LEXIS 14144
(9th Cir. June 11, 2024)………………………………………………………………………10

*Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198 (E.D.N.Y. 2015)……………..……...3-4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………..4

*Conn. Citizens Def., League, Inc. v. Thody*, No. 23-724,
2024 U.S. App. LEXIS 1056 (2d Cir. Jan. 17, 2024)…………………………………………..6

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
664 F. Supp. 3d 584 (D. Del. 2023)…………………………………………………………11

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………….……..9, 10, 11, 12, 20

*Duse v. IBM Corp.*, 252 F.3d 151 (2d Cir. 2001)………..……………………………..4

*Frey v. Nigrelli*, 661 F. Supp. 3d 176 (S.D.N.Y. 2023)………………………………...16, 20

*Gazzola v. Hochul*, 645 F. Supp. 3d 37 (N.D.N.Y. 2022)……………………………………..9-10

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)……………………………….……7-10, 12-13

*Giambalvo v. Suffolk County*, 656 F. Supp. 3d 374 (E.D.N.Y. 2023)………………..9, 16, 18-19

*Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023)………………………….21

*Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023)…………………………….11

*Hollingsworth v. Perry*, 570 U.S. 693 (2013)…………………………………………...6

*Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178 (2d Cir. 2017)………………………14

*Kentucky v. Graham*, 473 U.S. 159 (1985)………………………………………….......5

*Kleinknecht v. Ritter*, No. 19 Civ 5760, 2024 U.S. Dist. LEXIS 36368
(E.D.N.Y. Mar. 1, 2024)……………………………………………………...……15-16

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996)…………………………………….4

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)…………………………………………5

## Cases

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)……………………………………….....11

*McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024)………………………………………...17

*Neary v. Weichert*, 489 F. Supp. 3d 55 (E.D.N.Y. 2020)……………………...…………..….8

*N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 U.S. Dist. LEXIS 80568
(W.D.N.Y. May 2, 2024)…………………………………………………………………...16

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022)…………………………………………………1, 9, 11, 13, 16-17, 19, 20

*NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)…………………………………………...14

*NRA v. Hochul*, No. 20-318, 2021 U.S. App. LEXIS 33909
(2d Cir. Nov. 16, 2021)………………………………………………………………………...5

*Oakland Tactical Supply, LLC v. Howell Twp.*, __ F.4th __, 2024 U.S. App.
LEXIS 13142 (6th Cir. May 31, 2024)………………………………………………………..10

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024)…………………………19

*Or. Firearms Fed., Inc. v. Brown*, 644 F. Supp. 3d 782 (D. Or. 2022)………………………17-18

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)………………………………5

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)……………………………………………………5

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)……………………………………10

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017)………………………………5

*United States v. Austin*, No. 22 Cr. 435, 2024 U.S. Dist. LEXIS 67540
(S.D.N.Y. Apr. 11, 2024)……………………………………………………………….......10-11

*United States v. Head*, 2024 U.S. Dist. LEXIS 90882 (N.D. Ill. May 21, 2024)………………..15

*United States v. Mayfield*, No. 22 Cr. 31, 2024 U.S. Dist. LEXIS 25643
(S.D. Miss. Feb. 14, 2024)……………………………………………………………….10-11

*United States v. Rahimi*, 602 U.S. __, 2024 U.S. LEXIS 2714
(U.S. June 21, 2024)……………………………………………………...…2, 14, 19-20, 24

*United States v. Saleem*, 659 F. Supp. 3d 683 (W.D.N.C. 2023)…………….…………………18

*Vidal v. Elster*, 602 U.S. __, 2024 U.S. 2605 (U.S. June 13, 2024)…………………………20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)…………………14

*Vt. Right to Life Comm. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014)…………………………...14-15

**Constitutional Amendments, Statutes, and Rules**

18 U.S.C. § 922(d)………………………………………………………………………10

2022 N.Y. Laws ch. 212……………………………………………………………………1-2

Conn. Gen. Stat. § 29.37p……………………………………………………………...17

Fed. R. Civ. P. 56…………………………………………………………………………..4

Haw. Rev. Stat. § 134-1……………………………………………………………………17

Haw. Rev. Stat. § 134-2……………………………………………………………………17

430 Ill. Comp. Stat. Ann. § 65/2…………………………………………………………17

Mass. Gen. Laws. Ann. § 131E……………………………………………………………17

Mich. Comp. Laws § 28.422………………………………………………………………17

N.J. Stat. Ann. § 2C:58-3…………………………………………………………………17

N.Y. Penal Law § 265.00………………………………………………………………3, 7-8

N.Y. Penal Law § 400.00………………………………………………………………2, 18

N.Y. Penal Law § 400.01………………………………………………………………3, 8

N.Y. Penal Law § 400.30…………………………………………………………………8

U.S. Const. Amend. II……………………………………………………………………..9

Wash. Rev. Code § 9.41.090………………………………………………………………17

**Other Authorities**

Federal Bureau of Investigation, *NICS Firearm Background Checks: Month/Year by State*, https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state.pdf……........13

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Probs. 55, 69 (2017)……………………………………………………21

Defendant Steven G. James, sued in his official capacity as Superintendent of the New York State Police (the "Superintendent"), respectfully submits this memorandum of law, along with his accompanying Local Civil Rule 56.1 Statement ("S56.1"), and the annexed declarations, in opposition to the motion for summary judgment filed by plaintiffs Michael McGregor, Zachary Giambalvo, Paul Felice, Matthew Olivieri, Edward Newman, and Dark Storm Industries, LLC ("Dark Storm," and collectively, "Plaintiffs"), and in support of the Superintendent's cross-motion for summary judgment. For the reasons set forth below, this Court should find as a matter of law that New York's licensing requirement for semiautomatic rifles is constitutional.

## PRELIMINARY STATEMENT

Plaintiffs bring a facial, pre-enforcement constitutional challenge to Senate Bill 9458, 2022 N.Y. Laws ch. 212 (the "Rifle Law"), which requires a license for the purchase of semiautomatic rifles, and have moved for summary judgment on their claim.[1] The Supreme Court has routinely expressed that governments can require persons to obtain a license in order to carry a weapon—including a weapon in common use. The Rifle Law represents a form of "shall-issue" licensing endorsed by the Supreme Court and it is fully "consistent with the Nation's historical tradition of firearm regulation." *NYSRPA v. Bruen*, 597 U.S. 1, 24 (2022). History and tradition in the Founding Era, the Fourteenth Amendment Era, and beyond demonstrate that our forebears were quick to enact licensing and registration requirements for firearms once those weapons began to pose a threat to Americans and the public at large. Similarly, when long guns akin to modern semiautomatic rifles appeared in society and began to present a public safety threat, states were

---

[1] Although Plaintiffs also challenge Suffolk County's procedures related to the implementation of the Rifle Law and licensing of such rifles, the Superintendent has no knowledge of, or control over, Suffolk County's procedures, and takes no position as to whether or not those procedures comply with state and/or federal law. *See* Declaration of Michael Deyo ("Deyo Decl."), ¶ 2. Moreover, any potential claim based on Suffolk County's procedures would not be traceable to the Superintendent. See Point I(C), infra. This memorandum of law, which is being filed before any discovery has taken place, accordingly addresses the facial constitutionality of the Rifle Law.

not hesitant to impose licensing requirements. Particularly after the Supreme Court's recent decision in *United States v. Rahimi*, which emphasizes that the Second Amendment is not "a law trapped in amber," 602 U.S. __, 2024 U.S. LEXIS 2714, at *16 (U.S. June 21, 2024), the constitutionality of rifle licensing is well-supported by law and history.

Before addressing the constitutionality of the Rifle Law, however, this Court should dismiss certain of Plaintiffs' claims on jurisdictional and justiciability grounds. First, the Court lacks subject matter jurisdiction over all claims seeking damages from the Superintendent, all claims by McGregor, and any claim concerning the registration of semiautomatic rifles. Second, Dark Storm and Newman do not have a constitutionally-protected right under the Second Amendment to sell firearms commercially. Nor have Dark Storm and Newman made the showing necessary to establish an infringement of their customers' Second Amendment rights. Thus, even though Plaintiffs have moved for summary judgment in their own favor, their motion should be denied, and the Superintendent's cross-motion granted.

## STATEMENT OF FACTS

The Rifle Law was enacted in June 2022, prior to the Supreme Court's decision in *Bruen*. *See* S56.1 ¶ 1; 2022 N.Y. Laws ch. 212. Under the Rifle Law, anyone seeking to take ownership of a semiautomatic rifle must obtain either a semiautomatic rifle license or a semiautomatic rifle endorsement on an existing pistol license. *See* S56.1 ¶ 2. The application process for a semiautomatic rifle license is functionally identical to the application for a license to possess a pistol or revolver, and subject to the same standards. *See* N.Y. Penal Law § 400.00(1), (3). As of June 27, 2024, approximately 14,384 new firearm licenses that include the authority to purchase/possess semiautomatic rifles were issued statewide, and of this number, approximately 500 were issued in Suffolk County. S56.1 ¶ 8. In addition, there were approximately 26,801

firearm license amendment transactions statewide that involve licenses which include the authority to purchase/possess semiautomatic rifles, and of this number, approximately 381 such transactions were in Suffolk County. *Id.* ¶ 9.

In New York State, licensing is done at the local level: investigations of license applications are conducted "by the duly constituted police authorities of the locality where such application is made," *id.* § (4), and licensing decisions are made by a statutorily-defined "licensing officer," which is a police commissioner or sheriff in New York City and Long Island, and a locally-based state judge elsewhere. *Id.* § (1); *see* N.Y. Penal Law § 265.00(10). In Suffolk County, the licensing officer is "the sheriff of that county" or, in the towns of Babylon, Brookhaven, Huntington, Islip, and Smithtown, "the commissioner of police of that county." N.Y. Penal Law § 265.00(10).

The Superintendent of State Police has a limited role in the licensing process, for instance approving the permit application form, N.Y. Penal Law § 400.00 § (3)(a); maintaining a database of issued licenses, *id.* § (5)(a); setting up the online form for periodic recertification, *id.* § (10)(b); and approving the curriculum of the required firearms safety course, *id.* § (19). Accordingly, Superintendent James does not make decisions on Suffolk County license applications; he serves as licensing officer only for retired sworn members of the Division of State Police. S56.1 ¶¶ 4–7; N.Y. Penal Law § 400.01(1); *see also* Deyo Decl. ¶ 2. Superintendent James has no knowledge or control over the policies and procedures of the Suffolk County Police Department. S56.1 ¶ 7; *see* Deyo Decl. ¶ 2.

## STANDARD OF REVIEW

"Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015) (Brown, M.J.) (*purgandum*). "A fact is material

if it might affect the outcome of the suit under governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 211–12. "The moving party bears the initial burden of establishing the absence of any genuine issue of material fact." *Id.* at 212.

A defendant moving for summary judgment on the merits of a substantive claim is not required to submit evidence negating a plaintiff's claim, but to make a prima facie case by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A defendant is entitled to summary judgment if the undisputed facts reveal an absence of sufficient proof as to any essential element of a claim. *See Duse v. IBM Corp.*, 252 F.3d 151, 158 (2d Cir. 2001). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion" will not defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). The nonmoving party must "go beyond the pleadings, and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

## ARGUMENT

## POINT I:  THE COURT LACKS JURISDICTION TO GRANT CERTAIN RELIEF AS AGAINST THE SUPERINTENDENT

Initially, summary judgment must be granted to the Superintendent with respect to certain aspects of Plaintiffs' Amended Complaint ("AC"), as the Court lacks subject matter jurisdiction to grant Plaintiffs relief on those issues.

### A. **Eleventh Amendment Immunity Bars Plaintiffs' Claims for Damages**

To the extent that Plaintiffs seek "nominal damages against Defendants," which presumably would include the Superintendent, *see* AC at 29, any such claim is barred by the Eleventh Amendment to the United States Constitution. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity). Plaintiffs' decision to only seek "presumed nominal damages," AC at 29, does not change this governing law. *See NRA v. Hochul*, No. 20-3187, 2021 U.S. App. LEXIS 33909, at *4 (2d Cir. Nov. 16, 2021) (summary order) (affirming dismissal of gun group's "claim for nominal damages . . . on the ground that it is barred by Eleventh Amendment sovereign immunity.").

### B. **McGregor Lacks Standing to Bring Any Claims Against the Superintendent**

Unless a plaintiff has Article III standing, a court lacks subject matter jurisdiction to hear his claim. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). To show Article III standing, a plaintiff bears the burden of establishing three "irreducible constitutional minimum" elements. *Id.* at 560. The plaintiff must have (1) suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* at 560 (internal quotation marks and citations omitted); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

At present, McGregor lacks any injury-in-fact, as he now possesses a rifle endorsement on his handgun license, Plaintiffs' Rule 56.1 Statement ("P56.1") ¶¶ 44–46, and, therefore, no longer has a "concrete and particularized" injury flowing from the Rifle Law's licensure requirement. *Cf. Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) ("Article III demands that an actual controversy persist throughout all stages of litigation." (quotation omitted)). Indeed, McGregor is presently free to purchase a semiautomatic rifle without fear of any enforcement action. Even aside from McGregor's lack of injury-in-fact, his rifle endorsement means that his claim for injunctive relief against the Superintendent has become moot. *See Conn. Citizens Def., League, Inc. v. Thody*, No. 23-724, 2024 U.S. App. LEXIS 1056, at *5–7 (2d Cir. Jan. 17, 2024) ("Upon receiving their permits, the individual plaintiffs lost any 'legally cognizable interest' in an injunction that would require the police chiefs to provide a timely process for obtaining such permits."). Thus, the lack of any current injury-in-fact means that McGregor cannot maintain this action against the Superintendent at all.

Regardless, even if the Court were to examine McGregor's standing as of the time this action was commenced, his inability to purchase a semiautomatic rifle was caused not by the Rifle Law—as McGregor had a pistol permit and was seemingly eligible to receive a rifle endorsement—but by the County Defendants' alleged inability or refusal to apply that endorsement to his license. And this is exactly how McGregor's injury is characterized in Plaintiffs' papers, which explain that if "SCPD endorsed McGregor's pistol license when the [Rifle Law] went into effect in September 2022, he would have suffered no barrier to the purchase of [semiautomatic rifles]." *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("PMOL") p.10. Accordingly, any claimed harm resulting from this failure to endorse McGregor's license in September 2022 may be traceable to the *County*; but is not traceable to the

*Superintendent.* *See Gazzola v. Hochul*, 88 F.4th 186, 202–03 (2d Cir. 2023) (injuries caused by county were not traceable to State defendants).[2] McGregor, therefore, lacks standing to pursue any claims against the Superintendent, and all claims brought on his behalf against the Superintendent should be dismissed.

### C. <u>The Remaining Plaintiffs Lack Standing to Bring a Challenge to the Purported Registration Requirement for Semiautomatic Rifles Against the Superintendent</u>

Finally, as concerns Plaintiffs' claim that the Rifle Law unconstitutionally requires them to register newly purchased semiautomatic rifles on a license prior to taking possession of them, no Plaintiff[3] has standing to obtain relief from the Superintendent on this issue.[4]

Any alleged injury from this registration requirement is not "fairly traceable" to the Superintendent, despite claims that it is required by the Rifle Law. P56.1 ¶¶ 116, 152; AC ¶¶ 114–15, 121. Instead, the State Police have publicly stated that the Rifle Law does not require this kind of registration, *see* S56.1 ¶ 10 & DE 21-3, p.4; Deyo Decl., ¶ 3 ("[S]emi-automatic rifles are not required to be listed on the license" the way handguns are), and other portions of Plaintiffs' Statement of Facts make clear that this requirement is one imposed by Suffolk County, P56.1 ¶¶ 40–42. Accordingly, any claimed harm resulting from a registration requirement may again be

---

[2] Additionally, Plaintiffs' assertions regarding many of Dark Storm and Newman's purported injuries mirror this aspect of McGregor's claimed harm, *see* PMOL p.10–11 (describing SCPD's "refusal to endorse existing pistol licenses" as causing harm to the commercial sale of firearms or undescribed customers' ability to purchase those guns), and therefore fail due to the same lack of traceability to the Superintendent. Additional aspects of Dark Storm and Newman's lack of standing are discussed further *infra*.

[3] By its nature, this claim does not impact Dark Storm or Newman, who complain about restrictions on the commercial sale of firearms rather than an individual right to purchase them. *See* PMOL at 5–7 (discussing Newman and Dark Storm as "the Selling Plaintiffs" claiming a "right to provide arms"). Nevertheless, to the extent Dark Storm or Newman could be seen as individually challenging this purported registration requirement—or challenging it on behalf of their unknown and unspecified customers—they would still lack standing for relief against the Superintendent for the same traceability and redressability reasons as the individual Plaintiffs. *See infra*.

[4] The Superintendent notes that the *only* Plaintiff who could *potentially* have an injury-in-fact for this claim is McGregor; as neither Giambalvo, Felice, nor Oliveri can presently purchase a semiautomatic rifle, P56.1 ¶¶ 60–61, 82–83, 159, 162–63, and therefore do not face any injury caused by a purported registration requirement for such rifles.

traceable to the *County*; but is not traceable to the *Superintendent*. *See Gazzola*, 88 F.4th at 202–03 (finding injuries caused by county were not traceable to State defendants).

Similarly, the Superintendent cannot redress Plaintiffs' purported harm caused by this requirement either, as he is not the licensing official for Suffolk County, *see* N.Y. Penal Law § 265.00(10), and therefore has no ability to change Suffolk County's policies with respect to the registration of semiautomatic rifles.[5] *See also* Penal Law § 400.30. This lack of redressability forms yet another independent bar to Article III standing as concerns this specific claim. *See, e.g., Gazzola*, 88 F.4th at 202–03; *Neary v. Weichert*, 489 F. Supp. 3d 55, 66 (E.D.N.Y. 2020) ("To satisfy the redressability requirement, a plaintiff must establish that it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief [the] plaintiff seeks in bringing suit[]." (internal quotation marks omitted)). Thus, the Superintendent is entitled to summary judgment with respect to all claims against him concerning the registration of semiautomatic rifles on a pistol or semiautomatic rifle license.[6]

## POINT II: PLAINTIFFS DARK STORM AND NEWMAN HAVE NO VIABLE SECOND AMENDMENT CLAIM

Next, Plaintiffs Dark Storm and Newman[7] have no viable Second Amendment claims, either as concerns their commercial dealings in firearms, or derivatively on behalf of their unknown and unspecified customers.

---

[5] The Superintendent is a licensing officer only for retired members of the Division of State Police. *See* N.Y. Penal Law §§ 265.00(10), 400.01(1); Deyo Decl. ¶ 2.

[6] To the extent Plaintiffs vaguely complain about having to obtain "permission" before purchasing a semiautomatic rifle, *see* PMOL pp.6 & 19, such harms are also not traceable to or redressable by the Superintendent, as they also relate to County policies. *See* P56.1 ¶ 152 (Dark Storm's customers "object to having to seek permission from SCPD every time they purchase a [semiautomatic rifle]"); PMOL p.6 ("SCPD is enforcing the registration requirement for [semiautomatic rifles] as they do for pistols, *which requires permission* and the amendment of one's license." (emphasis added)). Thus, these claims must also be dismissed as against the Superintendent for a lack of standing.

[7] Newman's claims are purely derivative of Dark Storm's in that Newman, as the "owner and operator of" Dark Storm, AC ¶ 12, raises concerns about being "prevented from selling, transferring, purchasing, or giving semiautomatic[s] to [the] customers and prospective customers" of Dark Storm. *See* AC ¶ 101; *see also id.* at ¶ 149

**A.** **Regulations of the Commercial Sale of Firearms Do Not Burden the Second Amendment Rights of Individuals**

The express terms of the Second Amendment, as well as Supreme Court caselaw, make clear that Second Amendment protects only an *individual's* right to be armed and not a business's desire to engage in particular commercial activity.   *See* U.S. Const. Amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." (emphasis added)); *Bruen*, 597 U.S. at 8 (Second Amendment right belongs to "ordinary, law abiding *citizens*" (emphasis added)); *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (Second Amendment right is an "*individual* right to possess and carry weapons *in case of confrontation*." (emphasis added)); *see also id.* at 579 ("Nowhere else in the constitution does a 'right' attributed to 'the people' refer to anything other than an individual right."); *see also Giambalvo v. Suffolk County*, 656 F. Supp. 3d 374, 381 (E.D.N.Y. 2023) (recognizing that the rights protected by the Second Amendment "are expressly limited" to "'ordinary, law-abiding, adult citizens'" (quoting *Bruen*)).   Accordingly, the right can apply only to living "people," and not to corporations and business entities, which have no independent need for self-defense.   *Gazzola*, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022) ("Plaintiffs fail to present any support for their contention that the individual right secured by the Second Amendment applies to corporations or any other business organizations.   It does not."), *aff'd on other grounds*, 88 F.4th 186 (2d Cir. 2023).

An individual's right to "keep and bear" arms does not include the right to sell arms, which is what Dark Storm and Newman seek to do.   P56.1 ¶¶ 108, 113, 115, 127, 133; *see also* PMOL

---

("After the passage of the Rifle Bill, [Dark Storm] and Mr. Newman were barred from selling and transferring semiautomatic rifles to its customers and potential customers who did not possess a license…"); *id.* at ¶ 150 ("[Dark Storm] and Mr. Newman continue to be barred from selling and transferring semiautomatic rifles to its customers and potential customers…").

at 5 (claiming a "right to provide arms").   The operative terms "keep" and "bear" confirm this principle, as discussed in the leading case on the subject, *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017).  *See Gazzola*, 88 F.4th at 196 ("[W]e find the Ninth Circuit's *en banc* decision in *Teixeira* persuasive."); *B&L Prods. v. Newsom*, __ F.4th __, 2024 U.S. App. LEXIS 14144, at *16 (9th Cir. June 11, 2024) (recognizing *Teixeira*'s holding that "the right to sell firearms is not a protected ancillary right"); *see also Oakland Tactical Supply, LLC v. Howell Twp.*, __ F.4th __, 2024 U.S. App. LEXIS 13142, at *14 n.4 (6th Cir. May 31, 2024).  Noting that "the most natural reading of 'keep arms' . . . is to 'have weapons,' and that "bear arms" is naturally read to mean "wear, bear, or carry…upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person"—the Ninth Circuit concluded that "[n]othing in the text of the [Second] Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons."  *Teixeira*, 873 F.3d at 683 (quoting *Heller*, 554 U.S. at 582, 584); *see also Gazzola*, 645 F. Supp. 3d at 64 (the Second Amendment "makes no mention of buying, selling, storing, shipping, or otherwise engaging in the business of firearms").

Other federal courts—including, most recently, the Southern District of New York in April of 2024—have also rejected the proposition that the Second Amendment creates a right to sell arms.  *See, e.g., United States v. Austin*, No. 22 Cr. 435, 2024 U.S. Dist. LEXIS 67540, at *21–22 (S.D.N.Y. Apr. 11, 2024) ("Such an interpretation would transform the protection afforded by the plain text of the Second Amendment from the right to possess and carry firearms for self-defense, as recognized by the Supreme Court, into a constitutional right to turn a profit on firearms dealing without condition or qualification.  There is no such unqualified right protected by the Second Amendment, either by its plain text or by implication."); *United States v. Mayfield*, No. 22 Cr. 31,

2024 U.S. Dist. LEXIS 25643, at *3 (S.D. Miss. Feb. 14, 2024) ("That plain text [of the Second Amendment] does not include a right to 'sell or otherwise dispose of any firearm or ammunition.'") (quoting 18 U.S.C. § 922(d)); *Del. State Sportsmen's Ass'n, v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 604 (D. Del. 2023) ("[N]o court has held 'that the Second Amendment secures a standalone right to *sell* guns….'"); *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 908 (W.D. Wash. 2023) ("[T]he gun dealer Plaintiff, has no independent Second Amendment right to sell firearms separate from its customer's right to acquire them."). This Court should likewise reject Dark Storm and Newman's attempt to expand the Second Amendment beyond its plain text.[8]

Any challenge by Dark Storm and Newman also fails because laws imposing conditions on the commercial sale of arms are "presumptively lawful." *See Heller*, 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws imposing conditions and qualifications on the commercial sale of arms."); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (same); *see also Gazzola,* 88 F.4th at 195 (citing *Heller* and *McDonald* for the proposition that such regulatory measures are "presumptively lawful," and stating that "[n]othing in the Court's more recent decision in [*Bruen*] casts doubt on that understanding of the Second Amendment's scope."); *Austin*; 2024 U.S. Dist. LEXIS 67540, at *22 ("To whatever extent the Second Amendment does protect dealing firearms, if any, such protection is nonetheless subject to presumptively constitutional laws that impose conditions and qualifications on the commercial sale of firearms." (*purgandum*)). And while this "presumption of legality" may be

---

[8] To the extent the AC and Plaintiffs' papers can be read to suggest a challenge by the individual Plaintiffs to the Rifle Law under the Second Amendment as concerns their own individual ability to privately sell or transfer semiautomatic rifles, such a challenge fails for the same reasons that Dark Storm and Newman's does. *See supra*; *see also Austin*, 2024 U.S. Dist. LEXIS 67540, at *20 (observing that the "private selling of guns" also does not "vindicate . . . [the] protected right to self-defense that is guaranteed by the Second Amendment" (*purgandum*)).

overcome if a plaintiff establishes that the laws "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms," *Gazzola*, 88 F.4th at 195–96, Dark Storm and Newman have not made—or even attempted to make—this showing. Thus, insofar as Dark Storm and Newman challenge the Rifle Law as prohibitive of their purported Second Amendment rights to commercially sell firearms to the public, such a challenge fails in its entirety.

### B. Dark Storm and Newman Have Not Made the Requisite Showing to Derivatively Assert their Customers' Second Amendment Rights

To the extent Dark Storm and Newman attempt to assert their customers' and potential customers' Second Amendment rights, P56.1 ¶¶ 105–06, 116, 133; PMOL p.12, any such attempt fails as well. As a threshold matter, the only alleged customers identified are some of the other Plaintiffs, *see, e.g.,* P56.1 ¶¶ 114, yet those individuals have already raised their own claims—flawed though they may be—making any derivative claim as to them purely duplicative and subject to dismissal for the same reasons. Even setting this point aside, Dark Storm and Newman have still not come close to alleging, much less demonstrating, the caliber of injury required to raise a derivative claim in the first place.

Contrary to the cursory arguments in PMOL at p.12, the Second Circuit has recently explained that in order for a gun dealer to pursue a derivative claim on behalf of its customers, the law at issue must "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola*, 88 F.4th at 196. Here, as Plaintiffs acknowledge, the Rifle Law only prohibits transfer of semiautomatic rifles to "customers and potential customers" who have "not applied for and obtained a Rifle License." P56.1 ¶¶ 113, 115. The Supreme Court has made clear that licensing laws that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law abiding, responsible citizens'" are consistent with the Constitution because "they do not necessarily prevent 'law abiding, responsible citizens' from exercising their Second

Amendment right to public carry." *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Any purported injury from a mere licensing requirement cannot be described as "so restrictive that it threatens a citizen's right to acquire firearms" as a whole. *Gazzola*, 88 F.4th at 196. Indeed, Dark Storm and Newman make no contentions about their sale of other kinds of rifles or firearms, and freely acknowledge that they now have resumed sales of semiautomatic rifles, P56.1 ¶ 115, thereby showing that Dark Storm and Newman cannot carry their burden of showing an "outright ban" under *Gazzola*.

Moreover, the evidence submitted with this cross-motion demonstrates that there is no basis for finding that Suffolk County citizens "will be meaningfully constrained-or, for that matter, constrained at all," *see Gazzola*, 88 F.4th at 197, from acquiring semiautomatic rifles given the significant number of such licenses that have been issued. As discussed in the Deyo Declaration, as of June 27, 2024, approximately 14,384 new firearm licenses that include the authority to purchase/possess semiautomatic rifles were issued statewide, and of this number, approximately 500 were issued in Suffolk County. *See* Deyo Decl., ¶ 7. Moreover, approximately 26,801 firearm license amendment transactions that involve licenses which include the authority to purchase/possess semiautomatic rifles occurred throughout the State, and of this number, approximately 381 such transactions were in Suffolk County. *See* Deyo Decl., ¶ 8. And the overall state of the firearms market in New York remains strong, with 145,952 separate background checks having been conducted in connection with sales between January and May of 2024 alone. *See* Federal Bureau of Investigation, *NICS Firearm Background Checks: Month/Year by State*, https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state.pdf (last visited June 20, 2024). Accordingly, Dark Storm and Newman's purported derivative claims raised on behalf of their unspecified customers are as defective as their own claims – and subject to dismissal

as well.

**POINT III:  THE RIFLE LAW IS CONSTITUTIONAL**

### A.  Plaintiffs Bring a Disfavored Facial Challenge

Plaintiffs' moving papers make clear that – at least as concerns the Superintendent – they are seeking to have the Court declare unconstitutional a law that has never been enforced against them.  *See* PMOL at 10 (demanding "a declaration that the [Rifle Law] is unconstitutional and the permanent injunction thereof"); *id.* at p.9 ("Plaintiffs have no burden to prove that SCPD and NYSP will enforce the challenged regulations").   A long line of Second Circuit precedent establishes that a "pre-enforcement" challenge to a state law, defined as a case brought "before [any plaintiffs] have been charged with any violation of law," is considered a facial challenge. *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017) (quoting *NYSRPA v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015)).

This is "the most difficult challenge to mount successfully," because "to succeed on a facial challenge, the challenger must establish *that no set of circumstances* exists under which the regulation could be valid." *Id.* (brackets omitted, emphasis in original).  Accordingly, "[a] facial [] challenge will succeed only when the challenged law can never be validly applied." *Vt. Right to Life Comm. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982). The Supreme Court reemphasized the importance of the facial challenge standard in *Rahimi*, explaining that a court must "consider the circumstances in which [a challenged law] was most likely to be constitutional," not "focus[] on hypothetical scenarios where [the law] might raise constitutional concerns."  2024 U.S. LEXIS 2714 at *29.  In evaluating a facial challenge under the Second Amendment, "a court's task is to seek harmony, not to manufacture conflict." *Id.*

In order for Plaintiffs to succeed, they must show that the Rifle Law can never be applied in a constitutional manner. They cannot meet that high burden.

**B.** **This Pre-Discovery Facial Challenge Must Be Resolved As a Pure Question of Law**

Although "only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery," *Kleinknecht v. Ritter*, No. 19 Civ. 5760, 2024 U.S. Dist. LEXIS 36368, at *8 (E.D.N.Y. Mar. 1, 2024) (Brown. J.), the Superintendent agrees with Plaintiffs that—at least as concerns the facial challenge to the constitutionality of the Rifle Law—the issue can be properly resolved at this stage. This is because the text-and-history analysis mandated by *Bruen* and *Rahimi* presents "a question of law, not fact." *United States v. Head*, No. 23 Cr. 450-1, 2024 U.S. Dist. LEXIS 90882, at *22 (N.D. Ill. May 21, 2024). Pre-discovery adjudication of Plaintiffs' facial challenge is also appropriate due to "the absence of any dispute over either side's historical sources." *Id.* at *23. Here, Plaintiffs have adduced no historical evidence of their own in their case-in-chief, and their pre-motion letter foreswears any intention to do so, instead seeking to hold the government to its burden. See ECF No. 58 at 2 ("Plaintiffs have no obligation to produce any evidence or historical analogues. The burden remains with the government to justify its firearm regulations."). Thus, the history adduced by the Superintendent below is uncontradicted.

The facial challenge, which concerns only the text of law itself and succeeds only if it "can *never* be validly applied," *Vermont Right to Life*, 758 F.3d at 128 (emphasis added), can be adjudicated now because the Plaintiffs' individual facts are not material to the Court's analysis. But if the Court were to find that the Plaintiffs' factual allegations are material, the Superintendent requests the opportunity to conduct discovery. *See Kleinknecht*, 2024 U.S. Dist. LEXIS 36368 at *8 ("[W]hen a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court

should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion."); *see also* Declaration of Patricia Hingerton pursuant to Rule 56(d). The Superintendent has no knowledge of the truth of Plaintiffs' allegations about themselves or about Suffolk County's policies; if the Court were to find those alleged facts to be material to the facial constitutionality of the Rifle Law (which is the only challenge brought as against the Superintendent), the allegations must be tested in discovery.

## C. **The Rifle Law is a Presumptively Constitutional Shall-Issue Licensing Statute**

The Rifle Law can be summarily upheld, based on the Supreme Court's declaration that shall-issue licensing laws are constitutional and the broad consensus among the lower federal courts. While *Bruen* struck down New York's then-existing "proper cause" requirement for a firearm license, the Supreme Court took great pains to emphasize that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the other 43 states' 'shall-issue' licensing regimes." 597 U.S. at 38 n.9 (quotation omitted). Instead, and as this Court unambiguously held in rejecting a challenge by two of these same Plaintiffs against the State's handgun licensing laws, "some things are beyond dispute," including that "certain state [firearm] licensing regimes are constitutionally permissible." *Giambalvo*, 656 F. Supp. 3d at 381; *accord Frey v. Nigrelli*, 661 F. Supp. 3d 176, 196 (S.D.N.Y. 2023) ("Nothing in *Bruen* suggested that the Second Amendment protects the right to carry a firearm without a license, and concurring opinions indicate the opposite."). The Western District of New York has also recently explained in the context of a challenge to the State's licensing requirements for the sale of ammunition that "it is undisputed that a license to obtain a firearm is constitutionally permissible[.]" *N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 U.S. Dist. LEXIS 80568, at *25–26 (W.D.N.Y. May 2, 2024).

Notably, federal courts have repeatedly upheld licensing and other measures that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," without needing to engage in a historical analysis, pointing to Justice Kavanaugh's statement that "'shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.'" *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring)); *accord United States v. Libertad*, 681 F. Supp. 3d 102, 110 (S.D.N.Y. 2023) ("Importantly, both the majority opinion and the Kavanaugh concurrence indicated the likely constitutionality of shall-issue regimes -- at least to the extent they are not applied in practice to frustrate gun ownership or carrying by law-abiding, responsible citizens -- <u>without</u> first conducting any exhaustive historical analysis." (emphasis in the original)).

There is no reason why *Bruen*'s licensing holding would apply any differently to rifles than to handguns, and indeed, multiple other states require a form of license to purchase some or all semiautomatic rifles.[9] And even more tellingly, several federal cases have found *Bruen*'s endorsement of licensing laws to apply outside the handgun contest. *Cf. Ore. Firearms Fed'n, Inc. v. Brown,* 644 F. Supp. 3d 782, 806 (D. Or. 2022) (upholding "Permit-to-Purchase Provision" that applied to sales of all firearms because it was "based on objective standards and is therefore

---

[9] *See, e.g.,* Conn. Gen. Stat. Ann. § 29-37p *et seq.* (discussing the requirements for a "long gun eligibility certificate"); 430 Ill. Comp. Stat. Ann. § 65/2(a)(1) ("No person may acquire or possess any firearm . . . within this state" without a FOID card from the state police); Haw. Rev. Stat. § 134-1, 134-2(a) (permit required to purchase any "firearm" which includes "pistols, revolvers, rifles, shotguns . . ."); Mass. Gen. Laws. Ann. Ch. 140 § 131E(a) ("rifles, shotguns and feeding devices therefor may be so purchased only upon presentment of: a valid firearm identification card . . . a valid license to carry firearms . . . or valid proof of exempt status."); Mich. Comp. Laws § 28.422 (1)(b) ("a person shall not . . . [p]urchase a firearm that is not a pistol in this state without first having obtained a license"); N.J. Stat. Ann. § 2C:58-3(b)(1) ("A person shall not . . . receive, purchase or otherwise acquire . . . a rifle or shotgun . . . unless the purchaser . . . possesses a valid firearms purchaser identification card . . ."); *see also* Wash. Rev. Code § 9.41.090(2)(b) ("no dealer may deliver a firearm to the purchaser thereof until . . . [t]he dealer is notified in writing" by local or state government "that the purchaser is eligible to possess a firearm.").

presumptively constitutional under the holding of *Bruen*."); *United States v. Saleem*, 659 F. Supp. 3d 683, 689 n.9 (W.D.N.C. 2023) (finding based on licensing language in *Bruen* that registration requirements of the National Firearms Act, which include, *inter alia,* short-barreled shotguns and short-barreled rifles, "are of the type that the Supreme Court in *Bruen* determined were permissible").

Plaintiffs attempt to attack the Rifle Law by analogizing it to that portion of New York's licensing laws struck down in *Bruen*, suggesting that the Rifle Law's "sole intention" was to "empower a local government official with subjective, 'broad discretion' to prevent non-disqualified, ordinary citizens from possessing . . . semiautomatic rifle[s]," PMOL p.15, contending that it "subjugates semiautomatic rifles to the same 'may issue' discretionary licensing scheme New York has unconstitutionally enforced on handguns since 1911," *id.* p.16. Yet, following *Bruen*, the standard for obtaining a semiautomatic rifle license is the same as that for a concealed carry permit, *see* N.Y. Penal Law § 400.00(1), and in another challenge to the overarching licensing scheme, the Second Circuit squarely rejected similar "impermissible discretion" arguments against it. *Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) ("*Bruen* does not forbid discretion in licensing regimes—on the contrary, the *Bruen* Court specifically stated that its decision did not imperil the validity of more than a dozen licensing schemes that confer discretion materially identical to [New York's licensing statute].").[10] Moreover, Plaintiffs Giambalvo and McGregor have both acknowledged in related litigation "that the State *may* maintain objective permitting standards," effectively conceding that the mere idea of requiring a license to purchase or own a firearm is constitutionally permissible. *Giambalvo*, 656 F. Supp. 3d

---

[10]  Indeed, the Second Circuit noted that the judgment exercised by licensing officials is a longstanding American historical tradition, for "as long as licenses to carry . . . have been issued in this country, the officials administering those systems have been tasked with making individualized assessments of each applicant." *Antonyuk*, 89 F.4th at 319.

at 381 (emphasis added).  This concession alone is sufficient to defeat Plaintiffs' facial challenge to the Rifle Law.  *See Rahimi*, 2024 U.S. LEXIS 2714 at *29 n.2 (facial challenge fails "unless the[] hypothetical faults occur in every case").

### D. <u>The Rifle Law Is Supported By the Nation's History And Tradition of Firearm Regulation</u>

To the extent *Bruen* and *Rahimi* leave any doubt about the constitutionality of shall-issue licensing laws (and they do not), the Rifle Law survives constitutional scrutiny under an examination of the nation's history and tradition of firearms regulation.  To pass muster at this stage, the State must identify one or more historical laws that are "relevantly similar" to the law being challenged.  *Bruen*, 597 U.S. at 28–29.  The identified laws, however, need not be a "historical twin; a well-established and representative historical analogue is sufficient." *Antonyuk*, 89 F.4th at 302–03 (internal quotations and citation omitted).  "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"  *Rahimi*, 2024 U.S. LEXIS 2714 at *17 (quoting *Bruen*, 597 U.S. at 30).  And in "cases implicating unprecedented societal concerns or dramatic technological changes"—such as the lethality of modern semiautomatic rifles, which had no parallel in the 18th or 19th Centuries— *Bruen* calls for "a more nuanced approach" in recognition of the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Bruen*, 597 U.S. at 27; *cf. Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024) ("Founding-era society faced no risk that one person with a [rifle] could, in minutes, murder several dozen individuals.").

The understanding of the right to bear arms that prevailed when the States adopted the Fourteenth Amendment in 1868, along with the Founders' understanding in 1791 of that right, are "both focal points of [the court's] analysis."  *Antonyuk*, 89 F.4th at 304.  This is particularly the

case after the Supreme Court's decision in *Rahimi*, which rejects the Founding-only version of history pushed by the Plaintiffs here. As Chief Justice Roberts wrote for the eight-justice *Rahimi* majority, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."[11] 2024 U.S. LEXIS 2714 at *16.

And when seen in this light, firearms licensing has *always* been a widespread regulatory tool used throughout America. *See Frey*, 661 F. Supp. 3d at 197–98. In *Frey*, for example, the court recently found "an abundance of examples" in the course of upholding the State statute providing for separate licensure in New York City, citing dozens of historical licensing laws from New York State and around the nation. *See id*. In the context of this case, the accompanying expert Declaration of Professor Robert Spitzer ("Spitzer Decl.") provides a detailed discussion of America's long history of gun licensing, including in the context of long guns, with supporting citations.

Although Plaintiffs contend (without adducing any history of their own) that there are no historical laws requiring individuals to obtain licenses before being able to purchase or sell a long gun, *see* PMOL p.14, this is inaccurate and ahistorical. Spitzer Decl., ¶ 12. Instead, as Professor Spitzer recounts, weapons licensing—the grant of which was predicated on an evaluation process—existed dating back to the 1600s, with a total of at least 47 states having enacted some

---

[11] Although the *Rahimi* Court declined to settle the "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," 2024 U.S. LEXIS 2714 at *17 n.1 (quoting *Bruen*, 597 U.S. at 37), the Court's Second Amendment precedent makes clear that 19th-Century history cannot be ignored. *See Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th Century."); *accord Rahimi*, 2024 U.S. 2714 at *78 (Barrett, J., concurring) ("In *Bruen*, the Court took history beyond the founding era, considering gun regulations that spanned the 19th century."). Moreover, in other cases from this year's term the Court considered late 19th and even 20th-century sources in determining the history and tradition that elucidates the constitution's meaning. *See, e.g., Vidal v. Elster*, 602 U.S. __, 2024 U.S. LEXIS 2605 (U.S. June 13, 2024).

type of licensing law from the 1600s through the early 1900s.  *Id*. at ¶¶ 9, 14 and Exhs, B, C.

Although licensing was first applied in populated areas, like cities, to address specific threats to

public safety and order—which generally came from handguns from the 1700s through the early

1900s—once repeating long guns appeared in civil society and started to pose a criminal and public

safety problem, states were quick to enact prohibitions and licensing requirements.  *Id*. at ¶¶ 12,

60–61.  Indeed, at least 36 states restricted long guns such as the Tommy gun, the Browning

Automatic Rifle, and sawed-off shotgun (i.e., long guns modified after purchase) and up to 11

states restricted semi-automatic long guns during the 1920s and early 1930s.  *Id*. at ¶ 60–61 and

Exh, D; *see also Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 22 (D.D.C. 2023) ("This

shows that the states confronted the public safety issues of their time with vigor; indeed, these

regulations were at the time 'obviously uncontroversial' from a constitutional perspective."

(quoting Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*,

80 L. & Contemporary Probs. 55, 69 (2017)).

    And insofar as Plaintiffs claim that New York State has no tradition of requiring a license

for long guns, PMOL p.14, this is likewise incorrect.  New York did enact licensing measures to

address practices that posed significant danger to colonists.  *See* Spitzer Decl. ¶ 12.  For example,

in 1680, the colonial legislature penalized the trafficking of "any gun or guns" to Indians or any

person who lived outside of the colony, unless the person first obtained a license to do so.  *Id*. at

¶¶ 12–13.  Later, New York enacted a licensing measure in 1763 to penalize any person who

carried any type of firearm onto enclosed lands.  *Id*. at 13.  Then, in the 1800s, 16 states—including

New York—enacted laws requiring individuals to be licensed as a prerequisite to possessing or

carrying a weapon.  *Id.* at ¶¶ 14, 25.  For example, shortly after the ratification of the Fourteenth

Amendment, Missouri enacted a measure to license the otherwise illegal practice of concealed

carrying of handguns and other named weapons, including "any other dangerous or deadly weapon," in St. Louis by means of "written permission of the Mayor." *Id.* at ¶ 20. As another example, in New Jersey, Jersey City enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, including long guns. *Id.* at ¶ 21; *see also Antonyuk*, 89 F.4th at 359 (recognizing "a municipal tradition of regulating firearms in urban public parks").

The criteria for the grant of these carry licenses generally involved an application of judgment to individual applications. Spitzer Decl., ¶ 17. Some laws contained broad criteria, which often included a requirement that the applicant be of good moral character or sound judgment, emphasizing the individualized analysis performed by law enforcement officers granting licenses. *Id.*; *see also Antonyuk*, 89 F.4th at 318, 320 (recognizing that "localities from around New York were enacting permitting schemes that depended on individualized assessments by local officials" and affirming that "widespread adoption by diverse and distant localities under varying circumstances suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments"). An example is New Jersey's 1873 law, which included language to the effect that no person would be issued a carry permit unless the city's municipal court was "satisfied that such person is temperate, of adult age, and capable of exercising self-control." Spitzer Decl., ¶¶ 21–23. Another example is New York City's ordinance enacted in 1881, pursuant to which a person who carried "a pistol of any description concealed on his person" could be subject to criminal penalties unless he was issued a permit based on a finding that he was a "proper and law abiding person." *Id.* at ¶¶ 17, 25–26. A few years later, an 1884 New York state law barred the carrying or possession of named weapons by those under 18 years old unless they possessed a license to do so. *Id.* at ¶ 28. Licenses

could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor." *Id*. Then, in 1885, the law was extended to all cities in the state and to "any pistol or other firearms of any kind," which would have included long guns. *Id*. In 1891, New York extended permitting to Buffalo, which covered handguns and other dangerous weapons. *Id*.

As Professor Spitzer further explains, from the 1700s to the 1860s, at least 13 states enacted laws to regulate, through licensing, the discharging of firearms, and these laws—which are similar to current licensing and background check requirements—extended to all firearms, including both long guns and handguns. *Id.* at ¶¶ 43–44. The earliest were in Pennsylvania, and included, among others: a 1713 Philadelphia law penalizing various city activities, including "firing a Gun without a license"; a 1721 act pertaining to the entire colony that imposed penalties on specified activities, including firing "any gun or other fire arm," without the "governor's special license"; and a 1721 Philadelphia ordinance requiring a "governor's special license" to prevent "mischief [that] may happen by shooting guns." *Id.* Other states followed Pennsylvania's lead, including, for instance, New Hampshire, which enacted a discharge permit system for Portsmouth in 1823, and New York, which enacted an 1824 law allowing Schenectady officials to grant permission for the discharge of guns. *Id.* at ¶ 45. Between the end of the Civil War and 1900, another 20 states enacted laws regulating the discharge of firearms. *Id.* and Exs. B–C.

In addition, at least 17 states required those selling or otherwise transferring weapons to record and keep information about the buyer, with that information to be maintained and subject to possible later examination. *Id.* at ¶ 50. For example, in 1885, Illinois enacted a registration requirement for weapons dealers requiring them to "keep a register of all such weapons sold or given away by them." *Id.* at ¶ 51. With minor exceptions, this law was typical of such

requirements, including those imposed in 1911 laws enacted by Colorado and New York. *Id.* ¶¶ 52–53.

Ultimately, as Professor Spitzer explains, a comprehensive review of historical laws and regulations reveals that "licensing was an integral component" of American legal history and tradition. *Id.* ¶ 61. Indeed, "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons"—not only to their sale, as provided for in the Rifle Law, but also their use and ownership—and as particular kinds of firearms presented themselves as public safety problems, a majority of the states acted swiftly to regulate and protect the health and safety of their citizens. *Id.* at ¶¶ 41, 57–58, 60–61. Accordingly, the Rifle Law is eminently "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 2024 U.S. LEXIS 2714 at *16, and must be upheld as constitutional.

## CONCLUSION

For the reasons set forth above, the Superintendent respectfully requests that the Court deny Plaintiffs' motion for summary judgment, grant the Superintendent's cross-motion for summary judgment, dismiss the Amended Complaint in its entirety and with prejudice as against him, and grant such other and further relief as it deems just and proper.

Dated: Hauppauge, New York
     June 28, 2024

                  LETITIA JAMES
                  Attorney General for the State of New York
                  Attorney for Superintendent James

                  By: *Patricia M. Hingerton*_____
                     Patricia M. Hingerton
                     Robert E. Morelli
                     Assistant Attorneys General
                     300 Motor Parkway, Suite 230
                     Hauppauge, New York 11788
                     Patricia.Hingerton@ag.ny.gov
                     Robert.Morelli@ag.ny.gov
                     (631) 231-2424