

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF REGIONAL OFFICES
SUFFOLK REGIONAL OFFICE

August 30, 2024

The Honorable Gary R. Brown
United States District Court for the Eastern District of New York
100 Federal Plaza
Central Islip, N.Y. 11722

Re:     **McGregor, et al. v. Suffolk County, et al.**
            Docket No.: 2:23-cv-01130 (Brown, J.) (Lindsay, M.J.)

Dear Judge Brown:

This Office represents Steven G. James, the Superintendent of the New York State Police, in the above-captioned action. This is to advise the Court of a recent decision that was rendered by the Fourth Circuit following the filing of the parties' motions in this case. In *Maryland Shall Issue v. Moore*, No. 21-2017 (4th Cir. Aug. 23, 2024), a copy of which is attached hereto, the court affirmed a grant of summary judgment to the State of Maryland, upholding the constitutionality of its handgun licensing law against a Second Amendment challenge similar to the one at issue in this matter.

Applying the first, textual step of the test from *NYSRPA v. Bruen*, 597 U.S. 1 (2022), the Fourth Circuit noted that "a regulation falls within the ambit of the Second Amendment only if the regulation 'infringes' the Second Amendment right to keep and bear arms." *Maryland Shall Issue*, slip op. at 12. The Court distinguished between laws such as the ones at issue in *Bruen*, *McDonald*, *Heller* and *Rahimi*, where "[t]here was no question that the laws 'infringed' the right to keep or bear arms because the government . . . prevented individuals from exercising these rights," *id.* at 13, and "shall-issue" licensing laws, which "generally do not 'infringe' the right to keep and bear arms" unless they are "put to abusive ends." *Id.* at 14 (quoting *Bruen*, 597 U.S. at 38 n.9). Accordingly, the Circuit found that Maryland's "shall-issue" handgun licensing law was "presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are 'law-abiding' persons," and that plaintiffs "failed to rebut this presumption of constitutionality afforded to 'shall-issue' licensing laws…." *Id.* at 4-5.

Although the *en banc* Fourth Circuit's majority did not reach the history-and-tradition test at *Bruen*'s second step, three judges concurring in the judgment did reach the issue and concluded that the licensing law was "constitutional because it is consistent with the principles underlying our Nation's historical tradition of firearm regulation." *Maryland Shall Issue,* slip op. at 30 (Rushing, J., concurring in the judgment). The concurring judges noted that shall-issue licensing laws were "comparable to historical regulations restricting certain persons' ability to possess and publicly carry weapons because of the danger they posed," *Id.* at 35-36, and categorically rejected any contention (like the one put forward by Plaintiffs here) that the Second Amendment prohibits any licensing law involving advance permission. *See id.* at

41.  The same historical tradition that supports the handgun licensing law upheld in *Maryland Shall Issue* supports the Rifle Law at issue in this case, as the State's expert and historical evidence have fully detailed.

Thank you for your consideration of this submission.

Respectfully,

*Patricia M. Hingerton and Robert E Morelli*

Assistant Attorneys General

cc: Counsel for Plaintiffs and Co-Defendants via ECF

**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

────────────────

**No. 21-2017**

────────────────

MARYLAND SHALL ISSUE, INC., for itself and its members; ATLANTIC GUNS, INC.; DEBORAH KAY MILLER; SUSAN BRANCATO VIZAS,

                        Plaintiffs - Appellants,

       and

ANA SLIVEIRA; CHRISTINE BUNCH,

                        Plaintiffs,

       v.

WES MOORE, in his capacity as Governor of Maryland; WOODROW W. JONES, III, Colonel,

                        Defendants - Appellees.

------------------------------

FIREARMS POLICY COALITION, INC.; FPC ACTION FOUNDATION; INDEPENDENCE INSTITUTE; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA; HELLER FOUNDATION; VIRGINIA CITIZENS DEFENSE LEAGUE; GRASS ROOTS NORTH CAROLINA; RIGHTS WATCH INTERNATIONAL; TENNESSEE FIREARMS ASSOCIATION; TENNESSEE FIREARMS FOUNDATION; AMERICA'S FUTURE; U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND; CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND,

                 Amici Supporting Appellant.

BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE; MARCH FOR OUR LIVES; MARYLANDERS
TO PREVENT GUN VIOLENCE, INC.; EVERYTOWN FOR GUN SAFETY,

                    Amici Supporting Appellee.

———————————————

**No. 21-2053**

———————————————

MARYLAND SHALL ISSUE, INC.; ATLANTIC GUNS, INC.; DEBORAH KAY
MILLER; SUSAN BRANCATO VIZAS,

                    Plaintiffs - Appellees,

          and

ANA SLIVEIRA; CHRISTINE BUNCH,

                    Plaintiffs,

          v.

WES MOORE, in his capacity as Governor of Maryland; WOODROW W. JONES,
III, Colonel,

                    Defendants - Appellants.

———————————————

Appeals from the United States District Court for the District of Maryland, at Baltimore.
Ellen Lipton Hollander, Senior District Judge.  (1:16−cv−03311−ELH)

———————————————

Argued:  March 21, 2024                    Decided:  August 23, 2024

———————————————

Before DIAZ, Chief Judge, and WILKINSON, NIEMEYER, KING, GREGORY, AGEE,
WYNN, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, RUSHING,
HEYTENS, BENJAMIN, and BERNER, Circuit Judges, and KEENAN, Senior Circuit
Judge.

———————————————

2

Affirmed by published opinion. Senior Judge Keenan wrote the opinion, in which Chief Judge Diaz and Judges Wilkinson, King, Wynn, Thacker, Harris, Heytens, Benjamin, and Berner joined. Judge Rushing wrote an opinion concurring in the judgment, in which Judge Gregory and Judge Quattlebaum joined. Judge Niemeyer wrote an opinion concurring in part, dissenting in part, and concurring in the judgment. Judge Richardson wrote a dissenting opinion, in which Judge Agee joined.

---

**ARGUED:** John Parker Sweeney, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants. Ryan Robert Dietrich, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Cary J. Hansel, III, Baltimore, Maryland; Mark W. Pennak, MARYLAND SHALL ISSUE, INC., Baltimore, Maryland, for Appellants. James W. Porter, III, Marc A. Nardone, Connor M. Blair, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellant Atlantic Guns, Inc. Brian E. Frosh, Attorney General, Robert A. Scott, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. David B. Kopel, INDEPENDENCE INSTITUTE, Denver, Colorado; Joseph G.S. Greenlee, FPC ACTION FOUNDATION, Las Vegas, Nevada, for Amici Firearms Policy Coalition, FPC Action Foundation, and Independence Institute. Douglas N. Letter, Shura Lauren Feldman, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C., for Amicus Brady Center to Prevent Gun Violence. William T. Clark, New York, New York, Esther Sanchez-Gomez, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, San Francisco, California, for Amicus Giffords Law Center to Prevent Gun Violence. Ciara Wren Malone, MARCH FOR OUR LIVES, New York, New York, for Amicus March for Our Lives. George J. Hazel, Katherine Moran Meeks, Claire Madill, Hayley Lawrence, Kirsten Bleiweiss, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, March for Our Lives, and Marylanders to Prevent Gun Violence.

---

BARBARA MILANO KEENAN, Senior Circuit Judge:

In the aftermath of mass shootings across the country, the Maryland General Assembly passed the Firearm Safety Act of 2013 (FSA). Among other measures,[1] the FSA contains a statutory licensing regime for handgun purchasers to ensure comprehensive background checks, to prevent straw purchases, and to aid in the safe and legal use of firearms (the handgun qualification statute, or the HQL statute). Under this law, the state of Maryland does not retain any discretion to deny a "handgun qualification license" to applicants who meet the statutory requirements. This type of law is commonly referred to as a "shall-issue" licensing law, as opposed to a "may-issue" licensing law in which the state retains some discretion in deciding whether to issue a firearm license to an applicant. The plaintiffs in this appeal assert a facial challenge to the constitutionality of the "shall-issue" HQL statute, chiefly contending that any "temporary deprivation" of the ability to purchase a handgun violates the Second Amendment right to keep and bear arms.[2]

This case requires us to apply the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). We conclude that the Supreme Court in *Bruen* foreclosed the plaintiffs' "temporary deprivation" argument by stating that, despite some delay occasioned by "shall-issue" permit processes, this type of licensing law is

---

[1] We have rejected constitutional challenges to the FSA's assault weapons ban in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), and, more recently, in *Bianchi v. Brown*, No. 21-1255, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) (en banc).

[2] The Second Amendment is made applicable to the states through the Fourteenth Amendment. *See McDonald v. Chicago*, 561 U.S. 742, 791 (2010). For simplicity, this opinion refers only to the Second Amendment.

presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are "law-abiding" persons. *Bruen*, 597 U.S. at 38 n.9. We hold that the plaintiffs have failed to rebut this presumption of constitutionality afforded to "shall-issue" licensing laws like the handgun qualification statute. So the plaintiffs' challenge to the HQL statute fails, and we affirm the district court's award of summary judgment to the state of Maryland.

## I.

### A.

Under the HQL statute, most Maryland residents must obtain a handgun qualification license before purchasing a handgun.[3] *See* Md. Code Pub. Safety § 5-117.1. To obtain this license, an individual must be at least 21 years old, be a Maryland resident, complete a firearms safety training course, and not be barred by federal or state law from purchasing or possessing a handgun. *Id.* § 5-117.1(d).

The firearms safety training course must include at least four hours of instruction and be approved by the Secretary of the Maryland State Police (the Secretary). *Id.* § 5-117.1(d)(3). The training course has two parts: (1) classroom instruction on "[s]tate firearm law," "home firearm safety," and "handgun mechanisms and operation"; and (2) a

---

[3] Certain categories of persons are exempt from the HQL statute. These categories include licensed firearms manufacturers, current or retired law enforcement officers in good standing, current or retired members of the United States armed forces or the National Guard, and people buying, renting, or receiving certain types of antique firearms. Md. Code Pub. Safety § 5-117.1(a).

"firearms orientation" that "demonstrates" the applicant's "safe operation and handling of a firearm."[4] *Id.*

The statute requires that individuals applying for a handgun qualification license submit (1) a set of their fingerprints, (2) proof that they have satisfied the training requirement, (3) a statement that they are not prohibited by law from possessing a handgun, and (4) a $50 application fee to cover the costs of administering the program. *Id.* §§ 5-117.1(f), (g). The Secretary reviews each application and submits the applicant's fingerprints for a state and national background check. *Id.* § 5-117.1(f). Within 30 days of receiving a properly completed application, the Secretary "shall issue" a handgun qualification license to any applicant who has satisfied the statutory requirements. *Id.* §§ 5-117.1(d), (h). After the Secretary issues the applicant a handgun qualification license, that individual may select and apply to purchase a handgun. *See infra* Part II.B.ii.3 (discussing the "77R process" for handgun purchases).

Handgun qualification licenses remain valid for 10 years, and individuals may renew their licenses for additional 10-year periods as long as they retain the qualifications for issuance of the license and pay a $20 fee to cover program administration costs. Md. Code Pub. Safety §§ 5-117.1(i), (j)(1). Applicants seeking renewal of their handgun

---

[4] The training requirement does not apply to qualified handgun instructors, honorably discharged members of the United States armed forces or National Guard, armored-car-company employees holding a different handgun permit, individuals who have completed certain other firearms training courses, and individuals who lawfully own a regulated firearm. *Id.* § 5-117.1(e).

qualification licenses are not required to satisfy more training requirements or to submit another set of their fingerprints. *Id.* § 5-117.1(j)(2).

## B.

In 2016, Maryland Shall Issue, Inc., Atlantic Guns, Inc., Deborah Kay Miller, and Susan Brancato Vizas (the plaintiffs)[5] sued the Governor of Maryland and the Secretary and Superintendent of the Maryland State Police (the state, or Maryland), alleging that the HQL statute violates their Second Amendment rights.[6] The parties filed cross-motions for summary judgment and, in August 2021, the district court issued a decision analyzing the constitutionality of the HQL statute. *Maryland Shall Issue, Inc. v. Hogan*, 566 F. Supp. 3d 404 (D. Md. 2021). At that time, our two-step, means-end framework for Second Amendment challenges required courts first to evaluate whether the challenged regulation imposed a burden "on conduct falling within the scope of the Second Amendment's guarantee." *See Bianchi v. Brown*, No. 21-1255, 2024 WL 3666180, at *4 (4th Cir. Aug. 6, 2024) (en banc) (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc)). If the challenged law imposed such a burden, the reviewing court then was required to apply either intermediate or strict scrutiny, "depend[ing] on the nature of the conduct being

---

[5] Two other individual plaintiffs brought claims that were dismissed with prejudice.

[6] The district court initially dismissed the plaintiffs' claims for lack of Article III standing. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020), *as amended* (Aug. 31, 2020). On appeal, we affirmed the dismissal of the plaintiffs' claims under Maryland law and the Fourteenth Amendment. *Id.* at 218–19. For the plaintiffs' Second Amendment claim, however, we held that Atlantic Guns had standing and remanded that claim for a decision on the merits. *Id.* at 216.

regulated and the degree to which the challenged law burden[ed] the right." *Id.* (quoting *Kolbe*, 849 F.3d at 133).

Applying this framework, the district court held that the HQL statute was subject to intermediate scrutiny, and that the government had shown that the HQL statute was "reasonably adapted to a substantial governmental interest." *Maryland Shall Issue*, 566 F. Supp. 3d at 421, 422, 426, 440. The district court awarded summary judgment to Maryland, *id.* at 440, and the plaintiffs later filed the present appeal, which we held in abeyance pending the Supreme Court's June 2022 decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

## C.

In *Bruen*, the Supreme Court addressed a Second Amendment challenge to a New York state statute known as the "Sullivan Law." 597 U.S. at 11. Under that "public carry" law, any person who sought a license to carry a firearm for self-defense outside that person's home or place of business had to prove first that "proper cause exist[ed]" to issue the license (the proper-cause requirement). *Id.* at 12. Although "proper cause" was not defined by the statute, New York courts had interpreted the phrase as requiring "a special need for self-protection distinguishable from that of the general community." *Id.* (citation omitted). The Supreme Court explained that under this type of "may-issue" licensing regime, "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id.* at 14. Each of the petitioners in *Bruen*

had applied for and had been denied an unrestricted license to carry a handgun in public for general self-defense. *Id.* at 15–16.

In assessing whether New York's proper-cause requirement violated the Second Amendment, the Supreme Court rejected the means-based analysis previously applied by our court and around which many Courts of Appeals "ha[d] coalesced." *Id.* at 17. Instead, the Court established a new, two-step framework for evaluating Second Amendment challenges. At the first step of this framework, courts look to "the text of the Second Amendment to see if it encompasses the desired conduct at issue" (step one). *See Bianchi*, 2024 WL 3666180, at *5 (citing *Bruen*, 597 U.S. at 24); *United States v. Price*, No. 22-4609, 2024 WL 3665400, at *5 (4th Cir. Aug. 6, 2024) (en banc) (identifying several textual limitations on the scope of the Second Amendment right (citing *Bruen*, 597 U.S. at 31–32)). "If the text does not extend to the desired conduct, that conduct falls outside the ambit of the Second Amendment, and the government may regulate it." *Bianchi*, 2024 WL 3666180, at *5.

If the text does cover the conduct at issue, "the burden shifts to the government to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation'" (step two). *Id.* (quoting *Bruen*, 597 U.S. at 24). At this second step, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *see Bianchi*, 2024 WL 3666180, at *18 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (quoting *Rahimi*, 144 S. Ct. at 1898)). If the

government satisfies its burden at this step, then the regulation may be enforced consistent with the Second Amendment. *See Rahimi*, 144 S. Ct. at 1902–03. But if the government does not, then the regulation is not constitutionally permissible. *See Bruen*, 597 U.S. at 34.

Applying this framework to New York's proper-cause requirement, the Supreme Court held that the plain text of the Second Amendment covered the plaintiffs' desired conduct, and that the government had not satisfied its burden under step two. *Bruen*, 597 U.S. at 33, 38–39. The Court thus held that the "proper-cause" requirement of the New York law was unconstitutional. *Id.* at 71.

But the Court did not limit its discussion in *Bruen* to the proper-cause requirement challenged by the petitioners or to other "may-issue" licensing regimes. Instead, the Court discussed in dicta the presumptive lawfulness of what the Court referred to as "shall-issue" licensing laws. *Id.* at 38 n.9. The Court explained:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion"—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Id.* (citations omitted) (hereafter referred to as the Supreme Court's "shall-issue" discussion).

\*     \*     \*

Following the Supreme Court's issuance of its decision in *Bruen*, a panel of this Court held that the HQL statute was unconstitutional under the Second Amendment. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017(L), 2024 WL 124290 (4th Cir. Jan. 11, 2024). That decision was vacated by a vote of the full court, and we now consider this appeal en banc.

## II.

We review de novo the district court's decision on the parties' cross-motions for summary judgment.[7] *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312–13 (4th Cir. 2013). Summary judgment may be granted only if "the movant shows that there is no

---

[7] We observe that the district court did not have the benefit of the Supreme Court's analysis in *Bruen* when the court issued its summary judgment decision. Often, in such a situation we will remand for the district court to consider the Supreme Court's newly articulated framework in the first instance. *See, e.g.*, *Firewalker-Fields v. Lee*, 58 F.4th 104, 111, 121–23 (4th Cir. 2023). Indeed, the *Bruen* framework raises questions that in many cases will require additional factual development before the district court. *See, e.g.*, *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (remanding for district court to apply *Bruen* in the first instance because "[t]he parties' briefing on appeal only scratche[d] the surface of the historical analysis"). But as explained in the following sections, the Supreme Court's clear guidance on "shall-issue" licensing laws and the nature of the plaintiffs' constitutional challenge render additional factual development unnecessary in this case. *See Bruen*, 597 U.S. at 38 n.9; *see also United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012) (describing standard for facial constitutional challenges). So we decide the constitutionality of the HQL statute without remand to the district court. *See United States v. Williams*, 56 F.4th 366, 371 n.4 (4th Cir. 2023) (explaining that we may affirm the district court "on any ground supported by the record").

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).

A.

i.

Because this case presents our first opportunity after *Bruen* to evaluate the

constitutionality of a "shall-issue" licensing law, we begin by examining how the Supreme

Court's "shall-issue" discussion bears on our analysis.  Under the first step of the *Bruen*

framework, a court must consider the text of the Second Amendment:

> A well regulated Militia, being necessary to the security of a free State, the
> right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.  Among other plain-text requirements,[8] a regulation falls within the

ambit of the Second Amendment only if the regulation "infringes" the Second Amendment

right to keep and bear arms.  *Cf. Price*, 2024 WL 3665400, at *3 (explaining that the Second

Amendment "does not apply" if the plain text does not cover the conduct at issue); *United

States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024) (declining to undertake the *Bruen*

historical analysis when the statute at issue did not "infringe" the right to keep and bear

arms).

In its seminal Second Amendment decisions, the Supreme Court has not conducted

an exhaustive evaluation of the term "infringe," most likely because the Court has not been

required to do so.  In *Bruen*, for example, the state of New York had denied the petitioners'

---

[8] We assume without deciding that the Second Amendment's other textual requirements have been satisfied in this case.  *See Price*, 2024 WL 3665400, at *5 (describing other textual components of step one (citing *Bruen*, 597 U.S. at 31–32)).

applications for unrestricted public carry licenses, thereby prohibiting them from carrying handguns in public for self-defense.  597 U.S. at 70–71.  The proper-cause requirement thus "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose" and plainly "infringed" the right to keep and bear arms. *See id.* at 60, 70.  Because each textual requirement was satisfied under step one, the burden shifted to the government to justify the regulation under step two.  *Id.* at 24.

The laws challenged in the Supreme Court's other Second Amendment decisions similarly banned or effectively banned the possession or carry of arms.  In *District of Columbia v. Heller*, the Court addressed the constitutionality of a District of Columbia statutory scheme that banned handgun possession in the home.  554 U.S. 570, 628 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms'" and "extends . . . to the home.").  In *McDonald v. Chicago*, the Court addressed the constitutionality of Chicago laws that "effectively bann[ed] handgun possession by almost all private citizens who reside in the City."  561 U.S. 742, 750 (2010).  In *Caetano v. Massachusetts*, the Court assessed the constitutionality of a Massachusetts law prohibiting the possession of stun guns.  577 U.S. 411, 411 (2016).  And in *United States v. Rahimi*, the Court considered the constitutionality of a federal statute prohibiting the possession of a firearm by an individual subject to a domestic violence restraining order.  144 S. Ct. at 1894.  So in these cases, there was no question that the laws "infringed" the right to keep or bear arms because the government, either by law, regulation, or means of a discretionary governmental determination, prevented individuals from exercising these rights.

But *Bruen*, in explicitly distinguishing "shall-issue" licensing laws, also introduced a more nuanced consideration of the concept of "infringement." The Court emphasized that "shall-issue" licensing laws "*do not necessarily prevent* law-abiding, responsible citizens from exercising their Second Amendment right[s]" and require a more refined analysis. 597 U.S. at 38 n.9 (emphasis added) (internal quotation marks and citation omitted). In the "shall-issue" discussion, the Court established guideposts that reviewing courts may use to determine whether a "shall-issue" licensing law "infringes" the right to keep and bear arms. The Court explained that "shall-issue" licensing laws, which employ "narrow, objective, and definite standards" and do not give authorities discretion with regard to issuing a license, ordinarily do not prevent law-abiding individuals from exercising their Second Amendment rights. *See id.* (citation omitted). Thus, such laws generally do not "infringe" the right to keep and bear arms. But the Court further stated that it did not "rule out constitutional challenges" to "shall-issue" licensing laws that "deny ordinary citizens their right to public carry." *Id.* And the Court provided as examples challenges to "shall-issue" licensing laws "put toward abusive ends," such as those imposing "lengthy" wait times or "exorbitant" fees. *Id.*

We are not free to ignore the Supreme Court's substantive dictum on "shall-issue" licensing laws. *See McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (explaining that dicta "doesn't get more recent or detailed than [the 'shall-issue' discussion in] *Bruen*"). And we observe that *Bruen* is not the first case in which the Supreme Court has discussed in dicta types of regulations not before the Court when announcing limits on the Second

Amendment right.  In the course of striking down the District of Columbia's ban on

handgun possession in the home in *Heller*, the Court emphasized:

> Like most rights, the right secured by the Second Amendment is not
> unlimited.  From Blackstone through the 19th-century cases, commentators
> and courts routinely explained that the right was not a right to keep and carry
> any weapon whatsoever in any manner whatsoever and for whatever purpose.

554 U.S. at 626.  Continuing, the Court in *Heller* described as "presumptively lawful"

certain "longstanding prohibitions," such as prohibitions on the possession of firearms by

felons.  *Id.* at 626–27 & n.26 (also describing as "presumptively lawful" "prohibitions on

the possession of firearms by . . . the mentally ill, or laws forbidding the carrying of

firearms in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms").  The Court reiterated this

"assurance[]" two years later in *McDonald*, and the Court again cited this language in its

recent decision in *Rahimi*.  *McDonald*, 561 U.S. at 786; *Rahimi*, 144 S. Ct. at 1902; *see*

*also Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Nor have we disturbed anything that

we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession

or carrying of guns."); *id.* at 81 (Kavanaugh, J., concurring).

In the years following *Heller* and *McDonald*, we and our sister circuits have relied

on this dictum from *Heller* in rejecting myriad constitutional challenges to laws prohibiting

the possession of firearms by felons.  Indeed, when we considered a defendant's challenge

to the federal felon-in-possession statute in *United States v. Moore*, we began our analysis

"by noting the unanimous result reached by every court of appeals that [18 U.S.C.]

§ 922(g)(1) is constitutional, . . . usually based at least in part on the 'presumptively lawful'

language from *Heller*."  666 F.3d 313, 316–17, 319–20 (4th Cir. 2012); *id.* at 318 ("[T]he clear declaration in *Heller* that such felon in possession laws are a presumptively lawful regulatory measure resolves [a facial constitutional] challenge fairly quickly.").  And following *Bruen*, in *United States v. Canada* we again rejected a facial constitutional challenge to § 922(g)(1).  103 F.4th 257, 258–59 (4th Cir. 2024).  We explained that "[w]hether the proper analysis focuses on the definition of the 'people,' the history of disarming those who threaten the public safety, *Heller*'s and *Bruen*'s assurances about 'longstanding prohibitions,' or circuit precedent, the answer remains the same: the government may constitutionally forbid people who have been found guilty of such acts from continuing to possess firearms." *Id.*

Consistent with our treatment of this dictum from *Heller* and our practice to "routinely afford substantial, if not controlling deference to dicta from the Supreme Court," we apply *Bruen*'s clear guidance on "shall-issue" licensing laws to our analysis of the constitutionality of the HQL statute.  *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 281–82 (4th Cir. 2019) (en banc); *see also Bianchi*, 2024 WL 3666180, at *26 (explaining that "we are bound to respect" both the "language of entitlement" and the "language of limitation" from *Heller* and *Bruen*).  So, in accord with the Supreme Court's "shall-issue" discussion, we hold that non-discretionary "shall-issue" licensing laws are presumptively constitutional and generally do not "infringe" the Second Amendment right to keep and bear arms under step one of the *Bruen* framework.  *See McRorey*, 99 F.4th at 837, 840 (holding that the challenged federal background check requirement was not "abusive" or "subject to *Bruen*'s historical framework as a *de facto* prohibition on

possession"). And if a plaintiff fails to rebut this presumption of constitutionality, the plaintiff's challenge to the "shall-issue" licensing law fails at step one, with no requirement to conduct a historical analysis under step two. *See Scheidt*, 103 F.4th at 1284.

If, however, a plaintiff rebuts this presumption of constitutionality by showing that a "shall-issue" licensing law effectively "den[ies]" the right to keep and bear arms, the burden shifts to the government to demonstrate that the regulation "is consistent with this Nation's historical tradition of firearm regulation."[9] *Bruen*, 597 U.S. at 17, 38 n.9. If the government satisfies its burden under step two, then even a "shall-issue" licensing law that effectively denies the Second Amendment right can be enforced consistent with the Second Amendment. *Cf. Rahimi*, 144 S. Ct. at 1902 (holding that the tradition of firearm regulation justified the challenged firearm prohibition). But if the government does not satisfy its burden in such cases, then the "shall-issue" licensing law violates the Second Amendment. *Cf. Bruen*, 597 U.S. at 38, 71 (holding that the government had not identified a tradition justifying the challenged "may-issue" licensing law).

ii.

Before turning to apply these legal principles to the HQL statute, we address the plaintiffs' and the dissent's preliminary arguments that the "shall-issue" discussion is inapplicable to the present case or to the step one inquiry. The plaintiffs initially assert that because the "shall-issue" discussion addresses only public carry laws, that discussion is

---

[9] In view of the Supreme Court's guidance on the presumptive constitutionality of "shall-issue" licensing regimes, we need not define the outer contours of the term "infringe" in determining the principles applicable to "shall-issue" licensing laws and the facial validity of the HQL statute. *See Bruen*, 597 U.S. at 38 n.9.

irrelevant to a "shall-issue" licensing law regulating the possession of firearms. We reject this contention because the distinction advanced by the plaintiffs rests on a false premise, namely, that the Supreme Court has recognized different levels of constitutional protection for the Second Amendment right to "keep" arms and the Second Amendment right to "bear" arms.

As the Supreme Court explained in *Bruen*, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." 597 U.S. at 32, 70. Moreover, the rationale supporting the Supreme Court's "shall-issue" discussion applies with equal force to "shall-issue" licensing laws governing the possession of firearms, and nothing in that discussion signals a contrary intent. So we decline the plaintiffs' request to bypass the Supreme Court's "shall-issue" discussion on the basis that the Court cited only "shall-issue" public carry laws.[10]

The plaintiffs separately contend that under *Bruen*, the "shall-issue" discussion pertains to a step two historical analysis, rather than to a step one plain text inquiry, because the Supreme Court appended the footnote containing the "shall-issue" discussion to the Court's analysis regarding historical regulations relating to public carry. We find no merit in this argument.

We first observe that the "shall-issue" discussion appears in tandem with the Court's ultimate holding invalidating the New York law based on the absence of a historical

---

[10] In analyzing a "shall-issue" licensing law, a court reaches the second step of the *Bruen* framework only when in step one the plaintiff rebuts the presumptive constitutionality of the regulatory regime. Accordingly, we need not address whether the step two analysis would differ for "may-issue" and "shall-issue" licensing laws.

tradition limiting public carry to law-abiding individuals who demonstrate a special need for self-defense. *Id.* at 38–39 & 38 n.9. So in the process of stating what the Court was *holding*, the "shall-issue" discussion served to alert the reader to the *limits* of that holding.

Moreover, in the "shall-issue" discussion the Court did not refer to any of the hallmarks of a step two historical inquiry, such as the historical tradition of "shall-issue" licensing laws or, conversely, the lack of a historical tradition for "shall-issue" licensing laws that may be subject to constitutional challenge. *Id.* at 38 n.9. Instead, without explicitly referencing the plain text of the Second Amendment, the Court grounded the "shall-issue" discussion in step one by explaining that even a presumptively constitutional "shall-issue" licensing law may go too far if it imposes conditions that effectively deny an individual the right to keep and bear arms.

The dissent attempts to circumvent the "shall-issue" discussion and move directly to step two by relying on *Rahimi*'s language that "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" 144 S. Ct. at 1897 (citation omitted); Dissenting Op., at 61–62. But the parties in *Rahimi* did not place in issue whether the challenged ban on the possession of firearms was covered by the plain text of the Second Amendment. So the Supreme Court was not required in *Rahimi* to conduct a plain text inquiry and moved directly to its step two analysis of the challenged firearms prohibition. *Rahimi*, 144 S. Ct. at 1899. When viewed in this context, the dissent's leap to step two is not supported by the holding in *Rahimi* and effectively would collapse *Bruen*'s two-part framework into merely one step, improperly treating the plain text inquiry as a meaningless check-the-box

exercise.[11]  *See Bruen*, 597 U.S. at 31–32.  We therefore remain guided by *Bruen* and its "shall-issue" discussion in our consideration of the HQL statute.

## B.

Turning to apply the "shall-issue" discussion to the present case, we examine in our step one analysis (1) whether the HQL statute qualifies as a presumptively constitutional "shall-issue" licensing law and, if so, (2) whether the plaintiffs have rebutted that presumption by demonstrating that the law "infringes," or effectively denies, the right to keep and bear arms.  *See Bruen*, 597 U.S. at 38 n.9.

### i.

We need address only briefly our conclusion that the HQL statute qualifies as a presumptively constitutional "shall-issue" licensing law.  The HQL statute allows any law-abiding person who seeks to obtain a handgun qualification license to do so by completing the objective criteria outlined in the statute.  The state may not deny an individual a license

---

[11] We also reject as frivolous the plaintiffs' suggestion that we should dismiss the Supreme Court's statements about "shall-issue" licensing laws as mere "stray comments." The "shall-issue" discussion reflects a carefully crafted limitation on the Court's holding regarding New York's proper-cause requirement, and undoubtedly was considered by the Supreme Court justices who comprised the *Bruen* majority.  Indeed, in a concurring opinion, Justice Kavanaugh, joined by Chief Justice Roberts, specifically referred to "shall-issue" licensing laws and underscored the limitations set forth in *Heller* and *McDonald*, explaining that the Second Amendment "allows a 'variety' of gun regulations."  597 U.S. at 80–81 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 636).  Contrasting "shall-issue" licensing laws with the "unusual" discretionary licensing regime struck down by the *Bruen* majority, which "in effect den[ied]" individuals "the right to carry handguns for self-defense," Justice Kavanaugh reiterated the core of the "shall-issue" discussion, namely, that "shall-issue" licensing laws "are constitutionally permissible, subject . . . to an as-applied challenge."  *Id.* at 79, 80 (citing as examples of constitutional components of a licensing law fingerprinting, background checks, and training requirements).

once the statutory requirements have been satisfied.  Moreover, the very requirements on which the plaintiffs focus their constitutional attack are the same requirements the Supreme Court cited as presumptively constitutional components of a "shall-issue" licensing law, namely, background checks and firearms safety courses.  *Id.*

The HQL statute thus falls easily within the scope of "shall-issue" licensing laws that the Supreme Court has indicated are presumptively constitutional.[12]  *See id.* Accordingly, the plaintiffs' constitutional challenge to the HQL statute can survive step one of the *Bruen* analysis only if they can demonstrate that the law "infringes," or effectively "den[ies]," the Second Amendment right.  *Id.*

ii.

The plaintiffs raise three arguments to rebut the presumptive constitutionality of the "shall-issue" HQL statute.  They contend that the HQL statute "has been put toward abusive ends" because (1) any "temporary deprivation" of the Second Amendment right constitutes "infringement," (2) the HQL statute imposes "lengthy" wait times, and (3)

---

[12] The plaintiffs attempt to draw a distinction between the HQL statute and certain other "shall-issue" licensing laws, arguing that the HQL statute does not qualify as a "shall-issue" law because before a law-abiding individual may acquire a handgun, that individual also must complete other objective, nondiscretionary criteria set out in a *different* Maryland firearm law.  But the plaintiffs do not dispute the constitutionality of this other law, referred to as the 77R process and described in Part II.B.ii.3 below, and a "shall-issue" licensing law is characterized not by its relationship to other, non-challenged legal requirements that may affect the same individual or subject matter, but by the challenged law's nondiscretionary nature.  *See Bruen*, 597 U.S. at 38 n.9.

21

Maryland's separate 77R firearm application (the 77R process) renders redundant the background check required under the HQL statute.[13]

Before addressing these arguments, we emphasize the difficulty of challenging the facial constitutionality of a statute. Plaintiffs contesting the validity of a firearms law under the Second Amendment may bring either an "as-applied" or a "facial" challenge to the law. *Moore*, 666 F.3d at 317–20. In an as-applied challenge, the court focuses on the circumstances of the particular plaintiffs and whether, in light of those circumstances, the challenged law was unconstitutionally applied to *those* plaintiffs. *Id.* at 319.

By contrast, in a facial constitutional challenge a plaintiff asks the court to declare that the statute is invalid. As the Supreme Court has explained, "facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi*, 2024 WL 3666180, at *10 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). So to succeed in a facial constitutional challenge, a plaintiff confronts a much more difficult task, namely, to establish that there is "no set of circumstances" under which the law would be valid. *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*,

---

[13] In their opening brief, the plaintiffs explained that the "costs" of completing the HQL statute "dissuaded" plaintiff Susan Brancato Vizas from acquiring a handgun qualification license, and that plaintiff Deborah Kay Miller could not complete the required training because of a physical disability that "makes it very difficult for her to sit for extended periods of time." But the plaintiffs have not advanced any argument that the cost of obtaining a handgun qualification license constitutes an "exorbitant" fee, or that the substantive components of the training requirement have been put toward abusive ends effectively "deny[ing]" applicants their Second Amendment rights. *Bruen*, 597 U.S. at 38 n.9. The plaintiffs thus have forfeited any facial constitutional challenge on these grounds. We express no view on the merits of any as-applied challenge on these bases.

22

481 U.S. 739, 745 (1987)); *see also Moore*, 666 F.3d at 318–19 ("[T]he Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application."). "The stakes are higher in a facial challenge, so the bar goes up as well." *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024).

## 1.

With these principles in mind, we consider the merits of the plaintiffs' arguments. First, we reject the plaintiffs' argument that *any* delay resulting from compliance with the HQL statute qualifies as "infringement." The plaintiffs center this argument on language in *Heller* and maintain that the Court "declared" that Second Amendment rights "shall not be *infringed*, curtailed, or broken in upon, in the smallest degree." But the Court did not make such a declaration. Rather, the language cited by the plaintiffs appears in a longer passage the Court quoted from *Nunn v. State*, a decision by the Georgia Supreme Court in 1846:

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.

*Heller*, 554 U.S. at 612–13 (quoting *Nunn,* 1 Ga. 243, 251 (1846)). When the Court introduced this passage, it explained that the state court in *Nunn* "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." *Id.* at 612. In other words, the Court relied on *Nunn* to explain its conclusion that the Second Amendment right "was an individual right

23

unconnected to militia service," not to explain when a law "infringes" the Second Amendment right.[14] *Heller*, 554 U.S. at 612.

The Supreme Court no doubt was aware of its prior statements in *Heller* and this passage from *Nunn* when it indicated in the "shall-issue" discussion that "shall-issue" licensing laws are presumptively constitutional even though such laws require compliance *before* individuals may exercise their Second Amendment rights. By equating "infringement" with any temporary delay, the plaintiffs improperly discount the Supreme Court's guidance that requirements such as background checks and training instruction, which necessarily occasion some delay, ordinarily will pass constitutional muster without requiring the government to justify the regulation at step two. *Bruen*, 597 U.S. at 38 n.9; *McRorey*, 99 F.4th at 839 ("Our law is plain as can be that some amount of time for background checks is permissible.").

## 2.

The plaintiffs alternatively contend that compliance with the HQL statute results in the type of "lengthy" wait time that would qualify under the "shall-issue" discussion as a "denial" of an applicant's Second Amendment rights. Without identifying any support for

---

[14] Moreover, in the present challenge to the HQL statute we need not address the other historical sources related to the dissent's interpretation of the term "infringe." Dissenting Op., at 58-60. Although the historical scope of the Second Amendment right typically informs a step one analysis, *Bianchi*, 2024 WL 3666180, at *6, *Price*, 2024 WL 3665400, at *5, in considering a "shall-issue" licensing law we apply the Supreme Court's clear direction in the "shall-issue" discussion that such laws may be subject to constitutional challenge when "put toward abusive ends" by imposing, "for example, lengthy wait times in processing license applications or exorbitant fees deny[ing] ordinary citizens" their Second Amendment rights. *Bruen*, 597 U.S. at 38 n.9; *see also supra* note 9 (explaining that we need not define the outer contours of the term "infringe" in this case).

their argument in the record, the plaintiffs maintain that the actual time involved to obtain a handgun qualification license "self-evidently takes longer than 30 days."

At the outset, this argument is flawed because it would require us to assume that the state takes the entire permissible 30-day period to process each application. The record before us squarely refutes such an assumption: "Through the first quarter of calendar year 2018, there were no completed HQL applications pending disposition for longer than 15 days." And of particular relevance to this facial challenge in which we consider whether the HQL statute "may constitutionally be applied in at least *some* 'set of circumstances,'" *Canada*, 103 F.4th at 258 (citation omitted), the record reflects that completed applications "can be and have been" processed within 24 hours of submission to the Maryland State Police.

The record therefore reveals that, in some cases, the process for obtaining a handgun qualification license can take only a few days. This time period is far shorter than many of the permissible processing periods cited by the Supreme Court in *Bruen*. *See, e.g.*, 597 U.S. at 13 n.1. We decline to construe the Supreme Court's reference to "lengthy" processing periods as including within its scope the relatively brief application, review, and approval process of the HQL statute.[15] *See also McRorey*, 99 F.4th at 836, 840

---

[15] The plaintiffs also emphasize that *after* obtaining a handgun qualification license, an individual must complete a separate firearm application not challenged in the present case, namely, the 77R process, before buying a handgun. *See infra* Part II.B.ii.3 (describing the 77R process). Even if we were to consider the plaintiffs' argument that this additional, unchallenged law renders the "entire" process so lengthy as to deny individuals their Second Amendment rights, we would reject the argument on the merits. Taken together, an individual can complete the HQL statute and the 77R process in well under two weeks. (Continued)

25

(rejecting constitutional challenge to federal background check requirement because "a period of 10 days does not qualify" as "lengthy" under *Bruen*).

3.

In their final argument, the plaintiffs contend that the HQL statute is "abusive" because a separate Maryland law, the 77R process, requires another background check for purchases of regulated firearms. *See* Md. Code Pub. Safety § 5-117. The plaintiffs do not challenge the constitutionality of background investigations generally, but they contend that Maryland "does not need two background checks." In making this argument, however, the plaintiffs ignore key differences between these two processes.

Unlike the HQL statute, which directs that each *individual* obtain a license before purchasing, renting, or receiving a handgun, the 77R process applies to the purchase, rental, or transfer of every regulated *firearm*.[16] Md. Code Pub. Safety § 5-117. Under the 77R process, an individual seeking to purchase a handgun in Maryland must submit to a firearms dealer a $10 fee and an application that contains, among other things, information regarding the handgun the individual seeks to purchase and the individual's personal identification information. *Id.* §§ 5-118(a), (b). The 77R application also must contain the individual's handgun qualification license number. *Id.* § 5-118(b)(4).

---

We find no merit in any contention that the time required to comply with this separate law renders the HQL statute presumptively unconstitutional.

[16] The phrase "regulated firearm" includes both handguns and certain assault weapons. Md. Code Pub. Safety §§ 5-101(n)(1)–(2), (r). *But see* Md. Code Crim. Law §§ 4-301(b), (d), -303(a)(2) (prohibiting the purchase of assault weapons); *Bianchi*, 2024 WL 3666180, at *1 (rejecting facial constitutional challenge to § 4-303).

Once the 77R application is completed, the Secretary conducts a background investigation. *Id.* § 5-121.[17]  Significantly, the background check under the 77R process does not involve the submission of fingerprints.  So when the Maryland General Assembly passed the HQL statute, the legislature included a fingerprinting requirement after considering expert testimony explaining that Maryland's then-existing laws were vulnerable to illegal "straw" purchases.[18]  One expert illustrated the gravity of this issue by citing a U.S. Government Accountability Office study in which undercover agents successfully used counterfeit driver's licenses to purchase firearms from licensed dealers in five states that did not require fingerprinting.  Thus, while both the 77R process and the HQL statute help ensure that an applicant is not prohibited from possessing a handgun, the HQL statute specifically aims to prevent individuals from using false identification to verify their eligibility to purchase a handgun.

In addition to this substantive difference between the background checks required by each law, these investigations also may take place at different points in time.  As noted above, the initial background check under the HQL statute occurs when applicants submit their fingerprints with their application for a handgun qualification license.  After this initial investigation, the law requires that the Maryland Department of Public Safety and Correctional Services provide the State Police with updated criminal history information

---

[17] The dealer may not sell, rent, or transfer the handgun to the applicant until seven days after the dealer forwards the application to the Secretary.  *Id.* § 5-123(a).

[18] A "straw" purchaser is legally eligible to buy a firearm and represents themselves to the seller as the purchaser of the firearm, but in fact is purchasing the firearm on behalf of a third party.

for handgun qualification license holders. *Id.* § 5-117.1(f)(7). The State Police "regularly receives" such reports. In contrast, individuals complete the 77R process each time they purchase any regulated firearm. *See id.* § 5-117. So the background check required by the 77R process fills any gap that might result between the HQL criminal history reports and ensures that *at the time* an individual applies to purchase a handgun, the background check information reflects the individual's current criminal history record.

In sum, background checks under the 77R process and the HQL statute differ because only the HQL statute involves the submission of fingerprints, and the background checks for each process may occur at different points in time. In light of these distinctions, and because the HQL statute effectively strengthens the 77R process, we reject the plaintiffs' argument that the HQL statute's background check is wholly redundant and so abusive as to "infringe" the Second Amendment right under step one of the *Bruen* framework.[19]

\*     \*     \*

The plaintiffs have not met their burden to show that the HQL statute "infringes" the Second Amendment right to keep and bear arms and, thus, they have failed to rebut the

---

[19] The plaintiffs also argue that the HQL statute has been put toward abusive ends "by deterring tens of thousands of law-abiding, responsible citizens from acquiring handguns." In support of this argument, the plaintiffs state that every year thousands of HQL applications are initiated but not submitted. This information is insufficient to show that the HQL statute is facially invalid. The data cited by the plaintiffs does not indicate *why* any application was initiated but not submitted and, thus, such data is of limited utility. For example, individuals may begin an application but not complete it because of ineligibility, because of a change in their decision to pursue a handgun qualification license, or because they ultimately complete a different type of application, such as a "permit-exempt" application.

presumption of constitutionality afforded to the HQL statute.  We therefore reject their facial constitutional challenge at step one of the *Bruen* framework, and do not reach their argument under step two that the HQL statute lacks a historical analogue.

## III.

Since the Supreme Court issued *Bruen*, courts across the country have struggled to answer the many questions resulting from the Court's new analytical framework.  But this uncertainty does not extend to "shall-issue" licensing laws, which the Supreme Court has indicated should not be cast aside in rote fashion by relying on *Bruen*'s invalidation of "may-issue" licensing laws.  We are not free to ignore the Supreme Court's clear guidance on the presumptive constitutionality of "shall-issue" licensing regimes, nor to unduly constrain legislatures seeking to employ such measures to prevent handgun misuse and violent criminal activity.  So, in line with the Court's "shall-issue" discussion, governments may continue to enforce "shall-issue" firearms licensing regulations that impose non-abusive, objective requirements like background checks and firearm safety training.  And because the plaintiffs in this case have failed to rebut the presumptive constitutionality of the "shall-issue" HQL statute, we reject their facial constitutional challenge.  We affirm the district court's judgment.

*AFFIRMED*

RUSHING, Circuit Judge, with whom Judges GREGORY and QUATTLEBAUM join, concurring in the judgment:

In Maryland, most people who wish to acquire a handgun must first obtain a "handgun qualification license." Md. Code Ann., Pub. Safety § 5-117.1(c). To obtain a license, a person must be at least 21 years old and a resident of Maryland, complete a firearms safety training course, submit a set of fingerprints to facilitate a background check, pay a $50 application fee, and aver that he is not prohibited under federal or state law from possessing a handgun. *Id.* § 5-117.1(d), (f), (g). Within 30 days of receiving a complete and accurate application, the Secretary of State Police issues the applicant a license. *Id.* § 5-117.1(h)(1).

A majority of this Court concludes that Maryland's handgun license requirement doesn't implicate the plain text of the Second Amendment, which preserves "the right of the people to keep and bear Arms." U.S. Const. amend. II. That is wrong. Maryland's law regulates acquiring a handgun, and the Second Amendment's text encompasses that conduct.

The handgun license requirement is nevertheless constitutional because it is consistent with the principles underlying our Nation's historical tradition of firearm regulation. In *New York State Rifle and Pistol Association v. Bruen*, the Supreme Court signaled that shall-issue licensing regimes designed to ensure that individuals bearing arms are "law-abiding, responsible citizens," and which do so through "narrow, objective, and definite standards," are relevantly similar to laws our regulatory tradition permits. 142 S. Ct. 2111, 2138 n.9 (2022) (internal quotation marks omitted). Maryland's handgun license

30

requirement fits that paradigm. Following the Supreme Court's guidance, I would conclude that Maryland's handgun license requirement is consistent with the Second Amendment. I therefore concur only in the judgment.

I.

All Second Amendment claims must be assessed within the text-and-history framework the Supreme Court established in *Bruen*. Under that rubric, we first ask if the challenged law addresses conduct covered by the "plain text" of the Second Amendment. *Id.* at 2129–2130. If so, then the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Maryland's handgun license requirement obviously regulates conduct covered by the text of the Second Amendment. As Judge Richardson explains in his dissenting opinion, Maryland's law applies to "the people," handguns are "Arms," and the law regulates acquisition, which is a prerequisite to "keep[ing] and bear[ing]" those arms. U.S. Const. amend. II; *see also District of Columbia v. Heller*, 554 U.S. 570, 579–592 (2008) (explicating these terms). I agree with his textual analysis. *See* Diss. Op. 51–52.

The majority concludes that the conduct addressed by Maryland's law—acquiring a handgun—is not covered by the text of the Second Amendment. That is "an implausible reading" of the constitutional text, not to mention the Court's opinion in *Bruen*. Diss. Op. 58. Here again, I agree with the dissent. *See* Diss. Op. 58–61. Because Maryland's handgun license requirement "regulates [protected] conduct, . . . [Maryland] bears the burden to justify its regulation." *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (internal quotation marks omitted).

31

II.

When, as here, the government places conditions on conduct covered by the plain text of the Second Amendment, it must show that those conditions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. This inquiry is necessarily an exercise in analogical reasoning, because "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897–1898; *see also Bruen*, 142 S. Ct. at 2132. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. A court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 142 S. Ct. at 2132). Central to this inquiry is "[w]hy and how the regulation burdens the right." *Id.*; *see also Bruen*, 142 S. Ct. at 2133. In this respect, the law "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 142 S. Ct. at 2133).

*Bruen*'s Footnote Nine gives us significant direction in evaluating a shall-issue licensing requirement under this standard. Recall that in *Bruen* the Supreme Court considered the constitutionality of New York's public-carry licensing regime, which required an individual to demonstrate "a special need for self-protection distinguishable from that of the general community" in order to receive a license to carry a firearm outside his home or place of business for self-defense. *Bruen*, 142 S. Ct. at 2123 (internal quotation marks omitted). Because licensing officials retained discretion "to deny licenses based on

a perceived lack of need or suitability," the Court dubbed New York's law a "may issue" licensing regime, as distinguished from the "shall issue" licensing laws in "the vast majority of States," pursuant to which "authorities must issue concealed-carry licenses" whenever applicants satisfy non-discretionary threshold criteria. *Id.* at 2123–2124; *see also id.* at 2123 n.1. After a comprehensive historical review, the Court held New York's licensing law unconstitutional because it prevented "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 2150; *see also id.* at 2156.

The Court was quick to distinguish "shall-issue licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." *Id.* at 2138 n.9 (internal quotation marks and brackets omitted). "[N]othing" in the Court's historical analysis, it warned, "should be interpreted to suggest the unconstitutionality of the 43 States' shall-issue licensing regimes." *Id.* "Because these [shall-issue] licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (quoting *Heller*, 554 U.S. at 635). "Rather," the Court reasoned, "it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials," unlike New York's proper-cause standard. *Id.* (first quoting *Heller*, 554 U.S. at 635, and then quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)).

33

That said, the Court "d[id] not rule out constitutional challenges to shall-issue regimes" that are "put toward abusive ends"—for example, where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* In other words, "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).

The Supreme Court's discussion of shall-issue licensing regimes in *Bruen*, while not strictly necessary to the Court's holding about New York's law, is welcome guidance to "lower courts grappling with complex legal questions of first impression" in an area of the law that remains relatively undeveloped. *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019) (en banc). That discussion cannot be dismissed as a "passing" aside on a "tangential issue" that we are free to ignore. *Id.* Rather, from the very beginning of its opinion in *Bruen*, the Court contrasted New York's may-issue law with the shall-issue laws in other States as a way to explain the rationale and limits of its holding. *See* 142 S. Ct. at 2122–2124, 2123 n.1, 2138 n.9. Accordingly, I would "give due weight" to this considered and reasoned guidance from the Supreme Court. *Manning*, 930 F.3d at 282.

Of course, the Court's analysis of shall-issue licensing regimes must be read in harmony with the rest of the *Bruen* opinion. Footnote Nine is not, as the State urges here, "a different analysis" separate from or in addition to the history-and-tradition framework the Court instructed us to employ in *Bruen*. Appellees' Supp. Br. 11. There is no indication that Footnote Nine is an exception from or contrary to the Second Amendment doctrine the

34

Court articulated just a few pages earlier in its opinion. Indeed, it would be bizarre for the Court to double down on the interpretive standard from *Heller*, which "centered on constitutional text and history," *Bruen*, 142 S. Ct. at 2128–2129, and then, in a footnote, introduce an entirely distinct standard for only a small subset of regulations. Commonsensically, Footnote Nine's assessment of shall-issue licensing regimes must be understood within the analytical framework the Court described and followed elsewhere in *Bruen*.

Viewed through that lens, Footnote Nine gives lower courts insight into the degree of fit necessary for a shall-issue licensing regime to be relevantly similar to historical analogues and thus consistent with the Nation's historical tradition of firearm regulation. The Supreme Court has instructed that "how and why" modern and historical regulations burden Second Amendment rights are "'*central*' considerations when engaging in [this] analogical inquiry," so we should begin there. *Id.* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)).

First is the *justification* for shall-issue licensing laws, or the "why." *Id.* By requiring applicants "to undergo a background check or pass a firearms safety course," shall-issue licensing laws "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In other words, the shall-issue licensing laws considered in *Bruen* burdened Second Amendment rights in order to keep firearms out of the hands of individuals who were not "law-abiding, responsible citizens" but whose public carry of firearms instead threatened public safety. That justification is comparable to historical regulations restricting certain

persons' ability to possess and publicly carry weapons because of the danger they posed. *See*, *e.g.*, *id.* at 2148–2150 (discussing historical surety statutes); *Heller*, 554 U.S. at 626 (noting "longstanding prohibitions on the possession of firearms by felons and the mentally ill").

Similarly here, the State relies on the tradition of regulating firearm possession by dangerous individuals, a historical justification that precedent well supports. What *Heller* and *Bruen* presumed, courts have confirmed through more exhaustive analysis of the historical record: "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting); *see Rahimi*, 144 S. Ct. at 1901 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."); *see also United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (upholding 18 U.S.C. § 922(g)(5), which prohibits possession of a firearm by an illegal alien, based on "historical evidence" that "the government could disarm individuals who are not law-abiding members of the political community"); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("Historically, limitations on the right were tied to dangerousness. . . . Violence was one ground for fearing danger, as were disloyalty and rebellion."); *Binderup v. Att'y Gen.*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he historical record leads us to conclude that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger

36

to the public if armed.").  As these decisions explain, history demonstrates the principle that certain dangerous individuals may be prohibited from possessing firearms at all, not just from carrying them publicly.  *Cf. Rahimi*, 144 S. Ct. at 1899–1902 (analogizing dangerousness justification underlying "surety and going armed laws" to dangerousness justification underlying possession prohibition).

The justification for Maryland's handgun license requirement is relevantly similar to this historical tradition.  Like the shall-issue licensing laws considered in *Bruen*, Maryland's law "require[s] a license applicant to undergo fingerprinting" for "a background check" and "a mental health records check," *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring), and to "pass a firearms safety course," *id.* at 2138 n.9 (majority opinion).  *See* Md. Code Ann., Pub. Safety § 5-117.1(d)(4) (investigation to determine whether person is "prohibited by federal or State law from purchasing or possessing a handgun"); *id.* § 5-133 (listing prohibited persons, including felons, fugitives, drug addicts, and the mentally ill).[1]  Because those requirements are "designed to ensure only that those [keeping] arms in the jurisdiction are, in fact, law-abiding, responsible citizens" whose possession of handguns does not pose a danger to others, they are supported by a historically defensible justification according to *Bruen*.[2] 142 S. Ct. at 2138 n.9 (internal quotation marks omitted).

---

[1] Plaintiffs do not challenge the constitutionality of any part of Section 5-133.

[2] Historical laws did not restrict firearm ownership or public carry based on a person's ability to use the weapon safely, although some laws apparently did require forfeiture of a firearm or ammunition that was not safely stored.  *See*, *e.g.*, Act of Mar. 1, (Continued)

Second, in addition to comparing "why" historical regulations and their modern counterparts burden Second Amendment rights, courts should compare "how" they do so, that is, "whether modern and historical regulations impose a comparable burden on the right." *Id.* at 2133. In Footnote Nine, the *Bruen* Court identified how shall-issue licensing regimes burden the right to keep and bear arms: using "narrow, objective, and definite standards" to identify persons rightfully prohibited from possessing or carrying a firearm, licensing officials deny those individuals a license, while issuing licenses to all other

---

1783, ch. 13, 1783 Mass. Acts 218, 218–219 (prohibiting loaded firearms in "any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of Boston" and authorizing seizure of such arms and a fine); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627–629 (prohibiting "any quantity of gun powder exceeding twenty-eight pounds weight, in any one place" in New York City "except in the public magazine" and requiring gunpowder to be "seperated into four stone jugs or tin cannisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gun powder" and paying a fine); Act of Feb. 28, 1786, § I, 1786 N.H. Laws 383, 383–384 (prohibiting "more than ten pounds of gun-powder" in "any dwelling-house, store or other building, on land, within the limits of said Portsmouth" and requiring gunpowder to "be kept in a tin cannister properly secured for that purpose" or else "forfeit the powder" illegally kept and pay a fine); Act of Mar. 28, 1787, ch. 328, § II, 1786 Pa. Laws 502, 502–503 (prohibiting "any house, store, shop, cellar or other place, within the city of Philadelphia" from storing "any greater quantity of gunpowder, at one time, than thirty pounds . . . under the penalty of forfeiture of the whole quantity so over and above stored or kept, together with the sum of twenty pounds for every such offence"); Act of June 19, 1801, ch. 20, § 1, 1801 Mass. Acts 507, 507–508 (prohibiting storage of gunpowder in any "house or shop for sale, by retail" exceeding "twenty-five pounds" and requiring gunpowder to be "kept in brass, copper or tin Tunnels" subject to "forfeiting all such Gun Powder"). The Supreme Court in *Bruen* nevertheless treated modern training requirements as covered by the historically justifiable purpose of ensuring that "those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." 142 S. Ct. at 2138 n.9 (internal quotation marks omitted). Plaintiffs have not identified any basis to depart from that reasoning in the context of restrictions on possession, so I follow *Bruen*'s lead and conclude that the justification underlying the training component of Maryland's handgun license requirement is sufficiently comparable to historical precursors prohibiting firearm possession on dangerousness grounds.

applicants.  *Id.* at 2138 n.9 (internal quotation marks omitted).  The Court acknowledged that even those individuals who ultimately receive a license must pay a fee and wait some amount of time while their application is processed, but it indicated that successful constitutional challenges to the burden on that group would likely be limited to cases of abuse, like when "lengthy wait times" or "exorbitant fees" de facto deny those individuals their right to keep or carry firearms.  *Id.*; *see also id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).

As Plaintiffs point out, a permitting scheme is undeniably different from historical laws that prohibited dangerous persons from keeping or carrying weapons and penalized them when they did so.  By subjecting *everyone* to a licensing requirement, the government temporarily prevents a much wider swath of people from possessing or carrying firearms than the narrower category of dangerous persons who can be disarmed long term.  Plaintiffs argue that, for this reason, a permitting scheme that licenses lawful gun owners in advance cannot be considered relevantly similar to historical laws that retrospectively punished unlawful gun owners.

That argument cannot be squared with *Bruen*'s Footnote Nine.  There, the Supreme Court acknowledged that some shall-issue licensing regimes are constitutional.  Yet *all* licensing schemes share the feature that Plaintiffs claim is unconstitutional—whether the delay is one day or thirty, a person entitled to a license will temporarily be prevented from exercising his rights while he awaits government approval.  Despite this fact, the Supreme Court was untroubled by a licensing regime requiring advance permission to carry a gun, at least when the criteria for receiving permission from the government are objective and

tied to historically defensible justifications.[3]  *See id.* at 2123 & n.1, 2138 n.9 (majority opinion).  We know from *Bruen*, then, that some firearm licensing regimes are constitutional, even though, unlike their historical analogues, they briefly burden the rights of "law-abiding, responsible citizens."  *Id.* at 2138 n.9 (internal quotation marks omitted).  An analogical assessment that finds this difference disqualifying, therefore, is requiring an erroneously stringent fit between the modern and historical regulations.  *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold.").

The Court's recent *Rahimi* decision is illustrative.  There, the Court considered the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits a person from possessing a firearm while subject to a domestic violence restraining order.  The Court found two types of historical laws analogous: surety laws and affray or "going armed" laws.  Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond," which "would be forfeit" if the individual subsequently broke the peace by, for example, "go[ing] armed offensively."  *Rahimi*, 144 S. Ct. at 1900 (majority opinion) (internal quotation marks omitted).  Going armed laws prohibited "riding or going armed, with dangerous or unusual weapons, to terrify" the people, which was punished by

_____

[3] Plaintiffs and amici suggest that because various historical licensing laws were imposed exclusively against "slaves, freedmen, and Indians," there can be no historical tradition justifying a licensing requirement for rights-holding citizens.  Brief for Firearms Policy Coalition et al. as Amici Curiae Supporting Appellants 8.  On their face, none of these laws constrained the licensing official's discretion, so they do little to prove that our historical tradition doesn't countenance applying a shall-issue licensing requirement to rights-bearing citizens.

"forfeiture of the arms and imprisonment." *Id.* at 1901 (internal quotation marks, brackets, and ellipsis omitted).

The enforcement mechanisms of those historical laws were materially different from that of Section 922(g)(8), yet the Court concluded that provision "is 'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right." *Id.* (quoting *Bruen*, 142 S. Ct. at 2132). Unlike Section 922(g)(8), neither surety laws nor going armed laws categorically disarmed a threatening person. And going armed laws solely punished past misbehavior; they did not impose a restraint to prevent future behavior. Despite these differences, the Court concluded that Section 922(g)(8) fit "within the tradition the surety and going armed laws represent" because it "restricts gun use to mitigate demonstrated threats of physical violence." *Id.* at 1901–1902.

Similarly here, although a shall-issue licensing regime designed to prevent dangerous individuals from obtaining firearms "does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 1898 (quoting *Bruen*, 142 S. Ct. at 2133). The theory underlying Plaintiffs' argument—that the Second Amendment prohibits *any* advance permission regulatory scheme—is inconsistent with the Supreme Court's reasoning in Footnote Nine. Despite the different enforcement mechanism, a shall-issue licensing regime *can* be consistent with the historical tradition of disarming those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety. In *Bruen*, the Court indicated that a shall-issue licensing scheme consistent with historical principles would use "only narrow, objective, and definite standards" to guide licensing officials in identifying persons

41

prohibited from carrying firearms and would not, through abuses like "lengthy wait times" or "exorbitant fees," de facto "deny ordinary citizens their right to public carry."  142 S. Ct. at 2138 n.9 (internal quotation marks omitted).

Applying these criteria to Maryland's handgun license requirement, no one disputes that the law contains only "narrow, objective, and definite standards" for distinguishing between individuals prohibited from receiving a handgun and everyone else.  *Id.* (internal quotation marks omitted).  Plaintiffs contend that the licensing process results in a lengthy wait time, but the majority correctly rejects that argument on the facts and the law.  *See* Maj. Op. 24–25.  Plaintiffs also argue that the handgun license requirement is redundant of a separate Maryland permit requirement and therefore abusive.  However, as the majority correctly explains, differences between the two requirements disprove Plaintiffs' premise. *See* Maj. Op. 26–28.   Accordingly, Maryland's handgun license requirement fits comfortably within *Bruen*'s criteria for a constitutional shall-issue licensing regime.

\*    \*    \*

In conclusion, I would affirm the district court's award of summary judgment to the State of Maryland.  Its handgun license law regulates conduct covered by the Second Amendment.  But, following the Supreme Court's guidance in *Bruen*, I would conclude that Maryland's licensing requirement is consistent with our Nation's historical tradition of firearm regulation.

NIEMEYER, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

Before us is the question of whether a portion of Maryland's handgun licensing regime is unconstitutional under the Second Amendment. The law at issue requires a would-be purchaser of a handgun first to obtain a "handgun qualification license," Md. Code Ann., Pub. Safety § 5-117.1, and then, in connection with the actual purchase of a handgun, a related law requires the purchaser to submit a "firearm application," *id*. § 5-118. If the statutory requirements are satisfied, the State is required to grant the handgun qualification license within 30 days. *Id*. § 5-117.1(h)(1). And the State has 7 days to decide whether to deny the firearm application. *Id*. § 5-122(b). In short, the Maryland licensing regime at issue is understood to be a "shall-issue" one under which the State *must* issue the licenses needed to purchase a handgun if specified, objective requirements are satisfied.

In addition to Maryland, over 40 other States have shall-issue licensing regimes.

The majority opinion finds Maryland's regime constitutional, relying on footnote 9 in the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022). In *Bruen*, the Court held that a New York law governing the process to obtain a license to carry a handgun in public was unconstitutional because the law conditioned the license's issuance on the applicant's demonstrating that he or she had some "special need" that justified carrying a handgun beyond a general interest in self-defense. *Id*. at 11–13, 38. Without demonstrating that special need, a citizen in New York could not carry a handgun in public for self-defense.

43

In holding New York's law unconstitutional, the *Bruen* Court began by articulating the applicable test for analyzing a government regulation under the Second Amendment. It stated:

> When the Second Amendment's *plain text* covers an individual's *conduct*, the Constitution presumptively protects that conduct. The government must then justify its *regulation* by demonstrating that it is consistent with the Nation's *historical tradition* of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 597 U.S. at 24 (emphasis added) (cleaned up). The Court thus adopted a two-step text-and-history test for determining whether a regulation violates the Second Amendment. *See also United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).

Explaining the test, the *Bruen* Court noted that at the first step, a court must focus on the plaintiff's *conduct* and determine whether it is covered by the text of the Amendment — "the right of the people to keep and bear Arms." 597 U.S. at 32 (quoting U.S. Const. amend. II). As to the plain meaning of that text, the Court stated that the right to "bear arms" describes "the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready . . . in . . . case of conflict with another person." *Id.* (cleaned up). And it stated that "arms" refers to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (cleaned up). Thus, a plaintiff's *conduct* in carrying a bearable firearm is presumptively protected by the Second Amendment. That is only the first part of the analysis, however, because, as the Court stressed, the scope of the right protected by the Amendment is "not unlimited." *Id.* at 21 (cleaned up). Yet, when the plaintiff's proposed course of conduct is

protected by the Amendment's plain text, the burden shifts to the government to justify its regulation of that conduct by showing the regulation's consistency with historical tradition. Thus, it is "the historical tradition that delimits the outer bounds of the right." *Id*. at 19; *see also Rahimi*, 144 S. Ct. at 1897.

After the Court established and explained the two-step analysis for application of the Second Amendment, it then turned to the New York law and, focusing on the conduct regulated, it readily concluded that the "textual" step of its test was satisfied, stating, "The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. But that was just the first step in determining the scope of the "right" protected. The second step required New York to demonstrate that there was a historical tradition that justified its requiring a license applicant to demonstrate a special need to carry a handgun beyond the needs of ordinary self-defense. On that step, the Court concluded that New York had shown no "historical tradition limiting public carry only to those . . . who demonstrate a special need." *Id*. at 38. Accordingly, the Court held, *after completing the second step*, that the New York licensing law was unconstitutional.

While rendering that holding, Court distinguished the New York law from the shall-issue licensing laws that, it noted, were in force in 43 other States. *Bruen*, 597 U.S. at 38 n.9. The Court explained, in footnote 9, that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." *Id.* (cleaned up). But the Court cautioned that "because any permitting scheme can be put toward abusive

45

ends," it was not "rul[ing] out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

The majority opinion relies on *Bruen* footnote 9 to uphold the constitutionality of Maryland's licensing regime, and I concur in its doing so. The Maryland law is a "shall-issue" licensing regime, and facially, it has not been "put toward abusive ends," insofar as it does not impose unreasonably lengthy wait times or exorbitant fees. *Bruen*, 597 U.S. at 38 n.9.

The majority opinion should have ended with that analysis. Instead, for a reason I have difficulty fathoming, the majority opinion launches into illogical dicta to alter *Bruen*'s clear test for applying the Second Amendment by requiring a plaintiff, *as part of step one*, to demonstrate that the regulation "infringes" the Second Amendment right. Specifically, the opinion states that, "[u]nder the first step of the *Bruen* framework, a court must consider the text of the Second Amendment" and that, "[a]mong other plain-text requirements [of the first step], a regulation falls within the ambit of the Second Amendment only if the regulation '*infringes*' the Second Amendment right to keep and bear arms." *Ante* at 12 (emphasis added). Gratuitously applying that test to the Maryland licensing regime, the opinion then concludes:

> The plaintiffs have not met their burden to show that the [Maryland licensing law] "*infringes*" the Second Amendment right to keep and bear arms . . . . We therefore reject their facial constitutional challenge *at step one* of the *Bruen* framework, and *do not reach their argument under step two* that the [Maryland licensing law] lacks a historical analogue.

*Ante* at 28–29 (emphasis added).

Thus, the majority now makes infringement part of the showing that must be made at step one. Doing so, however, sets the *Bruen* test on its head. Rather than requiring the plaintiff to prove infringement at step one, as the majority does, *Bruen* requires the plaintiff to show only that his or her *conduct* is covered by the Amendment's plain text. 597 U.S. at 17, 24; *see also Rahimi*, 144 S. Ct. at 1897. Moreover, in addition to flipping the burden of the *Bruen* test on its head, the majority's newly created test is also circular and begs the question. Under it, the plaintiff must prove that the regulation "infringes" before the government is required to demonstrate the permissibility of the regulation by reference to historical tradition. Yet, *Bruen* makes clear that it is *only* after *both* steps are taken that infringement can be found. This new test is plainly wrong.

Under the actual *Bruen* framework, as noted, the first question is simply whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24; *see also Rahimi*, 144 S. Ct. at 1897. And if *the conduct* being regulated involves keeping or bearing a firearm, then it is *presumptively protected*. But that, of course, does not end the analysis, because the right may nonetheless be regulated in accordance with historical tradition, which must be demonstrated by the State. If a court finds that the government regulation "is consistent with the Nation's historical tradition of firearm regulation," only then may it "conclude that the individual's conduct falls outside the Second Amendment's unqualified command" — *i.e.*, that the regulation does not "infringe" the right. *Bruen*, 597 U.S. at 24 (cleaned up). In other words, the scope of the Second Amendment right depends on what the government can demonstrate regarding "the Nation's historical tradition of

firearm regulation" and, consequently, both steps must be conducted before "infringement" can be found.  *Id*.

Were this not clear enough, the Supreme Court again in *Rahimi* reiterated its text-history two-step analysis, distinguishing between *conduct*, which the text addresses, and the *regulation*, which history must justify and on which the government has the burden. Explaining *Bruen*, the *Rahimi* Court stated, "We also clarified that when the Government regulates arms-bearing *conduct*, . . . it bears the burden to 'justify its *regulation*.'"  144 S. Ct. at 1897 (emphasis added) (quoting *Bruen*, 597 U.S. at 24).  And, as *Rahimi* repeated, the way the government carries this burden is by showing that the "challenged regulation fits within" "our 'historical tradition of firearm regulation.'"  *Id*. (quoting *Bruen*, 597 U.S. at 17).

By instead requiring plaintiffs bringing a Second Amendment claim to demonstrate, at step one, the ultimate issue of whether the challenged law infringes the Second Amendment right, the majority fails to recognize that such a conclusion can only be reached after step two.  The majority's new test is thus illogical, requiring plaintiffs to establish infringement before infringement can logically be determined.  Not only does this analysis beg the ultimate question, it fails to recognize that *the scope of the Second Amendment right* — an antecedent to a finding of infringement —can only be determined by considering *both* the constitutional text *and* the historical tradition.

I quickly add that the majority's new "infringement" analysis — which appears nowhere in *Bruen* — is also completely unnecessary to the majority's analysis of the

Maryland licensing regime.   The majority opinion fairly explains why footnote 9 is dispositive.

Thus, I concur in the court's holding that the Maryland licensing regime is constitutional by virtue of the Supreme Court's explanation in footnote 9 of *Bruen*, but I dissent from the "infringement" analysis and the adoption of the new "infringement" test, as described herein.  Finally, I concur in the judgment.

RICHARDSON, Circuit Judge, with whom Judge AGEE joins, dissenting:

Maryland law prohibits anyone from acquiring a handgun without a "handgun qualification license." Md. Code, Pub. Safety § 5-117.1(c). To obtain a license, an applicant must, among other things, submit fingerprints for a background check and take a four-hour-long "firearms safety training course," all at the applicant's expense. *See* § 5-117.1(d). If an applicant completes these requirements, fills out an application, and pays the required $50 fee, then the Secretary of State Police "shall issue" her a license within thirty days. § 5-117.1(d), (g)–(h).

Deterred by these requirements, Plaintiffs challenged this regime as violating their Second Amendment rights. Maryland eventually defended its law before a panel of our Court. But rather than identifying any relevant historical support for its regulation, Maryland rested its case on a footnote in a Supreme Court opinion. The panel, unmoved by this effort to bypass controlling principles, held that Maryland's law violates the Second Amendment.

Now, our en banc Court carries Maryland's defense across the finish line. Yet to do so, the majority stretches implications from Supreme Court dicta to establish a carveout from Supreme Court doctrine. It then defends this result by grounding it in a contrived reading of the Second Amendment's plain text, for which the majority offers no support beyond negative inference.

I cannot assent to this transparent workaround of governing doctrine. The Supreme Court established a two-step, text-and-history framework for assessing all Second Amendment claims. I would treat Maryland's law like any other and analyze it under this

framework.  Because Maryland's law regulates protected conduct under the amendment's text, and because Maryland has identified no historical basis for its law, I would hold that it violates the Second Amendment.  I thus respectfully dissent.

## I.     Maryland's handgun licensing requirement regulates conduct that falls within the plain text of the Second Amendment.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  When considering a facial challenge to a firearm regulation, we first ask whether the challenged law regulates conduct that falls within the Second Amendment's plain text.  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).  This means that Plaintiffs must show three things:  (1) Maryland's law applies to "the people"; (2) it covers "Arms"; and (3) it regulates the "keep[ing]" or "bear[ing]" of those arms.  *Id.* at 31–33; *Bianchi v. Brown*, No. 21-1255, 2024 WL 3666180, at *48 (4th Cir. Aug. 6, 2024) (en banc) (Richardson, J., dissenting).

Plaintiffs easily make this threshold showing.  Maryland does not contest that its law applies to "the people."  *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008); § 5-117.1(b)–(c) (applying to all "person[s]").  Furthermore, Maryland's law targets handguns, which are "Arms" within the plain text of the Amendment.  *Heller*, 554 U.S. at 628.  Finally, Maryland's law regulates conduct protected by the Second Amendment's plain text.  True, the law only restricts someone's ability to "purchase, rent, or receive a handgun"—it does not directly prohibit anyone from keeping or bearing arms.  § 5-117.1(c).  But if someone does not already own a handgun, she can only keep or carry one

51

if she first acquires it. And Maryland's law cuts off all avenues of doing so unless she complies with its terms. Thus, the law necessarily regulates conduct protected by the Second Amendment's plain text. *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms."); *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.'" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011))).

Plaintiffs have thus established a prima facie Second Amendment claim. Yet to the majority, none of this matters. According to the majority, *Bruen*'s Footnote Nine blessed licensing schemes like Maryland's unless they are particularly abusive. And since Plaintiffs have not alleged that Maryland's scheme is particularly abusive, the majority finds that they cannot even establish a prima facie case for Second Amendment protection.

But the majority errs in reading Footnote Nine to control this case. Contrary to the majority's claims, Footnote Nine did not presumptively immunize Maryland's licensing regime—nor any others—from constitutional challenge absent special circumstances. It rather limited the Court's holding to the particular kind of licensing regime at issue in *Bruen* while leaving open constitutional challenges to other kinds of licensing regimes. Reading Footnote Nine to establish anything more would elevate implications from dicta over the mandatory text-and-history test established in *Bruen*.

Like any written or spoken language, Footnote Nine's meaning stems from its context. *Bruen* involved a constitutional challenge to New York's requirement that

applicants demonstrate a special need for self-protection in order to obtain a license for public carry. *Id.* at 12–13. New York's regime was a type of "may-issue" licensing law, which grant public authorities discretion to deny licenses even if applicants satisfy the statutory criteria for obtaining them. *Id.* at 13–15. May-issue licensing regimes are distinct from "shall-issue" licensing regimes, like Maryland's, which require authorities to issue a license upon an applicant's showing that she meets established statutory criteria. *Id.* at 13.

The Supreme Court began its analysis of New York's law by determining whether the plaintiffs—who had unsuccessfully applied for a license—sought to engage in conduct that fell within the plain text of the Second Amendment. To that end, the Court considered three things: (1) whether the plaintiffs were part of "the people"; (2) whether their desired weapons—handguns—were "Arms"; and (3) whether their proposed course of conduct— "carrying handguns publicly for self-defense"—constituted "bear[ing]" arms. *Id.* at 31– 32. The Court found that the plaintiffs satisfied all three textual requirements. *Id.* at 31– 33. At no point did the Court consider the degree of burden imposed by the regulation at the plain-text stage. Rather, it was enough that New York *regulated* protected conduct to entitle the plaintiffs to prima facie protection. *Id.* at 17 (explaining that, when the plain text covers individual conduct, the Government must "justify its *regulation*" (emphasis added)); *see also id.* at 24 (analogizing to First Amendment doctrine in which the government bears the burden of proving constitutionality any time it "restricts speech" (citation omitted)).

The Court then considered whether New York's law was consistent with history and tradition. Earlier in its opinion, the Court had established that the Government must justify

a firearm regulation that falls under the Second Amendment's plain text (step one) by analogizing it to its historical forebears, which partly requires assessing "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense." *Id.* at 29 (emphasis added). At this second step of analysis, the Court therefore measured the burden imposed by New York's law and determined that it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71; *see also id.* at 38 ("broadly prohibit[ed] the public carry of commonly used firearms for self-defense"); *id.* at 60 ("prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"). The Court then compared this burden to those imposed by historical regulations, along with the comparable justifications for those laws, and found that no historical tradition justified the onerous burden New York imposed on the right to bear arms. *See, e.g.*, *id.* at 38 ("Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense."); *id.* at 55 (contrasting the burden imposed by New York's law with historical surety laws). So the Court concluded that New York's regime was inconsistent with historical regulations and violated the Second Amendment.

Along the way, the Court clarified the limits of its holding.  A careless reader might have interpreted the Court's analysis to suggest that all licensing regimes fail Second Amendment scrutiny.  So immediately after stating that New York's law flunked the history-and-tradition test, the Court added Footnote Nine and explained that its analysis should not "be interpreted to suggest the unconstitutionality of" shall-issue licensing regimes.  *Id.* at 38 n.9.  Unlike may-issue regimes, the Court explained, shall-issue regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."  *Id.* (quoting *Heller*, 554 U.S. at 635).  Such regimes are, in the main, guided by "narrow, objective, and definite standards" and do not require the "appraisal of facts, the exercise of judgment, and the formation of an opinion," so they do not necessarily impose the same burden on public carry as did New York's law. *Id.* (first quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969); and then quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).  At the same time, however, the Court clarified that some shall-issue regimes might operate to "deny ordinary citizens their right to public carry," such as those featuring "lengthy wait times" or "exorbitant fees," and therefore might resemble may-issue regimes like New York's in practice.  *Id.*

The majority reads Footnote Nine to establish the presumptive constitutionality of all shall-issue licensing regimes, including Maryland's.  But read in context, Footnote Nine's role was much more modest.  Footnote Nine merely clarified that shall-issue licensing regimes are not necessarily unconstitutional just because may-issue regimes are. Unlike may-issue regimes, shall-issue regimes generally impose a lesser burden on the right to keep and bear arms, since they do not require heightened showings or grant

significant discretion to state officials.  So it is possible that the burden they impose is akin to those imposed by historical regulations, in contrast with may-issue regimes.  Footnote Nine thus invited courts to independently assess the pedigree of shall-issue licensing regimes against the historical record.  Only when a shall-issue regime effectively operates like a may-issue regime is such an inquiry unnecessary, for then it is unconstitutional for the reasons announced in *Bruen*.

Reading Footnote Nine to accomplish anything more risks elevating perceived implications from dicta over doctrine.  *Bruen* mandated that whenever a law regulates protected conduct, the Government must prove that the regulation is consistent with history and tradition.  *Id.* at 19; *see also Rahimi*, 144 S. Ct. at 1896 ("In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" (quoting *Bruen*, 597 U.S. at 24)).  But the constitutionality of shall-issue licensing regimes was not before the Court in *Bruen*, so it had no opportunity to consider their historical pedigree.  And though we sometimes afford substantial weight to Supreme Court dicta, the Supreme Court has expressly cautioned against "read[ing] a footnote" in an opinion to "establish the general rule" for a class of cases.  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 755 n.6 (2023).  Without such caution, we risk cherry-picking "stray comments and stretch[ing] them beyond their context—all to justify an outcome inconsistent with th[e] Court's reasoning and judgments."  *Brown v. Davenport*, 596 U.S. 118, 141 (2022).

The Court's decision in *Rahimi* illustrates the peril of stretching perceived implications from dicta. In both *Heller* and *Bruen*, the Court arguably suggested that the Second Amendment only protects the rights of "responsible citizens." *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70. Emboldened by these statements, the Government in *Rahimi* argued that individuals subject to domestic-violence restraining orders are not protected by the Second Amendment, since they are not "responsible." *Rahimi*, 144 S. Ct. at 1903. Yet the Court in *Rahimi* renounced having ever adopted such a limit, questioning whether the term "responsible" could provide meaningful guidance and emphasizing that "such a line [did not] derive from our case law," since "[t]he question was simply not presented" in prior cases. *Id.* The Court instead conducted afresh a text-history-and-tradition analysis of the constitutionality of the restriction. *Id.* at 1898–903. *Rahimi* is a warning that courts must not rely on suggestions drawn from dicta to establish exceptions outside the mandated *Bruen* framework.

Rather than heeding this warning, however, the majority circumvents it by contriving a creative way to ground its reading of Footnote Nine in the Second Amendment's plain text. The majority observes that a law only violates the Second Amendment if it "infringes" the right to keep or bear arms. Majority Op. at 12. It adds that each of the Supreme Court's recent Second Amendment cases involved laws that "banned or effectively banned the possession or carry of arms." *Id.* at 13. From this, the majority concludes that Footnote Nine must reflect the Supreme Court's finding that shall-issue regimes do not infringe the Second Amendment right, absent particularly abusive

circumstances, since they do not ban or effectively ban the possession or carry of arms.  *Id.* at 14.

This is an implausible reading of *Bruen*.  Nowhere in Footnote Nine did the Supreme Court tie shall-issue licensing to the plain meaning of "infringe."  Indeed, the Court never mentioned this word at all in its plain-text inquiry or in Footnote Nine.  The Court rather appended Footnote Nine to a sentence explaining why there was no historical support for New York's may-issue regime.  In contrasting the burden imposed by shall-issue regimes to may-issue regimes, the Court merely clarified that its historical analysis of the latter's constitutionality did not determine the constitutionality or unconstitutionality of the former.  Nothing about this discussion had any bearing on how we analyze the Second Amendment's plain text.[1]

Nor is there any basis for limiting the term "infringe" to total or effectively total deprivations of the right to keep or bear arms.  To the contrary, the evidence overwhelmingly points in the opposite direction.  Early American dictionaries defined

---

[1] My good friends in the majority and those concurring in the judgment all strain to find how their preferred reading of Footnote Nine fits into *Bruen*'s stated framework.  The majority finds that the supposed blessing of shall-issue licensing regimes can be found in *Bruen*'s step-one, plain-text inquiry.  Judge Rushing finds that blessing a home in step two's historical analysis.  And Judge Niemeyer seemingly believes the blessing resides outside *Bruen*'s framework, requiring no consideration of its two steps.  But reading Footnote Nine to find that shall-issue regimes are presumptively constitutional clashes with the rest of *Bruen*.  There is, however, a reading of this precautionary footnote that makes *Bruen* internally consistent:  In Footnote Nine, the Court did not decide the unpresented question of the constitutionality of shall-issue licensing regimes, suggesting only that the answer to that open matter may not look the same as the conclusion just reached.  *See Bruen*, 597 U.S. at 38 n.9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality" of shall-issue licensing regimes); *cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821).

58

"infringe" to include burdens that fell short of total deprivations. *Compare* 1 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1775) (defining "infringe" as "[t]o destroy; to *hinder*" (emphasis added)), *and* 1 Noah Webster, *American Dictionary of the English Language* (1828) (defining "infringe" as "[t]o destroy or *hinder*" (emphasis added)), *with* 1 Johnson, *supra* (defining "hinder" as "to cause impediment"), *and* 1 Webster, *supra* (defining "hinder" as "[t]o stop; to *interrupt*; to obstruct; to *impede or prevent from moving forward by any means*" (emphasis added)).[2]  Other early sources similarly confirm that even the smallest burden, if unjustified, could violate the Second Amendment right.  *See* 2 George Tucker, *Blackstone's Commentaries* 143 n.40 (1803) ("The right of the people to keep and bear arms shall not be infringed . . . *and this without any qualification as to their condition or degree . . . .*" (emphasis added)); *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people . . . to keep and bear *arms* . . . shall not be *infringed*, curtailed, or broken in upon, *in the smallest degree*." (third emphasis added)).  And nineteenth-century courts often entertained challenges to laws that merely regulated the right to carry arms, without prohibiting it, and decided these cases using analogical reasoning—not by holding that these laws didn't sufficiently burden the right in the first place.  *See, e.g.*, *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (holding that a concealed carry ban did not "infringe" the Second Amendment right because it was consistent with historical police powers); *Commonwealth v. Murphy*, 166 Mass. 171, 172–

---

[2] Modern dictionaries define "infringe" similarly.  *See, e.g.*, *Infringement*, *Black's Law Dictionary* (12th ed. 2024) (defining "infringement" as "[a]n encroachment or trespass on []a right").

73 (1896) (upholding a law prohibiting the parading of firearms because it was analogous to prohibitions on concealed carry). Finally, lest there be any doubt, the Court in *Bruen* contemplated challenges to laws that impose burdens short of total prohibitions on the right, such as sensitive-place restrictions.[3] 597 U.S. at 30 (discussing how to analogize modern sensitive-place restrictions to historical ones); *cf. United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871) (finding a rule "impairing the effect of" a pardon to "infring[e] the constitutional power of the Executive"). These sources show that any regulation of the Second Amendment right, absent constitutional justification, is an infringement of the right.[4]

---

[3] It is thus immaterial that *Heller*, *McDonald v. Chicago*, 561 U.S. 742 (2010), and *Bruen* all involved laws that prohibited or effectively prohibited the right to have or carry arms. Nothing in those cases limited Second Amendment challenges to laws of those kinds. To the contrary, the framework those cases adopted contemplated challenges to less burdensome laws that still regulate the right to keep or bear arms. It is baffling that the majority chooses to rest its argument on this negative inference alone without even mentioning the overwhelming evidence to the contrary.

[4] Though this is not dispositive, it is noteworthy that the majority's threshold inquiry was not part of the first step of the two-step analysis that prevailed in the Courts of Appeals, including our own, before *Bruen*. At the first step of this inquiry, courts simply asked whether "the challenged regulation *burdens* conduct that was within the scope of the Second Amendment as historically understood," without considering the magnitude of the burden imposed. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (emphasis added); *see also United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (same); *Ezell*, 651 F.3d at 702–03 (considering whether the "challenged firearms law *regulates* activity falling outside the scope of the Second Amendment right" (emphasis added)). It was only at the second step of this inquiry—when determining which level of scrutiny to apply—that courts considered "the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682. Importantly, *Bruen* called the first step of this approach "broadly consistent with *Heller*" but abrogated the second step. 597 U.S. at 19.

If there were any doubt on this front, the Court foreclosed it in *Rahimi*. There, the Court clarified that "when the Government *regulates* arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24 (emphasis added)). Two other Justices, writing separately, similarly explained that the mere targeting of protected conduct triggers Second Amendment scrutiny. *See id.* at 1907 (Gorsuch, J., concurring) ("In this case, no one questions that the law Mr. Rahimi challenges *addresses individual conduct* covered by the text of the Second Amendment."); *see also id.* at 1932 (Thomas, J., dissenting) (asking whether a regulation "*target[s]* conduct protected by the Second Amendment's plain text" (emphasis added)). *Rahimi* establishes what was already apparent: A law need only regulate protected conduct to trigger Second Amendment scrutiny, and any regulation unjustified by our historical tradition "infringe[s]" the right.[5]

Thus, the majority's construction of the Second Amendment's plain text is baseless. *Bruen* did not instruct courts to consider how significantly a regulation burdens protected conduct at the plain-text stage. And it certainly did not tie Footnote Nine to the plain-text meaning of "infringe." Rather, text, history, and Supreme Court precedent establish that

---

[5] This mirrors how the Supreme Court considers challenges brought under other constitutional rights. Under the First Amendment's free speech clause, for instance, "'[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.'" *Bruen*, 597 U.S. at 24 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000)). And the Court has explained that "[i]t is of no moment that the [challenged] statute does not impose a complete prohibition," for both "burdens" on and "bans" of protected speech face "the same rigorous scrutiny." *Playboy Ent. Grp.*, 529 U.S. at 812. So just as an unjustified regulation of protected speech "abridge[s]" the First Amendment right, an unjustified regulation of the keeping or bearing of arms "infringe[s]" the Second Amendment right. U.S. Const. amends. I, II.

any regulation of protected conduct, if unjustified, infringes the Second Amendment right.

Because shall-issue licensing regimes like Maryland's regulate protected conduct under

the amendment's plain text, they must be justified according to history and tradition.

## II.    Maryland has not shown that history and tradition justify its handgun licensing requirement.

Because the challenged law regulates conduct protected by the Second

Amendment's plain text, Maryland must show under *Bruen*'s second step that it is

consistent with our Nation's historical tradition of firearms regulation.  *Bruen*, 597 U.S. at

17.[6]  Maryland offers two potential historical analogues for its regulation.  First, Maryland

argues that its law is analogous to the historical tradition of prohibiting dangerous people

from possessing weapons.  Second, Maryland argues that its law is analogous to militia-

---

[6] Maryland argues that its licensing law need not face historical scrutiny at all since it is not a "substantive limitation[]" but rather an "administrative regime that implements [substantive] limitations," which Maryland contends must be assessed according to a separate, non-historical analysis. Appellees' Suppl. Br. at 11.  But the cases Maryland cites for this proposition applied interest-balancing to determine whether other constitutional rights were violated, an approach which *Bruen* explicitly rejected in the Second Amendment context. *See Rosario v. Rockefeller*, 410 U.S. 752, 761–62 (1973) (upholding voter registration because it advanced a "particularized legitimate purpose" and was "in no sense invidious or arbitrary"); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) (considering whether a permitting requirement for parades was "exerted so as not to deny or unwarrantly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places")*; but see Bruen*, 597 U.S. at 22–23 (rejecting "judge-empowering 'interest-balancing'" (quoting *Heller*, 554, U.S. at 634)).  For the Second Amendment, "when the Government regulates arms-bearing conduct, . . . it bears the burden to 'justify its regulation'" based on text and history. *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24).  Here, Maryland's administrative scheme burdens protected conduct, so Maryland must put forth evidence that establishes its scheme is consistent with our historical tradition of firearm regulation.

training laws from the Founding.  But neither tradition is relevantly similar to Maryland's

licensing scheme.  So the challenged law is unconstitutional.

> ### 1. The historical tradition of prohibiting "dangerous" people from owning firearms does not justify Maryland's law.

Maryland first argues that its licensing scheme is analogous to historical limitations

on the ability of "dangerous" people to own firearms.  Appellees' Br. at 32–33.  Outside of

several modern U.S. code provisions,[7] Maryland does not cite any historical regulations to

support its position.  *See Bruen*, 597 U.S. at 66 n.28 ("20th-century evidence . . . does not

provide insight into the meaning of the Second Amendment when it contradicts earlier

evidence.").  But Maryland does point to several court decisions that have held, to varying

degrees, that dangerous people may be disarmed.  In *Rahimi*, for example, the Supreme

Court held that history and tradition support the temporary disarmament of an "individual

[who] poses a clear threat of physical violence to another."  144 S. Ct. at 1901.  Some

judges have gone further and argued that history and tradition permit legislatures to

permanently disarm categories of people considered dangerous to public peace and safety.

*See Kanter v. Barr*, 919 F.3d 437, 451–64 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar

v. Att'y Gen.*, 980 F.3d 897, 912–20 (3d Cir. 2020) (Bibas, J., dissenting); *Antonyuk v.

Chiumento*, 89 F.4th 271, 314 (2d Cir. 2023), *cert. granted, judgment vacated sub. nom.

Antonyuk v. James*, No. 23-910 (U.S. July 2, 2024) ("There is widespread agreement

among both courts of appeals and scholars that restrictions forbidding dangerous

---

[7]  *See* 18 U.S.C. § 922(g)(1) (prohibiting felons from possessing firearms); § 922(g)(3) (same for persons addicted to a controlled substance); § 922(g)(9) (same for persons who have been convicted of a domestic-violence misdemeanor).

individuals from carrying guns comport with this Nation's historical tradition of firearm regulation . . . ." (internal quotation marks and citation omitted)).[8]  Maryland argues that its licensing regime fits within this tradition because it ensures that dangerous people prohibited from owning handguns cannot acquire them.[9]

I need not decide how far history and tradition support the disarming of a dangerous person.  For regardless of how far it does, Maryland's law is not "relevantly similar" to historical laws within this tradition.  *Bruen*, 597 U.S. at 29.  *Bruen* identified two metrics for determining whether modern and historical laws are analogous:  "how" and "why" the regulations burden a citizen's Second Amendment right.  *Id*.  Put differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry."  *Id.* (quoting *McDonald*, 561 U.S. at 767 (cleaned up));

---

[8] After *Bruen*, courts are split over how such a principle justifies, if at all, the modern U.S. code provisions Maryland cites.  *Compare Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023), *cert. granted, judgment vacated*, No. 23-374 (U.S. July 2, 2024) (holding that § 922(g)(1) violates the Second Amendment, as applied to a particular nonviolent felon); *United States v. Duarte*, 101 F.4th 657, 691 (9th Cir. 2024), *vacated*, No. 22-50049 (9th Cir. July 14, 2024) (same); *and United States v. Daniels*, 77 F.4th 337, 341–55 (5th Cir. 2023), *cert. granted, judgment vacated*, No. 23-376 (U.S. July 2, 2024) (concluding that § 922(g)(3) is unconstitutional); *with United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023), *cert. granted, judgment vacated*, No. 23-610 (U.S. July 2, 2024) (upholding § 922(g)(1) and concluding "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"); *and Vincent v. Garland*, 80 F.4th 1197, 1199–1202 (10th Cir. 2023), *cert. granted, judgment vacated*, No. 23-683 (U.S. July 2, 2024) (same).

[9] *See* § 5-117.1(c)(2) (requiring a determination that an applicant "is not otherwise prohibited by federal or State law from purchasing or possessing a handgun"); § 5-133(b) (prohibiting felons, fugitives, individuals addicted to drugs, the mentally ill, individuals subject to protective orders, and other categories of persons from possessing firearms).

*see also Rahimi*, 144 S. Ct. at 1898 (reaffirming this approach). Maryland's licensing law might share an analogous "why" with historical restrictions on dangerous people. But it does not share a relevantly similar "how" because it imposes a burden that is materially different from the one imposed by every other restriction within this tradition.

Every historical law limiting the ability of dangerous people to keep or bear arms targeted those found dangerous by the government—either individually or as a class—and penalized them for having or carrying firearms. For example, the Militia Act of 1662 authorized royal officers to disarm persons that they determined were "dangerous to the Peace of the Kingdom." *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) (quoting 13 & 14 Car. 2, c. 3, § 13). Some American colonies, meanwhile, disarmed Catholics and loyalists unless they swore an oath of loyalty to the sovereign, since it was feared that they owed fealty to a foreign higher power. *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting). Many states also enacted surety laws, which required individuals found to give another person "reasonable cause to fear" violence to post a bond before going armed. *Rahimi*, 144 S. Ct. at 1900. And "going armed" laws, enacted in several colonies and states, penalized anyone who went armed with dangerous and unusual weapons to terrify the people with forfeiture of arms and imprisonment. *Id.* at 1900–01. As these examples demonstrate, each law within this tradition targeted only people determined to be dangerous and subjected them to various penalties.

Maryland's law operates through an entirely different mechanism. It does not identify dangerous people and then target them with restrictions and sanctions. Rather, Maryland's law bars *everyone* from acquiring handguns until they can prove that they are

*not* dangerous.  By preemptively depriving all citizens of firearms to keep them out of dangerous hands, Maryland's law utilizes a meaningfully different mechanism and thereby goes far beyond historical dangerousness regulations.  So these regulations cannot justify Maryland's law.  *See id.* at 1898 ("Even when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

This is not some trivial difference.  The contrast in mechanism between past and present laws is precisely how the Supreme Court has assessed potential analogues *within this exact tradition*.  In *Bruen*, the Court concluded that New York's may-issue licensing regime was not analogous to historical surety laws because the two sets of laws employed meaningfully different mechanisms.  "While New York presumes that individuals have *no* public carry right without a showing of heightened need," the Court explained, "the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'"  *Bruen*, 597 U.S. at 56 (quoting Mass. Rev. Stat., ch. 134, § 16 (1836)).  In *Rahimi*, by contrast, the Court concluded that 18 U.S.C. § 922(g)(8) and surety laws were relevantly similar because both laws presumed "that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others."  144 S. Ct. at 1902.  In both *Bruen* and *Rahimi*, then, the Court found dispositive the fact that surety laws targeted only those who were already deemed dangerous and used this mechanism as the basis for analogizing to present-day restrictions.  Yet Maryland's law operates in the exact opposite manner—it treats everyone

as presumptively dangerous until they can show that they are safe and responsible. Maryland's law therefore is not relevantly similar to historical laws targeting dangerous persons. *See Bruen*, 597 U.S. at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century[,] . . . [and] earlier generations addressed the societal problem . . . through materially different means, that . . . could be evidence that a modern regulation is unconstitutional.").[10]

This contrast is especially stark given that licensing laws have been around since the Founding, yet before the late nineteenth century, they were only used to target allegedly dangerous persons who did not enjoy constitutional rights. Conventional accounts typically explain that firearm licensing for American citizens did not begin until the late 1800s or early 1900s. *See* Adam M. Samaha, *Is* Bruen *Constitutional? On the Methodology*

---

[10] Judge Rushing thoughtfully suggests that Maryland's licensing regime is supported—at step two—by the historical tradition of "regulating firearm possession by dangerous individuals." Rushing Concurring Op. at 36. With great respect, Judge Rushing commits two errors. First, she overreads *Bruen*'s Footnote Nine. The Supreme Court did not, as Judge Rushing suggests, find that some shall-issue licensing regimes not before the Court were "relevantly similar" to this regulatory tradition. *Id.* at 30, 37–40. Rather than address how this regulatory tradition might be analogous to a shall-issue licensing regime, Footnote Nine merely suggested that the constitutionality of a shall-issue regime did not necessarily fall prey to the same concerns as New York's may-issue regime. The second error flows from the first. Having decided that the Supreme Court blessed at least some shall-issue regimes, she then assumes that we must ignore the undeniable difference between the burdens on the right imposed by *ex ante* disarmament of all citizens and *ex post* punishment of a dangerous individual who poses a threat. *See* Rushing Concurring Op. at 39–41. The surety and going-armed laws *Rahimi* discussed as part of this historical tradition punished dangerous individuals based on their conduct. 144 S.Ct. at 1900–01. But these after-the-fact punishments burden the right of "an individual" who "poses a clear threat of violence." *Id.* at 1901. Faithfully applying the Second Amendment demands that we actually consider "how" the historical tradition of punishing such a dangerous individual burdened Second Amendment rights compared with the burden imposed by Maryland's preemptive, if only temporary, ban on all citizens possessing handguns.

*that Saved Most Gun Licensing*, 98 N.Y.U. L. Rev. 1928, 1933 (2023); Saul Cornell, *The Long Arc of Arms Regulation in Public:  From Surety to Permitting, 1328–1928*, 55 U.C. Davis L. Rev. 2545, 2596, 2599–600 (2022).  But long before then, colonies and states used licensing to stifle the keeping and bearing of arms by racial minorities.  Prior to the American Revolution, at least three colonies prohibited slaves, free blacks, or Native Americans from having or carrying firearms in most or all circumstances without first obtaining a license.[11]  Many more states enacted similar requirements after the Revolution and until the enactment of the Fourteenth Amendment.[12]  Indeed, it appears that licensing

---

[11] An Act Directing the Trial of Slaves . . ., ch. IV, §§ XIV–XV (1723), *in* 4 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, From the First Session of the Legislature in the Year 1619*, at 126, 131 (1820) (prohibiting any "negro, mulatto, or Indian" from keeping or carrying a gun unless they were a "housekeeper, or listed in the militia," but permitting any such person, "bond or free," who lived "at any frontier plantation" to "keep and use guns" if they "first obtained a licence for the same, from some justice of the peace"); An Act for the Better Order and Governing Negroes and Other Slaves in this Province § XXIII (1740), *in* 7 *Statutes at Large of South Carolina* 397, 404 (David J. McCord ed., 1840) (prohibiting any slave from "carry[ing] or mak[ing] use of fire arms" outside "the presence of some white person" unless he acquired a "ticket or license, in writing, from his master, mistress or overseer"); An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province (1755), *in* 18 *Colonial Records of the State of Georgia* 102, 117–18 (Allen D. Candler ed., 1910) (copying South Carolina's law).

[12] Act of Dec. 17, 1792, ch. CIII, §§ 8–9, *in A Collection of All Such Acts of the General Assembly of Virginia, of a Public & Permanent Nature, As Are Now in Force* 186, 187 (1803) (prohibiting any "negro or mulatto" from "keep[ing] or carry[ing] any gun" unless they were a housekeeper, but permitting any such person, "bond or free," who lived "at any frontier plantation" to "keep and use guns" upon obtaining a license from a justice of the peace); Act of Feb. 8, 1798, ch. CLXXIV, §§ 5–6, *in* 2 *A Digest of the Statute Law of Kentucky:  Being a Collection of All the Acts of the General Assembly, of a Public and Permanent Nature, from the Commencement of the Government to May Session 1822*, at 1149, 1150 (William Littell & Jacob Swigert eds., 1822) (any "negro, mulatto, or Indian"); Slaves, and Free Persons of Color § 7 (1805), *in A Digest of the Laws of the State of* (Continued)

requirements for racial minorities were widespread by the mid-nineteenth century, particularly in the South. *See* Firearms Policy Coalition Amicus Br. at 6–17 (collecting sources).

These early licensing laws were treated as constitutional on the ground that people of color—who were considered categorically dangerous at that time—were not entitled to the full enjoyment of constitutional rights. *See* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J. 1587, 1611 (2014). For example, when upholding a licensing requirement for free blacks, the North Carolina Supreme Court explained that "free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation." *State v. Newsom*, 27 N.C. (5 Ired.) 250, 252

---

*Alabama: Containing All the Statutes of a Public and General Nature, in Force at the Close of the Session of the General Assembly, in January 1833*, at 391, 391–92 (John G. Aikin ed., 1833) (slaves); Slaves §§ 3–4 (1818) *in A Digest of the Laws of Missouri Territory* 373, 374 (Henry S. Geyer ed., 1818) (any "negro or mulatto"); Free Negroes and Mulattoes, ch. 76, §§ 21–23 (1830), *in A Digest of the Statutes of Arkansas; Embracing All Laws of a General and Permanent Character in Force at the Close of the Session of the General Assembly of 1856*, at 552, 557 (Josiah Gould ed., 1858) (any "free negro or mulatto"); Crimes and Punishments, ch. 30 (1841), *in A Digested Manual of the Acts of the General Assembly of North Carolina, From the Year 1838 to the Year 1846*, at 72, 73 (James Iredell ed., 1847) (any "free negro, mulatto, or free person of color"); An Act to Amend the Criminal Law, No. 4731, § XIII (1865), *in Acts of the General Assembly of the State of South Carolina, Passed at the Sessions of 1864–65*, at 271, 275 (1866) (all "[p]ersons of color"); An Act Prescribing Additional Penalties for the Commission of Offences Against the State, and for Other Purposes § 12 (1866), *in The Acts and Resolutions Adopted by the General Assembly of Florida, at its Fourteenth Session* 23, 25 (1866) ("any negro, mulatto, or other person of color"); Certain Offenses of Freedmen, 1865 Miss. Laws, p. 165 § 1, *in* 1 Walter L. Fleming, *Documentary History of Reconstruction* 289 (1906) (any "freedman, free negro or mulatto"). Delaware also enacted a licensing scheme for "free negroes or free mulattoes" in 1832. Act of Feb. 10, 1832, ch. CLXXVI, § 1, *in* 8 *Laws of the State of Delaware* 208, 208 (1841). But it later repealed this law in 1843. Act of Feb. 28, 1843, ch. DI, § 1, *in* 9 *Laws of the State of Delaware* 552, 552 (1843).

(1844). Similarly, the Virginia Supreme Court explained that firearm restrictions that would otherwise be "inconsistent with the letter and spirit of the Constitution . . . as respects the free whites" were constitutional when applied to racial minorities. *Aldridge v. Commonwealth*, 2 Va. 447, 449 (1824); *see also Waters v. State*, 1 Gill. 302, 309 (Md. 1843) (describing free blacks as "a vicious and dangerous population," which is why laws "make it unlawful for them to bear arms"); *State v. Allmond*, 7 Del. 612, 641 (Gen. Sess. 1856) (explaining that states could disarm people of color under the police power). And the Supreme Court in *Dred Scott v. Sandford* made clear that if blacks were ever recognized as citizens, "it would give them the full liberty . . . to keep and carry arms wherever they went." 60 U.S. (919 How.) 393, 417 (1857); *Cooper v. Savannah*, 4 Ga. 72, 72 (1848) ("Free persons of color have never been recognized here as citizens; they are not entitled to bear arms . . . .").[13]

I do not cite these examples because I believe they stand for some constitutional principle. Far from it—these laws were based on the ill-founded belief that their targets were not entitled to constitutional protection, and they were eventually overruled by legislative and constitutional reforms that guaranteed the blessings of liberty to all Americans. *See McDonald*, 561 U.S. at 770–78. Instead, I see these laws as further evidence that licensing schemes like Maryland's lack a historical basis. The problem of dangerous persons having and carrying firearms has been around since the Founding. And

---

[13] Native Americans likewise were not considered part of "the people" entitled to constitutional protection. *See United States v. Price*, No. 22-4609, 2024 WL 3665400, at *33 n.19 (4th Cir. Aug. 6, 2024) (en banc) (Richardson, J., dissenting).

as these examples show, colonies and states were capable of imposing licensing requirements for the keeping or bearing of arms.  Yet there is no evidence that any jurisdiction, before the late nineteenth century, required all members of "the people" to obtain a license, or anything like it, before keeping or carrying firearms.  The only evidence of licensing we do have was for persons who were thought *not* to enjoy constitutional liberties.  This is probative evidence that Maryland's licensing requirement is an unprecedented aberration in our historical tradition.

Some undoubtedly think that Maryland's licensing requirement strikes a beneficial balance between individual liberty and public safety.  But it is not the role of judges to balance these two competing interests.  Our job is to enforce the Second Amendment, which "is the very *product* of an interest balancing by the people."  *Heller*, 554 U.S. 635.  By adopting a mechanism inconsistent with "the traditions of the American people," Maryland's law transgresses that original balance.  *Bruen*, 597 U.S. at 26.

### 2.    Maryland's law is not analogous to militia training laws.

Maryland further argues that its law is analogous to historical laws requiring training for members of the militia.  Before and after the Founding, many colonies and states required most able-bodied men of a certain age to participate in the militia.  *See Hirschfeld v. ATF*, 5 F.4th 407, 428–30 (4th Cir.), *vacated as moot*, 14 F.4th 332 (4th Cir. 2021).  They likewise required members of the militia to arrive with their own weapons and report for regular training.  *Id.* at 428–32.  Maryland argues that its licensing law is analogous to these historical regulations because it ensures "that individuals who may use a handgun have some knowledge and training to do so safely."  Appellees' Br. at 34.

71

Contrary to Maryland's claims, however, these militia laws were not part of our Nation's historical tradition of firearms regulation. In reality, they did not regulate the right to keep or bear arms in any way but rather imposed service obligations, unconnected with the ownership of firearms, on all members of the militia. So they cannot serve as relevant analogues for Maryland's licensing regime.

Consider two examples. In 1778, New Jersey enacted a law requiring militiamen to "assemble, properly armed and accoutered, twice in the Year, at such Times and Place or Places as the Field-Officers, or a Majority of them, shall direct for the Purpose of Training and Exercise." 1778 N.J. Sess. Laws 42, 46 § 15. "[I]n case of Absence" from training, the law imposed a monetary sanction based on the absentee's rank. *Id.* The law also sanctioned any militia member who failed to acquire the proper arms and ammunition. *See id.* at 45 §§ 11–12.

Delaware enacted a similar law in 1782. It required the militia to "be duly exercised and instructed once in every Month," 1782 Del. Sess. Laws 1, 3 § 5, and penalized all who "shall neglect or refuse to appear on the Parade . . . not having reasonable Excuse," *id.* at 4 § 7. It also required militia members to acquire and bring their own firearms, and sanctioned any member for failing to keep his arms "by him at all Times, ready and fit for Service." *Id.* at 3 § 6

These examples illustrate why historical militia laws are not relevant analogues for Maryland's licensing law. Early militia laws imposed training requirements based on a person's membership in the militia, not their ownership of firearms. A militia member could not dodge a training obligation by trashing his gun—indeed, he would be sanctioned

72

if he did so.  And the mere fact of owning a gun did not obligate anyone to train with the militia.  Women and elderly persons, for instance, could own firearms without being required to train.  So historical militia training laws did not regulate the keeping or bearing of arms and were not part of our Nation's historical tradition of firearms regulation.  As a result, they cannot buttress the constitutionality of Maryland's training requirement, which, unlike these laws, does regulate Second Amendment freedoms.[14]

*          *          *

Three times, our en banc Court has considered Second Amendment challenges in *Bruen*'s aftermath.  And three times, our Court has disposed of these challenges at the plain-text stage, each time relying on a different threshold limit unsupported by the plain text and appearing nowhere in the Supreme Court's precedent.  *See Bianchi*, No. 21-1255, 2024 WL 3666180, at *17; *Price*, No. 22-4609, 2024 WL 3665400, at *4–5; Majority Op. at 12–17.  It is disheartening that our Court has gone out of its way to avoid applying the framework announced in *Bruen*.  I can only hope that in future cases we will reverse course and assess firearm regulations against history and tradition.

I thus respectfully dissent.

---

[14] Maryland insists that its law ensures that those who own handguns are "responsible."  But the Supreme Court in *Rahimi* rejected reliance on general notions of responsibility when assessing firearm regulations.  *See* 144 S. Ct. at 1903 (explaining that any such limit is "vague," "unclear," and "does [not] derive from [the Court's] case law").