UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MICHAEL MCGREGOR, ZACHARY GIAMBALVO,
PAUL FELICE, MATTHEW OLIVIERI, EDWARD
NEWMAN, and DARK STORM INDUSTRIES, LLC,

<em>Plaintiffs</em>,

-against-                    No. 23 Civ. 1130 (GRB) (ARL)

SUFFOLK COUNTY, NEW YORK, RODNEY
HARRISON, in his official capacity and individually,
and MICHAEL KOMOROWSKI,

<em>Defendants,</em>

LETITIA JAMES, in her official capacity as Attorney
General of the State of New York,

<em>Intervenor</em>.
-------------------------------------------------------------------X

## INTERVENOR ATTORNEY GENERAL'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HER CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, New York 10005

James M. Thompson
Special Counsel for Second Amendment Litigation
Of Counsel

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    A. New York's Licensing Requirement for Semiautomatic Rifles ........................................ 2

    B. Procedural History ............................................................................................. 3

STANDARD OF REVIEW ..................................................................................................... 4

ARGUMENT: NEW YORK'S LICENSING REQUIREMENT FOR SEMIAUTOMATIC
RIFLES IS CONSTITUTIONAL ............................................................................................ 5

    A. The Semiautomatic Rifle Licensing Requirement Does Not Implicate the Second
        Amendment's Text........................................................................................... 7

        1. Shall-Issue Licensing Laws Do Not Infringe the Rights Protected by the
            Second Amendment ................................................................................. 7

        2. The Semiautomatic Rifle Licensing Requirement is a Presumptively Constitutional
            "Condition or Qualification on the Commercial Sale of Arms".................................. 11

    B. The Semiautomatic Rifle Licensing Requirement Comports With the Nation's
        History And Tradition of Firearm Regulation ................................................. 12

CONCLUSION.................................................................................................................. 17

**TABLE OF AUTHORITIES**

**Cases**

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)..................................................... passim

*B&L Prods. v. Newsom*, 104 F.4th 108 (9th Cir. 2024)........................................... 11

*Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198 (E.D.N.Y. 2015) ................................. 4

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..................................................... 9, 10, 11, 16

*Frey v. Nigrelli*, 661 F. Supp. 3d 176 (S.D.N.Y. 2023)........................................... 8

*Gazzola v. Hochul*, 645 F. Supp. 3d 37 (N.D.N.Y. 2022) ........................................... 5

*Gazzola v. Hochul,* 88 F.4th 186 (2d Cir. 2023) ........................................... 11

*Giambalvo v. Suffolk County*, 656 F. Supp. 3d 374 (E.D.N.Y. 2023) ................................. 1, 8, 10

*Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023)................................. 13

*Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178 (2d Cir. 2017) ................................. 6

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024)........................................ 8, 9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................................... 11

*McGregor v. Suffolk County*, 690 F. Sup. 3d 147 (E.D.N.Y. 2023) ................................. 4

*McRorey v. Garland* 99 F.4th 831 (5th Cir. 2024) ................................. 8, 11

*Mills v. New York City*, No. 23 Civ. 7460, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024) .... 5, 9, 15

*N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 WL 1932050 (W.D.N.Y. May 2, 2024) ................................. 8

*NYSRPA v. Bruen*, 597 U.S. 1 (2022)................................................... passim

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) ................................. 6

*Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023)........................................ 10

*Ritrovato v. Donovan*, No. 23 Civ. 10820, 2025 WL 777216 (D. Mass. Mar. 11, 2025) ............. 8

*United States v. Austin*, 729 F. Supp. 3d 396 (S.D.N.Y. 2024) ................................. 7, 12

*United States v. DeFelice*, No. 23 Cr. 116, 2024 WL 3028425 (D. Conn. June 17, 2024)........... 8

*United States v. Libertad*, 681 F. Supp. 3d 102 (S.D.N.Y. 2023)........................................ 7, 8, 12

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) ................................... 5

*United States v. Rahimi*, 602 U.S. 680 (2024) ............................................ 2, 6, 10, 16

*United States v. Scheidt*, 103 F.4th 1281 (7th Cir. 2024) .......................... 15

**Statutes**

2022 N.Y. Laws ch. 212 ................................................................................ 2

28 U.S.C. § 2403 ........................................................................................... 4

Conn. Gen. Stat. Ann. § 29-37p .................................................................. 10

Haw. Rev. Stat. § 134-1, 134-2 ................................................................... 10

Ill. Comp. Stat. ch. 430 § 65/2 ................................................................... 10

Mass. Gen. Laws. Ann. Ch. 140 § 131E ...................................................... 10

Mich. Comp. Laws § 28.422 ........................................................................ 10

N.J. Stat. Ann. § 2C:58-3 ............................................................................ 10

N.Y. Penal Law § 265.00 ............................................................................. 3

N.Y. Penal Law § 400.00 ............................................................................. 3

Wash. Rev. Code § 9.41.090 ........................................................................ 10

**Other Authorities**

John Ash, *The New and Complete Dictionary of the English Language*, Vol. 1 (1st Ed. 1775)..... 9

Joseph Blocher & Darrell A.H. Miller, *What is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016) ......... 9

Noah Webster, *A Compendious Dictionary of the English Language* (1st ed. 1806) ................... 9

Office of the New York State Attorney General, *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022* ........................................... 2

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Probs. 55, 69 (2017).......................................................... 13

Samuel Johnson, *A Dictionary of the English Language* (1st edition 1755) .................................. 9

Statement of Senate Majority Leader Stewart-Cousins, N.Y. State Senate Stenographic Record,
Regular Session (June 2, 2022) ................................................................................................... 3

## PRELIMINARY STATEMENT

Intervenor Letitia James, in her official capacity as Attorney General of the State of New York ("Attorney General James" or the "Attorney General"), respectfully submits this memorandum of law, along with her accompanying Local Civil Rule 56.1 Statement ("S56.1"), and the annexed declarations, in opposition to the motion for summary judgment filed by plaintiffs Michael McGregor, Zachary Giambalvo, Paul Felice, Matthew Olivieri, Edward Newman, and Dark Storm Industries, LLC and in support of her cross-motion for summary judgment with respect to plaintiffs' facial challenge to the constitutionality of New York's licensing requirement for semiautomatic rifles.

As this Court previously noted, even as Second Amendment law continues to develop, "some things are beyond dispute," including that "certain state handgun licensing regimes are constitutionally permissible." *Giambalvo v. Suffolk County*, 656 F. Supp. 3d 374, 381 (E.D.N.Y. 2023) (Brown, J.). The Supreme Court emphasized in *NYSRPA v. Bruen*, 597 U.S. 1, 38 n.9 (2022), that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes," and Justice Kavanaugh (joined by Chief Justice Roberts) confirmed that "New York . . . may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements." *Id.* at 80 (Kavanaugh, J., concurring). Plaintiffs here make a facial challenge to the law that requires a license to purchase or take possession of a semiautomatic rifle, under the same standards and subject to the same requirements that apply to handgun licensing. But there is no reason why the law would be any different for semiautomatic rifles than it is for handguns, particularly when it is handguns, not rifles, that the Supreme Court has identified as "the quintessential self-defense weapon." *Bruen*, 597 U.S. at 47.

First, the challenged law does not implicate the plain text of the Second Amendment, both because shall-issue licensing regimes do not prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry and because the challenged law imposes only a presumptively constitutional condition or qualification on the commercial sale of arms. Second, even if the challenged law implicated the text of the Second Amendment, the measure is lawful because it is entirely "consistent with the principles that underpin our regulatory tradition," *United States v. Rahimi*, 602 U.S. 680, 692 (2024). As explained in the accompanying expert declaration of Dr. Robert Spitzer, firearm licensing, including licensing of long guns, is firmly grounded in American history. Plaintiffs' facial challenge to semiautomatic rifle licensing must fail.

## STATEMENT OF FACTS

### A.     New York's Licensing Requirement for Semiautomatic Rifles

In June 2022, the New York State Legislature enacted a law requiring anyone seeking to purchase or take ownership of a semiautomatic rifle to obtain either a semiautomatic rifle license or a semiautomatic rifle endorsement on an existing pistol license. *See* 2022 N.Y. Laws ch. 212. The law was enacted in response to a tragic mass shooting in which a lone shooter motivated by white supremacist ideology used a recently-purchased semiautomatic rifle to kill ten people and wound three others in a supermarket in Buffalo, New York. *See* 2022 N.Y. Laws ch. 212; *see also* Office of the New York State Attorney General, *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022* at 9-10 (describing the shooting and the semiautomatic rifle used), available at https://ag.ny.gov/sites/default/files/ buffaloshooting-onlineplatformsreport.pdf. At the time of the Buffalo shooting, there was no statewide license requirement for persons wishing to purchase a semiautomatic rifle. Accordingly,

the purpose of the law was "to close loopholes that directly address the gaps in our laws exposed by these horrific shootings in Buffalo . . . and around the country." Statement of Senate Majority Leader Stewart-Cousins, N.Y. State Senate Stenographic Record, Regular Session at 5365:21-5366:12 (June 2, 2022).

The application process for a semiautomatic rifle license is functionally identical to the application for a license to possess a pistol or revolver, and subject to the same standards. *See* N.Y. Penal Law § 400.00(1), (3). In New York State, investigations of license applications are conducted "by the duly constituted police authorities of the locality where such application is made," N.Y. Penal Law § 400.00(4), and licensing decisions are made by a statutorily defined "licensing officer," which is a police commissioner or sheriff in New York City and Long Island, and a locally-based state judge elsewhere. *Id.* § (1); *see* N.Y. Penal Law § 265.00(10). In Suffolk County, the licensing officer is "the sheriff of that county" or, in the towns of Babylon, Brookhaven, Huntington, Islip, and Smithtown, "the commissioner of police of that county." N.Y. Penal Law § 265.00(10).

As of March 4, 2025, there have been 26,117 new firearm licenses issued that include the ability to purchase or take possession of a semiautomatic rifle, and approximately 47,875 amendments that add the ability to purchase or take possession of a semiautomatic rifle. Deyo Dec. ¶¶ 7-8. 707 of those new licenses were issued in Suffolk County specifically.[1] *Id.* ¶ 7.

**B. Procedural History**

In February 2023, plaintiffs filed this lawsuit against Suffolk County, members of the Suffolk County Police Department, and the Superintendent of the New York State Police, and then

---

[1] The search run by the State Office of Information Technology Services did not include an updated figure for amendment transactions adding the ability to purchase or take possession of semiautomatic rifles. *See* Deyo Dec. ¶ 8. However, as of the first round of summary judgment briefing in June 2024 there had been 381 such amendment transactions in Suffolk County, and "[t]hat figure is certainly higher now." *Id.*

moved for a preliminary injunction against enforcement of the semiautomatic rifle licensing law. *See generally* Complaint, ECF No. 1, 6. In September 2023, this Court denied the motion for a preliminary injunction. *See McGregor v. Suffolk County*, 690 F. Sup. 3d 147 (E.D.N.Y. 2023).

Plaintiffs amended their complaint, ECF No. 47, and plaintiffs and the Superintendent subsequently cross-moved for summary judgment, ECF Nos. 66 and 70. The Court ordered the cross-motions to be withdrawn without prejudice pending the Second Circuit's resolution of *Antonyuk v. James* following remand from the U.S. Supreme Court. *See* Order (Sept. 16, 2024). In November 2024, the parties stipulated to the dismissal of all claims against the Superintendent, ECF No. 82, 83, and the remaining parties agreed that "there is no additional discovery to be conducted," and that the appropriate course was to file cross-motions for summary judgment on the issue of liability. *See* ECF No. 84.

Although Plaintiffs have dismissed their claims against the Superintendent, they continue to pursue declaratory and injunctive relief with respect to the facial constitutionality of New York's semiautomatic rifle licensing requirement. Accordingly, the New York Attorney General has intervened for the limited purpose of defending the law's constitutionality.[2] *See* ECF No. 85; Order (Dec. 11, 2024).

## STANDARD OF REVIEW

"Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015) (Brown, J.) (*purgandum*). "A fact is material if it might affect the outcome of the suit under governing law, and an issue of fact is genuine if the

---

[2] Because the Attorney General's intervention is limited to defending the facial constitutionality of the statute, *see* 28 U.S.C. § 2403(b), this motion does not address other relevant matters, such as whether plaintiffs have standing to bring this action and the existence or legality of any policies or procedures employed by Suffolk County.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 211–12. "The moving party bears the initial burden of establishing the absence of any genuine issue of material fact." *Id.* at 212. The nonmoving party must "go beyond the pleadings, and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

## ARGUMENT

### NEW YORK'S LICENSING REQUIREMENT FOR SEMIAUTOMATIC RIFLES IS CONSTITUTIONAL

"*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024) (quoting *Bruen*, 597 U.S. at 19). At the first step, the plaintiff bears the burden of demonstrating that his or her conduct is covered by the Second Amendment's text. *See Gazzola v. Hochul*, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022), *aff'd*, 88 F.4th 186 (2d Cir. 2023). If the text is not implicated, "that ends the inquiry: the Second Amendment does not apply." *Mills v. New York City*, No. 23 Civ. 7460, 2024 WL 4979387 at *7 (S.D.N.Y. Dec. 4, 2024) (quoting *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (*en banc*)).

If the text of the Second Amendment is implicated, the burden shifts to the government to show that the challenged law is consistent with the nation's history and tradition of firearms regulation. At this stage, the State must identify one or more historical laws that are "relevantly similar" to the law being challenged. *Bruen*, 597 U.S. at 28–29. "The law must comport with the

principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  And in "cases implicating unprecedented societal concerns or dramatic technological changes"—such as the lethality of modern semiautomatic rifles, which had no parallel in the 18th or 19th centuries—*Bruen* calls for "a more nuanced approach" in recognition of the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27; *cf. Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024) ("Founding-era society faced no risk that one person with a gun could, in minutes, murder several dozen individuals.").

A facial challenge to a legislative enactment is "the most difficult challenge to mount successfully" because "to succeed on a facial challenge, the challenger must establish *that no set of circumstances* exists under which the regulation could be valid." *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017) (brackets omitted, emphasis in the original). The Supreme Court recently reiterated the applicability of the facial challenge statute in the Second Amendment context, explaining that a court must "consider the circumstances in which [a challenged law] was most likely to be constitutional," not "focus[] on hypothetical scenarios where [the law] might raise constitutional concerns." *Rahimi*, 602 U.S. at 701.  The Second Circuit likewise emphasized in a Second Amendment case that "[f]acial challenges are disfavored, and that courts must not allow them to "short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the constitution." *Antonyuk*, 120 F.4th at 987.

For the reasons explained below, this Court can reject plaintiffs' facial challenge to the semiautomatic rifle licensing requirement at either step of the *Bruen* inquiry.

**A. The Semiautomatic Rifle Licensing Requirement Does Not Implicate the Second Amendment's Text**

    **1. Shall-Issue Licensing Laws Do Not Infringe the Rights Protected by the Second Amendment**

As with other fundamental constitutional rights, "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it." *United States v. Libertad*, 681 F. Supp. 3d 102, 109 (S.D.N.Y. 2023). Accordingly, it is not sufficient merely to point out that a challenged law has something to do with firearms; a plaintiff must "show[] that such a burden has actually *infringed* any individual's constitutional right to self-defense protected by the Second Amendment" in order to shift the burden to the government to defend a challenged regulation. *United States v. Austin*, 729 F. Supp. 3d 396, 407 (S.D.N.Y. 2024).

In *Bruen*, the Supreme Court took great pains to emphasize that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the other 43 states' 'shall-issue' licensing regimes." 597 U.S. at 38 n.9 (quotation omitted). The concurrence by Justice Kavanaugh, joined by Chief Justice Roberts, likewise explained that "States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so," and that "New York" in specific "may continue to require licenses for carrying handguns for self-defense" so long as its licensing law operated in a shall-issue manner. *Id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring). "Importantly, both the majority opinion and the Kavanaugh concurrence indicated the likely constitutionality of shall-issue regimes – at least to the extent they are not applied in practice to frustrate gun ownership or carrying by law-abiding, responsible citizens – <u>without</u> first conducting any exhaustive historical analysis, suggesting that such 'shall-issue' regimes do not infringe the right to keep and bear arms. . . . This is because they do not on their face prevent anyone lawfully entitled to do so from 'keep[ing] and bear[ing] arms.'"

*Libertad*, 618 F. Supp. 3d at 110-11 (emphasis in the original); *see also Giambalvo*, 656 F. Supp. 3d at 381; *accord Frey v. Nigrelli*, 661 F. Supp. 3d 176, 196 (S.D.N.Y. 2023) ("Nothing in *Bruen* suggested that the Second Amendment protects the right to carry a firearm without a license, and concurring opinions indicate the opposite.").

Since *Bruen*, a chorus of federal courts across the country have "h[e]ld that non-discretionary 'shall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework." *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222-23 (4th Cir. 2024) (*en banc*) (citing *McRorey v. Garland* 99 F.4th 831, 837, 840 (5th Cir. 2024)); *Ritrovato v. Donovan*, No. 23 Civ. 10820, 2025 WL 777216, at *4 (D. Mass. Mar. 11, 2025); *United States v. DeFelice*, No. 23 Cr. 116, 2024 WL 3028425 at *5 (D. Conn. June 17, 2024) (a "licensing requirement" "does not prevent anyone from keeping and bearing arms, precisely because it does not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry" (quotation omitted)); *N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 WL 1932050, at* 8 (W.D.N.Y. May 2, 2024) ("it is undisputed that a license to obtain a firearm is constitutionally permissible"). "[I]f a plaintiff fails to rebut this presumption of constitutionality, the plaintiff's challenge to the 'shall-issue' licensing law fails at step one, with no requirement to conduct a historical analysis under step two." *Maryland Shall Issue*, 16 F.4th at 223.

Such a conclusion is fully consistent with "the plain text of the Amendment as historically understood." *Antonyuk*, 120 F.4th at 968. The scope of a constitutional provision is "pegged to the public understanding of the right" at the time when it was adopted, *Bruen*, 597 U.S. at 37, and a member of the public at the time of the founding would have understood the term "infringe" to refer to only a *significant* or *complete* violation of a right. For example, Dr. Samuel Johnson

defined "infringe" as a significant infraction or complete breach: "to violate; to break laws or contracts" or else "to destroy; to hinder." Samuel Johnson, *A Dictionary of the English Language* (1st edition 1755), Thompson Declaration ("TD") Ex. 1; *see also* John Ash, *The New and Complete Dictionary of the English Language*, Vol. 1 (1st Ed. 1775), TD Ex. 2 (defining "infringed" as "violated, broken, destroyed"); *cf. District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (looking to these sources for "[t]he 18th-century meaning" of the Second Amendment's text). The grievousness of an "infringement" stood in contrast to the related term "abridgement," which was defined as "a diminution in general" or any "restraint, or abridgement of liberty." *See* Johnson, *A Dictionary of the English Language*, supra, TD Ex. 3; *see also id.* (defining "abridge" as "to contract, to diminish, to cut short"). The same distinction appears in Noah Webster's dictionary, where "abridge" is defined as "to contract, shorten, deprive," while "infringe" means something much more serious: "to violate, break, transgress." Noah Webster, *A Compendious Dictionary of the English Language* (1st ed. 1806) at 2, 158, TD Exs. 4 & 5. The public thus understood an "infringement" to be a full and complete violation of a right, while a smaller or marginal impact on a right would constitute an abridgement only. *Cf.* Joseph Blocher & Darrell A.H. Miller, *What is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 334-35 (2016) (discussing the textual meaning of the term "infringed" and how the text is not implicated by "incidental burdens"); *see also Maryland Shall Issue*, 116 F.4th at 226-27; *Mills*, 2024 WL 4979387 at \*9.

Plaintiffs contend that the challenged law "subjugates semiautomatic rifles to the same 'may issue' discretionary licensing scheme New York has unconstitutionally enforced on handguns since 1911," *id.* at 14, and that New York does not "remain loyal to the Constitution." *Id.* at 16. But the Second Circuit has squarely rejected this argument, holding that "*Bruen* does

not forbid discretion in licensing regimes—on the contrary, the *Bruen* Court specifically stated

that its decision did not imperil the validity of more than a dozen licensing schemes that confer

discretion materially identical to [New York's licensing statute]." *Antonyuk*, 120 F.4th at 982.

Instead, the Second Circuit recognized that "statutes that grant [] limited discretion in applying

defined criteria are consistent with our tradition of firearms regulation," particularly when those

criteria are focused on an evaluation of dangerousness, as New York's revised statute is. *Id.* at

987; *see also Rahimi*, 602 U.S. at 700. Moreover, Plaintiffs Giambalvo and McGregor have both

acknowledged in related litigation "that the State may maintain objective permitting standards,"

effectively conceding that the mere idea of requiring a license to purchase or own a firearm is

constitutionally permissible. *Giambalvo*, 656 F. Supp. 3d at 381 (emphasis added).

If the Second Amendment permits shall-issue licensing laws with respect to handguns, "the

quintessential self-defense weapon," *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629), it

must also permit comparable laws respecting semiautomatic rifles. Indeed, multiple States require

a form of license to purchase some or all semiautomatic rifles.[3] *Cf. Oregon Firearms Fed'n v.*

*Kotek*, 682 F. Supp. 3d 874, 884, 939-40 (D. Or. 2023) (upholding Oregon's "permit to purchase"

law, which applies to all firearms, including all rifles, as "consistent with the type of regulations

that the United States Supreme Court has deemed constitutional"). These laws are presumptively

constitutional and do not infringe the rights protected by the Second Amendment.

---

[3] *See, e.g.,* Conn. Gen. Stat. Ann. § 29-37p *et seq.* (discussing the requirements for a "long gun eligibility certificate");
Ill. Comp. Stat. ch. 430 § 65/2(a)(1) ("No person may acquire or possess any firearm . . . within this state" without a
FOID card from the state police); Haw. Rev. Stat. § 134-1, 134-2(a) (permit required to purchase any "firearm" which
includes "pistols, revolvers, rifles, shotguns . . ."); Mass. Gen. Laws. Ann. Ch. 140 § 131E(a) ("rifles, shotguns and
feeding devices therefor may be so purchased only upon presentment of: a valid firearm identification card . . . a valid
license to carry firearms . . . or valid proof of exempt status."); Mich. Comp. Laws § 28.422(1)(b) ("a person shall not
. . . [p]urchase a firearm that is not a pistol in this state without first having obtained a license"); N.J. Stat. Ann. §
2C:58-3(b)(1) ("A person shall not . . . receive, purchase or otherwise acquire . . . a rifle or shotgun . . . unless the
purchaser . . . possesses a valid firearms purchaser identification card . . ."); *see also* Wash. Rev. Code § 9.41.090(2)(b)
("no dealer may deliver a firearm to the purchaser thereof until . . . [t]he dealer is notified in writing" by local or state
government "that the purchaser is eligible to possess a firearm.").

**2. The Semiautomatic Rifle Licensing Requirement is a Presumptively Constitutional "Condition or Qualification on the Commercial Sale of Arms"**

Alternatively, New York's semiautomatic rifle licensing requirement is a presumptively constitutional "law[] imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26; *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (same); *see also Gazzola v. Hochul,* 88 F.4th 186, 195 (2d Cir. 2023) (citing *Heller* and *McDonald* for the proposition that such regulatory measures are "presumptively lawful," and stating that "[n]othing in the Court's more recent decision in [*Bruen*] casts doubt on that understanding of the Second Amendment's scope."). Federal courts have routinely rejected constitutional challenges to such statutes without need for a historical analysis, reasoning that *Bruen* only "requires a historical showing by the government 'when the Second Amendment's *plain text* covers an individual's conduct.' The plain text covers plaintiffs' right 'to keep and bear arms.' And on its face 'keep and bear' does not include purchase—let alone without a background check." *McRorey*, 99 F.4th at 838 (quoting *Bruen*, 597 U.S. at 24) (emphasis by the Fifth Circuit); *see also B&L Prods. v. Newsom*, 104 F.4th 108, 110 (9th Cir. 2024) (commercial regulations that "do not meaningfully constrain any individual's ability to keep and bear arms . . . do not implicate the plain text of the Second Amendment").

Here too, the relevant provisions of the challenged law impose a condition (or require a qualification) for the commercial sale of arms; as Plaintiffs describe it, the challenged law prohibits vendors from "selling and transferring [semiautomatic rifles] to any individual who does not hold a [semiautomatic rifle] license." P56.1 ¶ 116. Because plaintiffs have "provided the Court no reason to conclude that the [challenged law] has 'substantially interfered with the right of law-abiding, responsible citizens to obtain and carry firearms for their self-defense, they have failed to

11

show that the [law] has infringed any individual's right protected by the plain text of the Second Amendment." *Austin*, 729 F. Supp. 3d at 407 (singular changed to plural) (quoting *Libertad*, 681 F. Supp. 3d at 111).

**B.** **The Semiautomatic Rifle Licensing Requirement Comports With the Nation's History And Tradition of Firearm Regulation**

This Court may also readily conclude that New York's semiautomatic rifle licensing requirement is consistent with the nation's history and tradition of firearms regulation, as is necessary under *Bruen*'s second step.

As explained in the accompanying expert Declaration of Professor Robert Spitzer (the "Spitzer Dec."), firearms licensing has been a widely used regulatory tool throughout American history. Weapons licensing—the grant of which was predicated on an evaluation process—existed dating back to the 1600s, with a total of at least 47 states having enacted some type of licensing law from the 1600s through the early 1900s. *Id*. at ¶¶ 9, 14 and Exhs, B, C.[4] Although licensing was first applied in populated areas, like cities, to address specific threats to public safety and order—which generally came from handguns from the 1700s through the early 1900s—once repeating long guns appeared in civil society and started to pose a criminal and public safety problem, states were quick to enact prohibitions and licensing requirements. *Id*. at ¶¶ 12, 60–61. Indeed, at least 36 states restricted long guns such as the Tommy gun, the Browning Automatic Rifle, and sawed-off shotgun (i.e., long guns modified after purchase) and up to 11 states restricted semi-automatic long guns during the 1920s and early 1930s. *Id*. at ¶ 60–61 and Exh, D; *see also Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 22 (D.D.C. 2023) ("This shows that the states confronted the public safety issues of their time with vigor; indeed, these regulations were at the

---

[4] Although "[t]wentieth-century evidence is not as probative as nineteenth-century evidence because it is less proximate to the ratification of the Fourteenth Amendment. . . . such laws are not weightless." *Antonyuk*, 120 F.4th at 989 n.41.

time 'obviously uncontroversial' from a constitutional perspective." (quoting Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Probs. 55, 69 (2017)); *aff'd*, 120 F.4th 223 (D.C. Cir. 2024).

New York in particular has long enacted licensing measures to address practices that posed significant danger to colonists. For example, in 1680, the colonial legislature penalized the trafficking of "any gun or guns" to certain persons absent a license. *Id*. at ¶¶ 12–13. Later, New York enacted a licensing measure in 1763 to penalize any person who carried any type of firearm onto enclosed lands. *Id*. at 13. In the 1800s, New York together with over a dozen other states enacted laws requiring individuals to be licensed as a prerequisite to possessing or carrying a weapon. *Id.* at ¶¶ 14, 25. And in nearby New Jersey, the municipality of Jersey City enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, including long guns. *Id*. at ¶ 21; *see also Antonyuk*, 89 F.4th at 359 (recognizing "a municipal tradition of regulating firearms" on specified issue).

The licensing systems described above generally involved an application of judgment to individual applications. Spitzer Decl., ¶ 17. Some laws contained broad criteria, which often included a requirement that the applicant be of good moral character or sound judgment, emphasizing the individualized analysis performed by law enforcement officers granting licenses. *Id*.; *see also Antonyuk*, 120 F.4th at 988-89. For example, Jersey City's 1873 law included language to the effect that no person would be issued a carry permit unless the city's municipal court was "satisfied that such person is temperate, of adult age, and capable of exercising self-control." Spitzer Decl., ¶¶ 21–23. Another example is New York City's ordinance enacted in 1881, pursuant to which a person who carried "a pistol of any description concealed on his person" could be subject to criminal penalties unless he was issued a permit based on a finding that he was

a "proper and law abiding person." *Id.* at ¶¶ 17, 25–26. A few years later, an 1884 New York state law barred the carrying or possession of named weapons by those under 18 years old unless they possessed a license to do so. Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor." *Id.* at ¶ 28. Then, in 1885, the law was extended to all cities in the state and to "any pistol or other firearms of any kind," which would have included long guns. *Id.* In 1891, New York extended permitting to Buffalo, which covered handguns and other dangerous weapons. *Id.*

As Professor Spitzer further explains, from the 1700s to the 1860s, at least 13 states enacted laws to regulate, through licensing, the discharging of firearms, and these laws—which are similar to current licensing and background check requirements—extended to all firearms, including both long guns and handguns. *Id.* at ¶¶ 43–44. The earliest were in Pennsylvania, and included, among others: a 1713 Philadelphia law penalizing various city activities, including "firing a Gun without a license"; a 1721 act pertaining to the entire colony that imposed penalties on specified activities, including firing "any gun or other fire arm," without the "governor's special license"; and a 1721 Philadelphia ordinance requiring a "governor's special license" to prevent "mischief [that] may happen by shooting guns." *Id.* Other states followed Pennsylvania's lead, including, for instance, New Hampshire, which enacted a discharge permit system for Portsmouth in 1823, and New York, which enacted an 1824 law allowing Schenectady officials to grant permission for the discharge of guns. *Id.* at ¶ 45. Between the end of the Civil War and 1900, another 20 states enacted laws regulating the discharge of firearms. *Id.* and Exhs. B–C.

In addition, at least 17 states required those selling or otherwise transferring weapons to record and keep information about the buyer, with that information to be maintained and subject to possible later examination. *Id.* at ¶ 50. For example, in 1885, Illinois enacted a registration

requirement for weapons dealers requiring them to "keep a register of all such weapons sold or given away by them." *Id.* at ¶ 51. With minor exceptions, this law was typical of such requirements, including those imposed in 1911 laws enacted by Colorado and New York. *Id.* ¶¶ 52–53.

To the extent that the facial constitutionality of N.Y. Penal Law § 400.00(9)'s provision for the listing of individual semiautomatic rifles on licenses is presented in this case – and it likely is not, given the fact that the New York State Police does not enforce the provision, *see* Deyo Aff. ¶ 3 – such a requirement would not implicate the text of the Second Amendment because "[o]rdinary information-providing requirements, . . do not 'infringe' the right to keep and bear arms." *United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024); *see also Mills*, 2024 WL 4979387 at *10 (upholding New York City's far more intrusive requirement that only two guns could be listed on a carry license, and that a license holder would need to "file certain administrative paperwork" to change which weapons were included, because such a recordkeeping requirement "plainly did not infringe [plaintiff's] right to possess and carry weapons in case of confrontation."). But even if the law did implicate the Second Amendment's text, the tradition of recordkeeping requirements identified by Dr. Spitzer comfortably encompasses a requirement that specific weapons be listed on a license.

Ultimately, as Professor Spitzer explains, a comprehensive review of historical laws and regulations reveals that "licensing was an integral component" of American legal history and tradition. Spitzer Decl., ¶ 61. Indeed, "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons"—not only to their sale, but also their use and ownership—and as particular kinds of firearms presented themselves as public safety problems, a majority of the states acted swiftly to regulate and protect the health and safety of their

citizens. *Id.* at ¶¶ 57–58, 60–61. Accordingly, New York's licensing requirement for semiautomatic rifles is eminently "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, and must be upheld as constitutional.

To the extent plaintiffs suggest that this Court may consider historical evidence only from the "Founding Era," Plaintiffs' brief at 20, they are wrong. The understanding of the right to bear arms that prevailed when the States adopted the Fourteenth Amendment in 1868, along with the Founders' understanding in 1791 of that right, are "both focal points of [the court's] analysis." *Antonyuk*, 120 F.4th at 972. As the Supreme Court explained in *Rahimi*, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." 602 U.S. at 691-92; *see also Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century").

## **CONCLUSION**

For the reasons set forth above, the Attorney General respectfully requests that the Court deny Plaintiffs' motion for summary judgment, grant her cross-motion for summary judgment, dismiss plaintiffs' facial challenge to the constitutionality of New York's licensing requirement for semiautomatic rifles in its entirety and with prejudice, and grant such other and further relief as it deems just and proper.

Dated: New York, New York
March 19, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
JAMES M. THOMPSON
  *Special Counsel for*
  *Second Amendment Litigation*

By: _____
JAMES M. THOMPSON
Special Counsel for
Second Amendment Litigation

28 Liberty Street
New York, NY 10005
(212) 416-6556
James.Thompson@ag.ny.gov