UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MICHAEL MCGREGOR, ZACHARY GIAMBALVO,
PAUL FELICE, MATTHEW OLIVIERI, EDWARD
NEWMAN, and DARK STORM INDUSTRIES, LLC,

                                 Plaintiffs,        23 Civ. 01130 (GRB)(ARL)

              -against-

SUFFOLK COUNTY, New York,
Police Commissioner RODNEY HARRISON,
in his Official Capacity and Individually, MICHAEL
KOMOROWSKI, Individually,

                         Defendants,

LETITIA JAMES, in her official capacity as Attorney
General of the State of New York,

                        Intervenor.

-------------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO INTERVENOR LETITIA JAMES'
## CROSS-MOTION FOR SUMMARY JUDGMENT
## AND IN FURTHER SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT .................................................................................. 1

I.  THE STATE'S REGULATIONS IMPLICATE SECOND AMENDMENT CONDUCT ......... 2

II.  THE SUPREME COURT'S SECOND AMENDMENT JURISPRUDENCE DOES NOT
SUPPORT THE STATE'S ARGUMENTS ..................................................................... 4

    A. This is Not A "Handgun Carry" Case ........................................................... 5

    B. Penal Law § 400.00 is Not a "Shall Issue" Statute ....................................... 6

    C. SARs are Common Rifles, Not NFA Weapons ............................................ 7

    D. This is Not a 'Prohibited Person' Case ........................................................ 7

III. SEMIAUTOMATIC RIFLES ARE 'BEARABLE ARMS,' PRESUMPTIVELY
PROTECTED BY THE SECOND AMENDMENT ........................................................ 7

IV. THE STATE FAILED TO IDENTIFY AN HISTORICAL TRADITION OF
CRIMINALIZING THE ACQUISITION OF COMMON RIFLES ............................................. 10

V. THE STATE FAILED TO JUSTIFY LICENSING COMMON RIFLES .............................. 11

    A. Licensing Common Rifles Was Never a 'National (or New York)Tradition' ............ 12

    B. Fully-Automatic Machine Guns Are Not Analogous to the Rifle Bill ...................... 13

    C. High-Capacity Magazine/Capability is Not An Analogue ......................................... 14

    D. Firing a Gun in Public, Fireworks, and Gunpowder Laws Are No Analogue ........... 14

    E. Past Regulations Cannot Overcome Today's 'Common Weapon' ............................ 15

    F. Commercial Regulations on Sellers Are Not Analogous .......................................... 15

    G. Burdening 'the People' with Registration Laws Was Never an American
Tradition .................................................................................................................. 16

VI. LICENSING STATISTICS DO NOT SATISFY THE *BRUEN* TEST .................................. 17

VII. THE STATE'S 'DEGREE OF INFRINGEMENT' TEST MUST BE REJECTED............. 17

VIII. THE SUPREME COURT PERSISTENTLY REJECTS PUBLIC SAFETY
JUSTIFICATIONS IN SECOND AMENDMENT CHALLENGES ........................................... 18

CONCLUSION.......................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrews v. State,*
   50 Tenn. 165 (1871) ........................................................................ 3

*Antonyuk v. James,*
   120 F.4th 941 (2d Cir. 2024) ................................................ 6, 7, 16

*Brown v. ATF,*
   704 F.Supp.3d 687 (N.D. W. Va. 2023) ......................................... 3

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) .................................................................... 4, 8

*D.C. v. Heller,*
   554 U.S. 570 (2008) ................................................................ Passim

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) .......................................................... 3

*Frey v. Nigrelli,*
   661 F.Supp. 3d 176 (S.D.N.Y. 2023) ............................................. 6

*Friedman v. City of Highland Park, Ill.,*
   577 U.S. 1039 (2015) ...................................................................... 8

*Heller v. D.C.,*
   670 F.3d 1244 (D.C. Cir. 2011) ................................................... 8, 9

*Husejnovic v. DeProspo,*
   225 A.D.3d 597 (2d Dept. 2024) .................................................. 16

*Jones v. Becerra,*
   498 F. Supp. 3d 1317 (S.D. Cal. 2020) ........................................... 9

*Jones v. Bonta,*
   34 F.4th 704 (9th Cir.) .................................................................... 9

*Kantarakias v. Kim,*
   226 A.D.3d 1020 ............................................................................ 6

*Maryland Shall Issue, Inc. v. Moore,*
   116 F.4th 211 (4th Cir. 2024) ........................................................ 3

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ........................................................................... 4, 20

*Miller v. Bonta*,
    542 F. Supp. 3d 1009 (S.D. Cal. 2021) ..................................................... 9

*New York State Firearms Ass'n v. James*,
    2024 WL 1932050 (W.D.N.Y. May 2, 2024)............................................. 6

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ..............................................................................Passim

*Nguyen v. Bonta*,
    2024 WL 1057241 (S.D. Cal. Mar. 11, 2024)........................................... 8

*Reese v. ATF*,
    127 F.4th 583 (5th Cir. 2025)................................................................... 3

*Renna v. Bonta*,
    667 F.Supp.3d 1048 (S.D. Cal. 2023)....................................................... 3

*Rogers v. Grewal*,
    140 S.Ct. 1865 (2020) ............................................................................ 18

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ................................................................................. 11

*Sedita v. United States*,
    2025 WL 387962 (D.D.C. Feb. 4, 2025) .................................................. 3

*Staples v. United States*,
    511 U.S. 600 (1994) ................................................................................. 8

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017)................................................................... 3

*U.S. v. Austin*,
    729 F.Supp.3d 396 (2024) ...................................................................... 18

*U.S. v. Libertad*,
    681 F.Supp.3d 102 (2023) ...................................................................... 18

*U.S. v. Rahimi*,
    602 U.S. 680 (2024) ...........................................................................Passim

*United States v. Hicks*,
   649 F.Supp.3d 357 (W.D. Tex. 2023) ............................................................. 3

*United States v. McNulty*,
   684 F.Supp.3d 14 (D. Mass. 2023) ................................................................. 3

**Statutes**

18 U.S.C. §922(g) ........................................................................................ 10, 19
New York State Penal Law § 265.00(3)................................................................ 12
New York State Penal Law § 265.00(21)............................................................... 14
New York State Penal Law § 265.00(22)............................................................... 13
New York State Penal Law § 265.00(23)............................................................... 14

# PRELIMINARY STATEMENT

Plaintiffs Michael McGregor, Zachary Giambalvo, Paul Felice, Matthew Olivieri, Edward Newman, and Dark Storm Industries, LLC ("Plaintiffs"), submit the within Memorandum of Law in opposition to the Cross-Motion for Summary Judgment filed by Intervenor New York State Attorney General Letitia James (the "State")[1] and in further support of Plaintiffs' motion for summary judgment.[2]

Rather than engage in an historical discussion of national traditions concerning the criminalization of everyday Americans for acquiring/purchasing rifles and/or the mandatory licensing of rifles, which is the State's burden to prove under the *Bruen* test, the State applies the stretch-Armstrong approach to legal theory – attempting, in vain, to expand inapposite laws and scenarios to reach its goal.

First, the State makes the specious claim that the Second Amendment is not even implicated by the *Rifle* Bill, pointing to comments in *Bruen*'s opinion relating to license requirements for the *concealed carriage* of *handguns* [State Br. at 2]. But this case does not involve handguns or public carry. The State further claims that the Second Amendment is not implicated because the Rifle Bill "only" places a "condition or qualification on the commercial sale of arms" [*Id.*] even though Penal Law § 265.65 makes it a felony for an individual to purchase semiautomatic rifles if they have not applied for, and received, a license. Next, the State claims that the Rifle Bill is "consistent with the principles that underpin our regulatory tradition" [*Id.*] but falls short if identifying any national tradition making it a felony to purchase a rifles without a government-issued license.[3]

---

[1] The State does not challenge the plaintiffs' standing [State Br. at 4, n. 2].

[2] Plaintiffs also respectfully refer the Court to the amicus brief filed by The Second Amendment Foundation [ECF 33].

[3] The Second Amendment was specifically penned to prohibit the government from encroaching on the individual right to be armed. It codified a *pre-existing* right. *D.C. v. Heller*, 554 U.S. 570, 592 (2008) ("it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."). There is no credible argument to support the idea that the public understanding at the ratification was that some act was required as a precursor to exercising that right. Had there been an intention to condition the right on a government

The State goes on to rely on district court opinions that retrofit the *Bruen* test with a factor that weighs the "degree of infringement" suffered by the individual [State Br. at 7] - in direct conflict with the Supreme Court's persistent rejection of interest-balancing in Second Amendment challenges. See, *Bruen*, 597 U.S. at 22 (recounting the Supreme Court's "express rejection" in *Heller* and *McDonald* of applying any "judge-empowering interest-balancing inquiry") (citations omitted).

The State's historian fares no better. In addition to including laws forbidding the possession of fully automatic machine guns in a category he labeled, "Semi-automatic firearms" [Ex. D to Spitzer Dec.] Spitzer's proposed analogues tragically miss the mark. Generously speaking, it is plausible that the State identified but three (3) laws analogous to its criminal penalties; only two (2) were state laws and all were enacted over 100 years after the ratification. The State's proposed licensing analogues are equally deficient. Not only is there no national tradition of licensing rifles, New York did not have any such requirement until the Rifle Bill was passed in 2022.

The State's failure to satisfy the *Bruen* test requires summary judgment in Plaintiffs' favor.

## I. THE STATE'S REGULATIONS IMPLICATE SECOND AMENDMENT CONDUCT

The State presses the untenable position that the Rifle Bill "does not implicate the plain text of the Second Amendment" [State Br. at 2].

The Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). The plain text "guarantee[s] the right to possess and carry weapons in case of confrontation." *D.C. v. Heller*, 554 U.S. 570, 592 (2008); *Bruen*, 597 U.S at 45 ("by the time of the founding, the right to keep and bear arms was understood

---

license, the plain text would have so indicated. Privileges require a license, Rights do not. Nor can the exercise of the Second Amendment, which codified a preexisting right , be criminalized.

to be an individual right protecting against both public and private violence") citing *Heller,* 554 U.S. at 594.

Plaintiffs' conduct – acquiring bearable arms – falls within the scope of conduct protected by the right to "keep and bear" arms. Of course, individuals would not have any 'arms' to keep or bear if the acquisition thereof was not also within the Amendment's protections.

"Indeed, the commonsense conclusion that "th[e] right of keeping arms" "necessarily involves the right to purchase and use them" has been a feature of judicial opinions from 1871, *Andrews v. State*, 50 Tenn. 165, 178 (1871), to the present, e.g., *Reese v. ATF*, 127 F.4th 583, 589-90 (5th Cir. 2025). [4] And rightly so, as "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether."" *Id.* at 590." See, Brief For Amicus Curiae National Shooting Sports Foundation, Inc. In Support Of Appellants in *Mills v. New York City,* 2d. Cir. Case No. 24-3308 at p. 11 (pending).

Having established that the Second Amendment presumptively protects Plaintiffs' conduct, the only issue for this Court to determine is whether the State met its burden of identifying a national tradition of (i) subjecting the general public to criminal penalties for acquiring/purchasing rifles without a government-issued license, (ii) requiring the general public to apply for and obtain a license before being able to lawfully acquire/purchase rifles, and (iii) requiring the general public

---

[4] Citing, *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 230 (4th Cir. 2024) (en banc) (Rushing, J., concurring) ("Maryland's law regulates acquiring a handgun, and the Second Amendment's text encompasses that conduct."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms[.]" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Sedita v. United States*, 2025 WL 387962, at *8 (D.D.C. Feb. 4, 2025); Brown v. ATF, 704 F.Supp.3d 687, 700 (N.D. W. Va. 2023); *United States v. McNulty*, 684 F.Supp.3d 14, 20 (D. Mass. 2023); *Renna v. Bonta*, 667 F.Supp.3d 1048, 1065 (S.D. Cal. 2023); *United States v. Hicks*, 649 F.Supp.3d 357, 359 (W.D. Tex. 2023).

to register a purchased rifle with the government before being able to lawfully remove the rifle from the store.

## II. THE SUPREME COURT'S SECOND AMENDMENT JURISPRUDENCE DOES NOT SUPPORT THE STATE'S ARGUMENTS

This case challenges New York's imposition of criminal penalties on "the People" for the purchase and transfer of semiautomatic rifles (SARs) without a license. The State's reliance on Supreme Court cases analyzing the historical traditions of *handgun* regulation is grossly misplaced. Long guns and handguns have separate and distinct histories, and there is no American tradition that justifies such regulations on rifles, nor did the State identify one.

The Supreme Court's Second Amendment jurisprudence since *Heller* has involved an historical analyses of the individual right under the Second Amendment in the context of handgun possession in *Heller*, the application of the Second Amendment to the states through the Fourteenth Amendment in *McDonald*, the public carriage of handguns in *Bruen*, confirming that the plain text of the Amendment covers bearable arms in *Caetano*, and confirming that the temporary disarmament of individuals who have been adjudicated by a court to pose a danger to another person in *Rahimi*.[5]

The Supreme Court's discussion of long guns in *Heller* acknowledged that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The Court called arguments to the contrary "frivolous." *Id.* The "conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Ibid.*

---

[5] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) (stun guns); *U.S. v. Rahimi*, 602 U.S. 680 (2024).

There is no Supreme Court case that supports imposing criminal sanctions on the general public for purchasing common rifles, nor is there any support for the State's licensing and registration requirements.

**A. This is Not A "Handgun Carry" Case**

Penal Law §§ 265.65 and 265.66 criminalize the purchase, receipt, and transfer of rifles in the absence of a government-issued license authorizing such conduct. *Bruen* involved a challenge New York's "proper cause" requirement to carry a handgun concealed in public.[6] The Court held that "the plain text of the Second Amendment protects carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32. The Court's clarification that its holding should not be interpreted as dispensing with "shall issue" licensing regimes for the <u>concealed carriage of</u> <u>handguns</u> does not equate to an imprimatur on licensing Rifles.

For one, the petitioners in *Bruen* "acknowledge[d], shall-issue licensing regimes [for the concealed carriage of handguns] are constitutionally permissible" [*Bruen*, 597 U.S. at 80]. This concession prompted the Court to encourage the 'outlier' states with "may issue" concealed carry handgun licensing regimes, like New York and California,[7] to transition to "narrow, objective, and definite standards" for issuing licenses to carry a handgun concealed. *Bruen*, 597 U.S. at 39, n. 9. Licensing itself was not part of the Court's analysis, nor were rifle-specific regulations.[8]

---

[6] When *Bruen* was decided on June 23, 2022, semiautomatic rifles had not yet been incorporated into the handgun licensing regime; the Rifle Bill did not go into effect until September 4, 2022. The issue of licensing rifles was neither before, nor contemplated by, the Supreme Court.

[7] Like New York, California's licensing scheme only applies to concealed carriage of handguns – open carry is banned in both states. And, at the time of the *Bruen* opinion in June 2022, the Rifle Bill was not yet enacted into the licensing statute, § 400.00*, et seq.*

[8] Relevant here, *Frey v. Nigrelli*, 661 F.Supp. 3d 176 (S.D.N.Y. 2023) challenges New York State's ban on the open carriage of handguns [State Br. at 8].

The licensing of a constitutional right – and criminalizing the exercise of protected conduct without the government's permission is odious to the Constitution.[9]

### B. Penal Law § 400.00 is Not a "Shall Issue" Statute

Even if there were a historical tradition of criminalizing the purchase/transfer of rifles without a license, which there is not, Penal Law § 400.00 is (still) not a "shall issue" licensing regime [State Br. at 8-9]. Nor is there any "presumption of constitutionality" of laws criminalizing unlicensed rifle transfers [State Br. at 8]. The State will likely point to the text of § 400.00(2), "Types of licenses," providing that a SAR license "shall be issued to purchase or take possession of such [SAR]" but an applicant must first survive § 400.00(1)(b)[10] which, in spite of *Bruen*, continues to implement a "broad" discretionary licensing scheme based on subjective assessment of facts requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion…features that typify proper-cause standards like New York's." *Bruen*, 597 U.S. at 39, n. 9. For the first time in New York's history, SARs are now subject to the same subjective, discretionary licensing requirements. Yet, before the conclusion is drawn that the Second Circuit's imprimatur of a "moral character" assessment in *Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024) [State Br. at 10] should be extended to rifles, *Antonyuk*'s analysis of § 400.00(2)(b)'s discretionary moral character factor was limited to <u>handguns</u>.[11] The State's only truly "objective standards"[12]

---

[9] *New York State Firearms Ass'n v. James*, No. 23-CV-6524-FPG, 2024 WL 1932050, at *7–8 (W.D.N.Y. May 2, 2024) challenged, *inter alia*, the requirement that a seller of ammunition be licensed or that commercial ammunition transfers involve a licensed dealer" – it did not challenge gun licensing under § 400.00, *et seq*.

[10] See, post-*Antonyuk* state appellate division cases continuing to hold that "[a] pistol licensing officer has broad discretion in ruling on permit applications and may deny an application for any good cause." *Kantarakias v. Kim*, 226 A.D.3d 1020, 1021, appeal dismissed, 42 N.Y.3d 1040 (2024).

[11] Even when acknowledging that the "Second Amendment does not tolerate a 'may issue' licensing regime, like New York's former regime, that conditions the issuance of a concealed-carry license on a discretionary assessment of need or justification" the Second Circuit ironically proceeded to endorse the "discretionary assessment" of an applicant's moral character under § 400.00(1)(b). *Antonyuk*, 120 F.4th at 965.

[12] State Br. at 10. Plaintiffs do not concede that § 400.00 is an objective licensing scheme, and have not so conceded in other litigation [State Br. at 10].

for acquiring guns lies in N.Y.S. General Business Law § 898, which subjects every sale and/or transfer to a NICS background check,[13] discussed further below.

Notably, Plaintiffs Giambalvo and Felice each already own SARs, which they purchased prior to the enactment of the Rifle Bill and after successfully passing a NICS background check [SOF ¶¶ 60-86]. Neither Plaintiff is firearms-disqualified under the objective federal and state law prohibiting factors for firearm possession - yet *both* plaintiffs applied for and were denied the issuance of license under the subjective discretion afforded to statutory licensing officers under Penal Law § 400.00.[14]

**C. SARs are Common Rifles, Not NFA Weapons:** The weapon at issue here is a commonly owned and sold rifle, not an 'unusual' weapon such as those covered by the National Firearms Act, including machine guns, short barrel shotguns/rifles, silencers, and destructive devices.[15]

**D. This is Not a 'Prohibited Person' Case:** Unlike the federal regulations challenged in *Rahimi,* which addressed temporary disarmament of individuals adjudicated by a court to pose a credible danger to another person, the Rifle Bill is a blanket prohibition over the all 'the People.'

## III. SEMIAUTOMATIC RIFLES ARE 'BEARABLE ARMS,' AND PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

As "we explained in *Heller*, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence." *Rahimi*, 602 U.S. at 680

---

[13] The statute exempts "immediate family," which shall mean spouses, domestic partners, children and step-children.
[14] Neither Giambalvo nor Felice have any disqualifying convictions or were "committed to a mental institution" or suffered any other disqualifying event [SOF ¶¶ 60-86]. Their license applications were denied because the licensing officers have discretion to assess "moral character." Giambalvo and Felice complied with all the application requirements set forth in § 400.00, *et seq.* If the state licensing regime were, in fact, a "shall issue" regime, the Suffolk County licensing officer would have been required to issue licenses to Giambalvo and Felice.
[15] https://www.atf.gov/firearms/qa/which-firearms-are-regulated-under-nfa

citing *Heller*, 554 U.S. at 582. Even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. *Bruen*, 597 U.S. at 28 quoting *Caetano*, 577 U.S. at 411–412.

The relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J., concurring).

Semiautomatic rifles are bearable arms in common use protected by the Second Amendment; they are not dangerous and unusual weapons. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J. joined by Scalia, J. dissenting from denial of certiorari) (discussing a city ordinance that "criminalizes modern sporting rifles, e.g., AR-style semiautomatic rifles, which many Americans own for lawful purposes like self-defense, hunting, and target shooting") (internal parentheses omitted); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011)[16]; *Nguyen v. Bonta*, No. 320CV02470WQHMMP, 2024 WL 1057241, at *7 (S.D. Cal. Mar. 11, 2024) (purchasing semiautomatic rifles is protected by the plain text of the Second Amendment); *Staples v. United States*, 511 U.S. 600, 611–12, 114 S. Ct. 1793, 1800, 128 L. Ed. 2d 608 (1994) (unlike "machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to [NFA] regulation…guns falling outside those categories traditionally have been widely accepted as lawful possessions]; *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1029 (S.D. Cal. 2021), vacated and remanded, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022) (same); *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir.), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022)

---

[16] "We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market. As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten."

(same); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1324 (S.D. Cal. 2020), aff'd in part, rev'd in part and remanded sub nom. *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022), and vacated and remanded sub nom. *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022) (long-guns and semi-automatic centerfire rifles are not 'dangerous and unusual').

*Heller II*, supra, concerned AR-15s, which continue to be banned in New York State. The common rifles at issue here are plain vanilla semiautomatic rifles – not "assault weapons" as the State so defines that term [265.00]  that regular people could freely purchase[17] in New York State prior to September 2022.

The State's mandatory NICS background checks are already in place to ensure that "anyone lawfully entitled" to purchase handguns, rifles, and shotguns are able to "keep arms." [State Br. at 7]. Under N.Y.S. General Business Law § 898, every purchase and transfer of handguns, rifles, and shotguns in New York State must be conducted through a federal firearms licensee (FFL) and state-licensed gun dealer. All purchases/transfers require a national background check through NICS (National Instant Criminal Background Check System) conducted through the New York State Police. See, https://nysnics.ny.gov/app/.

Penal Law §§ 265.65 and 265.66 subject the entire population of New York to criminal penalties for engaging in presumptively protected conduct – making no distinction between prohibited persons and non-prohibited individuals, notwithstanding that laws already exist to punish prohibited people who acquire/possess firearms. See, 18 U.S.C. §922(g), Penal Law 265.00, *et seq.* Regulations like the Rifle Bill were never imposed in New York prior to 2022, nor are there any analogous national historical regulations. And the State's imposition of a licensing scheme to 'soften the blow' of criminal penalties does not absolve the State from proving that §§

---

[17] After a mandatory NICS background check.

265.65 and 265.66 – the criminal penalties - are consistent with America's historical traditions. Criminalizing the acquisition of common rifles is repugnant to the Constitution, which presumptively "guarantee[s] the individual right to possess…weapons in case of confrontation." *Heller,* 554 U.S. at 592.

## IV. THE STATE FAILED TO IDENTIFY AN HISTORICAL TRADITION OF CRIMINALIZING THE ACQUISITION OF COMMON RIFLES

"Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 597 U.S. at 17 (internal quotation marks omitted). In "*Bruen*, the Court repeated that the Nation's historical tradition of firearm regulation guides the constitutional analysis of gun regulations and exceptions to the right to bear arms." *Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (citation omitted).

Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "central" considerations when engaging in an analogical inquiry. *Bruen,* 597 U.S. at 29 (citation omitted).

There was no comparable burden in America's historical traditions for Penal Law §§ 265.65 and 265.66. The State identified only (3) laws imposing criminal penalties on ordinary citizens who took possession of/purchased semiautomatic rifles: 1893 Florida (repeating rifles), 1933 Hawaii (not a state until 1959) (any type of gun); and 1925 West Virginia (high powered rifles). A 'national tradition' is not demonstrated by citing three regulations, one of which was merely a territory. And because "territorial laws were rarely subject to judicial scrutiny" [*Bruen*, 597 U.S. at 68] the Hawaii regulation should be summarily rejected. Two state laws enacted over 100 years after the ratification, do not reflect the "public understanding" of the scope of the Second Amendment nor can they constitute a national tradition.

Constitutional interpretation should reflect "the principles adhered to, over time, by the American people, rather than those favored by the personal (and necessarily shifting) philosophical dispositions of a majority of this Court." *Rahimi*, 144 S. Ct. at 1917 quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 96 (1990) (Scalia, J., dissenting).

Over time, laws have been enacted to prevent the sale and possession of dangerous and unusual weapons – a category that the common rifles like the SAR do not fall into. SARs are not "dangerous and unusual" weapons – they are the most common sporting rifle in the nation. https://www.nssf.org/wp-content/uploads/2022/07/EstMSR1990_2020.pdf.

And until 2022, New Yorkers were freely able to purchase SARs through a licensed gun dealer after undergoing a brief mandatory background check through NICS – all purchasers were confirmed to be law-abiding people with no prohibitors to the possession of firearms under state and federal law, like every individual Plaintiff in this case [SOF ¶¶ 39-40, 60-61, 74-75, 87].

## V. THE STATE FAILED TO JUSTIFY LICENSING COMMON RIFLES

The general constitutionality of licensing regimes has never been squarely before the Supreme Court – nor has the issue of criminal sanctions for acquiring or transferring rifles without a license, or requiring a license to take possession of rifles.

All discussions and analysis of handguns, concealable weapons[18], and/or the public carriage thereof is immaterial to the issues before this Court. While at first glance, Spitzer's declaration, Table and List of Licensing Laws (Spitz. Ex. B, Ex. C) may appear impressive and abundant with comparable regulations, when appropriately scrutinized, the State's offering is a

---

[18] Laws banning or licensing concealable weapons are no analogy. Rifles with a barrel under sixteen inches in length, or with an overall length of less than twenty-six inches are already illegal in New York. Penal Law § 265.00(3).

near-sanctionable overinclusion of immaterial and useless information.[19] Verily, a court that did not closely scrutinize the text of the State's proposed analogues could easily be misled.[20]

### A. Licensing Common Rifles Was Never a 'National (or New York)Tradition'

The State's attempt to morph *Bruen*'s analysis-free take on "shall issue" concealed carry handgun licensing schemes into a blind approval the Rifle Bill cannot stand. The State urges the coupling because it cannot identify any analogous national traditions for criminalizing the unlicensed acquisition of rifles, rifle licensing requirements, and registration requirements.

But the State must be held to its burden of identifying an historical tradition for <u>the challenged regulations</u> on rifles - not the regulation of some other classification of weapon (handguns) [See, State Br. at 10].

Of the hodge-podge of regulations listed in Exhs. B, C, and D[21], the only laws material to the issue of whether a "license requirement to take possession of a common rifle was a National tradition" are the three (3) mentioned above: 1893 Florida (licensed repeating rifles), 1933 Hawaii (not a state until 1959) requiring a permit to acquire *any* type of gun; and 1925 West Virginia, requiring a permit for high-powered rifles. Again, not a "national tradition" and also too far removed from the ratification to shed light on the Framers' intent. *See, Bruen*, 597 U.S. at 36.

---

[19] Spitzer's comment that it would have been an "impossibility" to require a license in early America because of inability of 'record-keeping' abilities should prompt the complete disregard of the Declaration in its entirety [Spitz. 6-7]. The state governments could not keep records? Plantations did not have a record of their slaves? Stores of their inventory? How did the courts operate? How were surety laws enforced? And the loyalty oath requirements in the Founding Era, which disarmed those who would not take a "printed or written oath" of allegiance to America – apparently no one kept track of that information either. Preposterous.

[20] The columns in Ex. B listing years and states licensing "fire or discharge, hunting, commercial sales and transporting, gunpowder and explosives, named groups, pre-civil war blacks, and tax" have nothing to do with regular people acquiring common rifles. Likewise, the public carry laws in the "carry or have" column are to be excluded.

[21] The abundance of irrelevant information is unsurprising. The State sought an overly broad opinion [Spitz. At ¶ 1 "I have been asked to render an opinion by the Office of the Attorney General of the State of New York on the history of weapons restrictions, focusing in particular on weapons licensing"]. 'Weapons' are not the issue – common rifles are.

**B. Fully-Automatic Machine Guns Are Not Analogous to the Rifle Bill**

Spitzer's Exhibit D ("Hardware Restrictions") contains a column titled, "Semi-automatic firearms" that only identifies a state and year for the proffered regulation. And, incredulously, the "semi-automatic" column is replete with laws banning ***automatic machine guns***. Automatic weapons are not at issue in this case.

The State's inclusion of machine guns and other NFA weapons as "proposed analogues" is duplicitous, as is adding fully-automatic machine weapons to the 'semiautomatic firearms' category.[22],[23]

Spitzer's claim that between "8 and 11 states imposed similar restrictions on semi-automatic long guns" in the 1920s and 1930s is disproven by the text of the regulations cited. All laws in the "Semi-automatic Firearm" column regulate the concealed carriage of handguns, machine guns, armed gangs, other automatic weapons now covered by the federal NFA, and high-capacity or illegally modified semiautomatic rifles – *none* are analogous to the common rifle at issue [Ex. B, D]. Their inclusion in Spitzer's Tables is beyond the pale, as is the State's attempt to analogize SARs to Tommy Guns and sawed off shotguns to a common rifle [State Br. at 12].

Spitzer deceitfully labels as "ambiguous cases" the Illinois' "Act to Regulate the…Possession…of ***Machine Guns***," the 1932 La. Acts 337-38 (same)[24], as well as laws from 1934 South Carolina (same), 1927 Massachusetts (same), and 1933 Minnesota (same, and semiautomatic guns ***modified*** to enable automatic fire) [Exhs. C, D].

---

[22] Two of the laws only affect the concealed carriage of handguns - D.C. and Rhode Island.
[23] Plaintiffs are not even challenging New York's ban on the AR-15 semiautomatic rifle  - coined "America's Rifle." https://www.nbcnews.com/news/us-news/america-s-rifle-why-so-many-people-love-ar-15-n831171.
Any semiautomatic rifle with "features" deemed 'prohibited' by the State are already classified as illegal "assault rifles" under § 265.00(22).  The weapon at issue here is a plain, featureless, common rifle.
[24] Notably, neither the text nor a citation to this law could be found in the Exhibits or Spitzer's Declaration. https://firearmslaw.duke.edu/laws/1932-la-acts-337-38-an-act-to-regulate-the-sale-possession-and-transportation-of-machine-guns-and-providing-a-penalty-for-a-violation-hereof-c2a7c2a7-1-2

The term "semiautomatic rifle" by definition[25], does not include "automatic weapons" as it requires a *separate* pull of the trigger to fire and does not allow the discharge of more than one cartridge successively.[26] This fact also requires the rejection of other laws from the "Semi-automatic Firearms" including the 1933 South Dakota and 1934 Virginia regulations banning firearms from which *multiple* shots can be fired with a "single" action or function of the firing device [Exhs. C, D].

### C. High-Capacity Magazine/Capability is Not An Analogue

Nor do regulations on high-capacity magazines and feeding devices fit the bill. The 1933 Ohio statute only required a license for SARs that could "shoot more than eighteen shots semi-automatically without reloading," the 1934 Virginia law regulated SARs from which "more than sixteen shots may be…discharged without reloading," and the 1927 Michigan law licensed "any gun that can be fired more than 16 times without reloading" [Exhs. C, D] (and, no 1929 MI gun law statute is cited anywhere else, nor could one be found online).

High capacity magazines and feeding devices are *already* illegal in New York State, a law not challenged here [see, § 265.00(23)].

### D. Firing a Gun in Public, Fireworks, and Gunpowder Laws Are No Analogue

Randomly shooting guns in the air, storing "gunpowder" (not analogous to merely keeping bullets), operating a shooting range, and other such conduct is not analogous conduct.

---

[25] "Semiautomatic" means any repeating rifle, shotgun or pistol, regardless of barrel or overall length, which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge case or spent shell and chamber the next round, and which requires a *separate pull of the trigger* to fire each cartridge or shell. Penal Law § 265.00(21).
[26] It should also be noted that the 1934 S.C. statute did not ban all machine guns – only those that could "automatically discharge more than 8 cartridges successively." [Ex. C].

### E. Past Regulations Cannot Overcome Today's 'Common Weapon'

The Second Amendment protects weapons "in common use at the time," as opposed to those that "are highly unusual in society at large." *Bruen*, 597 U.S. at 47 quoting *Heller,* 554 U.S. at 629. Whatever the likelihood that SARs were considered "dangerous and unusual" during the early 1920's and 30's, they are indisputably in 'common use' today.[27] Spitzer's Ex. D identifies no semiautomatic weapon regulation that predates 1927 – a time period that provides zero "insight" into the Second Amendment's original intent or the national traditions that existed at the Founding or even when the Fourteenth Amendment was adopted. See, e.g., *Bruen*, 597 U.S. at 36 quoting *Heller*, 554 U.S. at 614; see also at 37 (even "19th-century evidence was treated as mere confirmation of what the Court thought had already been established") (quotations omitted).

### F. Commercial Regulations on *Sellers* Are Not Analogous

Regulations on the commercial sale of firearms do not justify the Rifle Bill [State Br. at 11]. No sale occurs without a purchaser. So, upholding the Rifle Bill using a 'commercial regulations' analysis is an erroneous disregard of the *Bruen* test. It also presents the potential for conflicting results: striking the licensing requirement for the public (§ 265.65) but leaving intact the criminal penalties for FFLs (§ 265.66) would continue to ban an unlicensed public from acquiring SARs.

Penal Law §§ 265.65 and 265.66 are inextricably intertwined. The criminal penalties of §§ 265.65 and 265.66 ***absolutely foreclose*** the People from purchasing SARs, even if only during the license application period. Those who try to obtain a license must pay money, apply for, and then wait for a license to issue[28], which takes a minimum of six (6) months under New York Law[29] and,

---

[27] See, ATF statistics on SARs at EstMSR1990_2020.pdf (last visited 4/27/2025).
[28] Penal Law § 400.00(1)(b).
[29] Penal Law § 400.00(4-b).

in Suffolk County, at least "seven to eight months" according to Lt. Komorowski [Komorowski Dec. ¶ 27 (but see, *Giambalvo v. Suffolk County*, 22 Civ. 04778 (E.D.N.Y.) challenging Suffolk County's 2-3 year delay in processing licenses issued under § 400.00).

Moreover, any license may be denied under the "broad discretion" of the licensing officer. *Husejnovic v. DeProspo*, 225 A.D.3d 597, 598 (2d Dept. 2024), appeal dismissed, 41 N.Y.3d 1008 (2024) (disregarding the petitioner's legal argument that *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) interpreted the licensing officers' discretion under § 400.00(1)(b) to determine an applicant's dangerousness to be a "modicum").

### G. Burdening 'the People' with Registration Laws Was Never an American Tradition

Spitzer's proposed analogues for registration require the *seller* of firearms to keep a registry of each sale/transfer – *that* would fall under the State's commercial regulation of firearm sales argument. And the ATF and New York State already impose such requirements on FFLs.

The Rifle Bill registration requirement enforced on individuals by Suffolk County is not analogous [SOF ¶¶ 9, 35-36]. The only laws that required *purchasers* to register their guns were from Montana (1918) and Hawaii (1933), which was not a state until 1959.[30] Two laws enacted 100+ years after the ratification does not satisfy the State's burden of identifying a "national tradition."

If approved under the State's discretionary licensing regime, the individual may purchase a SAR but cannot remove it from the store until he has traveled back to the Suffolk County Pistol Licensing Bureau, filed an application to amend the license to add the SAR to the back of the license, obtain a permission slip, and travel back to the gun store; only after receiving the amended license may the individual remove his rifle from the store [§ 400.00(9); SOF ¶¶ 9, 35-36]. Whether

---

[30] https://www.history.com/this-day-in-history/hawaii-becomes-50th-state

or not the NYSP enforces the registration requirements for SARs is immaterial to Plaintiffs' request that the registration requirement be permanently enjoined. The Legislature requires registration [Penal Law § 400.00(9)], the State Intervenor has an obligation to defend its laws, and Lt. Komorowski confirmed that Suffolk County is enforcing the statute [SOF ¶¶9, 25-36]. Licensing officers also have discretion *not* to approve the amendment request. "If granted," the SAR must be registered to the back of the license before the it can be removed from the store § 400.00(9).

But the State has failed to identify a national historical tradition for this imposition on the People, requiring summary judgment in favor of Plaintiffs.

## VI. LICENSING STATISTICS DO NOT SATISFY THE *BRUEN* TEST

Statistics on the number of rifle licenses that have been issued statewide since the enactment of the Rifle Bill does not satisfy the State's burden under *Bruen*. As a matter of law and of fact, modern day statistics from 2022-2024 do not establish a "national historical tradition."

And the fact that some people have applied for and obtained the required license (or an endorsement of an existing pistol license) does not alter (i) the absence of an historical tradition; (ii) SCPD's denial of Giambalvo and Felice's applications to obtain a license; (iii) Olivieri's outright rejection of the licensing requirement; and (iv) Newman/DSI's inability to transfer SARs to unlicensed customers and potential customers, and their respective unlicensed customers and potential customers' inability to acquire SARs from them.

Prior to the enactment of the Rifle Bill, all people aged 18 and over were free to purchase semiautomatic rifles after passing a NICS background check.

## VII. THE STATE'S 'DEGREE OF INFRINGEMENT' TEST MUST BE REJECTED

Two of the S.D.N.Y. cases cited by the State -- *U.S. v. Libertad*, 681 F.Supp. 3d 102 (2023) and *U.S. v. Austin*, 729 F.Supp. 3d 396 (2024) -- are deeply rooted in a fatally flawed analyses

[State Br. at 7] that interjects a "degree of infringement" test into *Bruen*'s threshold inquiry of whether the plaintiffs' proposed conduct falls within the Amendment's plain text.

Leaning on that shaky post, the State declares that Plaintiffs must prove the Rifle Bill "substantially interfered" with the exercise of their Second Amendment rights [State Br. at 11] – a view in direct conflict with the Supreme Court's persistent rejection of interest-balancing in Second Amendment challenges. See, *Bruen*, 597 U.S. at 22 (recounting the Supreme Court's "express rejection" in *Heller* and *McDonald* of applying any "judge-empowering interest-balancing inquiry") (citations omitted); *Rahimi*, 602 U.S. at 708 (2024) (Gorsuch, J. concurring) (considering "how lower courts approached the Second Amendment before our decision in *Bruen*. They reviewed firearm regulations under a two-step test that quickly "devolved" into an interest-balancing inquiry, where courts would weigh a law's burden on the right against the benefits the law offered.") citing, *Rogers v. Grewal*, 590 U.S. ——, ——, and n. 1, 140 S.Ct. 1865, 1867–1868, and n. 1, 207 L.Ed.2d 1059 (2020) (Thomas, J., joined by Kavanaugh, J., dissenting from denial of certiorari).

The Second Amendment "is the *very product* of an interest balancing by the people." *Bruen*, 597 U.S. at 26 (emphasis supplied). So, where the government fails to prove that its laws are "consistent with the Second Amendment's text and historical understanding," the regulation, as a matter of law, violates the Second Amendment. *Bruen*, 597 U.S. at 24.

## VIII. THE SUPREME COURT PERSISTENTLY REJECTS PUBLIC SAFETY JUSTIFICATIONS IN SECOND AMENDMENT CHALLENGES

Premised on the mass-shooting in a grocery store in Buffalo, New York in May 2022 [State Br. at 2], the State implies that the tragedy would have been prevented had SARs been subject to mandatory state licensing. But the Rifle Bill is no more successful at preventing 'prohibited people'

from acquiring semiautomatic rifles than the mandatory NICS check already in place under G.B.L. § 898.

Rather, the Rifle Bill foreclosed the entire public from engaging in protected activity under penalty of criminal sanctions, then subjected the People to the "broad discretion" of a government official, a waiting period, payment of fees and, if a license was granted, the run-around just to be able to remove the purchased rifle from the store.

Notably though, the State points to no correlation between the enactment of the Rifle Bill and the purchase of SARs by "prohibited people" – conduct already regulated by G.B.L. § 898 and the State's mandatory NICS background checks.

Truly, New York's discretionary licensing scheme introduces an impermissible "gut feeling" into the equation, as it did with Giambalvo and Felice both of whom have been subject to and passed multiple NICS background checks, have no objective disqualifiers under 18 U.S.C. § 922(g), § 265.00, *et seq.*, or any other objective firearm regulation, and have been armed with SARs for years without incident.

That said, 'public safety' justifications have repeatedly been rejected by the Supreme Court as justifications for firearms regulations, because the "right to keep and bear arms is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at 783.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted in its entirety; the State Intervenor's cross-motion for summary judgment should be denied in its entirety; and an Order should issue declaring the Rifle Bill unconstitutional in violation of the Second Amendment, and striking it in its entirety by the permanent injunction of its enforcement by the Superintendent of

the New York State Police, the Police Commissioner of Suffolk County, and their agents, attorneys, staff, officers, those acting in concert with them, and all those receiving notice of the same.

Dated: April 28, 2025
        Scarsdale, New York

                              THE BELLANTONI LAW FIRM, PLLC
                              *Attorneys for Plaintiffs*


                    By:     *Amy L. Bellantoni*
                              Amy L. Bellantoni
                              2 Overhill Road, Suite 400
                              Scarsdale, New York 10583
                              abell@bellantoni-law.com