UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MICHAEL MCGREGOR, ZACHARY GIAMBALVO,
PAUL FELICE, MATTHEW OLIVIERI, EDWARD
NEWMAN, and DARK STORM INDUSTRIES, LLC,

                         Plaintiffs,

      -against-

SUFFOLK COUNTY, New York, Police Commissioner
RODNEY HARRISON, in his Official Capacity and Individually,
MICHAEL KOMOROWSKI, Individually,

                        Defendants,

LETITIA JAMES, in her official capacity as Attorney General
of the State of New York,

                        Intervenor.
------------------------------------------------------------X

FILED
CLERK
12/22/2025 10:56 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM OF
DECISION AND ORDER**

Civil Action
No. 23-1130 (GRB) (ARL)

**GARY R. BROWN, United States District Judge**:

       Cases interpreting the Second Amendment can require consideration of complex questions. This case, however, is straightforward. While the plaintiffs challenge the constitutionality of a state firearm statute, they neglected to file their claims against Suffolk County and its law enforcement personnel in the proper court.

       Before the Court are cross-motions for summary judgment by (i) plaintiffs Michael McGregor, Zachary Giambalvo, Paul Felice, Matthew Olivieri, Edward Newman, and Dark Storm Industries, LLC ("DSI") challenging the facial constitutionality of the state statute, Docket Entry ("DE") 91; (ii) Attorney General Letitia James ("the State"), who has intervened for the purpose of defending the statute's constitutionality, DE 94; and (iii) Suffolk County, former Suffolk County Police Commissioner Rodney Harrison, and Suffolk County Police Lieutenant

Michael Komorowski ("County Defendants") defending Suffolk County's implementation of the statute, DE 101-7. For the reasons that follow, the Court grants summary judgment for the State and the County Defendants and denies summary judgment for plaintiffs.

**Background**

The factual background and procedural history of this matter are set forth in an earlier decision denying plaintiffs' request for injunctive relief, *McGregor v. Suffolk Cnty., New York*, 690 F. Supp. 3d 147, 149 (E.D.N.Y. 2023), *appeal withdrawn,* No. 23-1297, 2023 WL 10408195 (2d Cir. Oct. 10, 2023) ("*McGregor I*"), which is incorporated herein. In sum, plaintiffs brought suit against state and local officials, raising facial and as-applied challenges to New York Senate Bill 9458, ("the Rifle Bill"), which, *inter alia*, (i) requires an individual to obtain a semiautomatic rifle license or receive an endorsement on an existing pistol license to purchase a semiautomatic rifle, N.Y. Penal Law § 400.00(1); (ii) mandates that semiautomatic rifle owners register their rifle on their license before taking possession, N.Y. Penal Law § 400.00(9); and (iii) allows licensing officers to consider an applicant's "character, temperament and judgment" in determining whether to grant a license, N.Y. Penal Law § 400.00(1)(b).

The New York State Legislature enacted the Rifle Bill in June 2022 "in response to a tragic mass shooting in which a lone wolf shooter motivated by white supremacist ideology used a recently purchased semiautomatic rifle to kill ten people and wound three others in a supermarket in Buffalo, New York." DE 94-1 at 7. The shooter was able to fire his semi-automatic rifle, a Bushmaster XM-15, approximately 60 times within two minutes. *See* Office of the New York State Attorney General, *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022*, October 18, 2022, at 9-10. Because New York did not have a licensing requirement for persons wishing to purchase semi-automatic rifles prior

to June 2022, the Rifle Bill was intended "to close loopholes that directly address the gaps in our laws exposed by these horrific shootings in Buffalo … and around the country." DE 94-1 at 7-8 (quoting Statement of Senate Majority Leader Stewart-Cousins, N.Y. State Senate Stenographic Record, Regular Session at 5365:21-5366:12 (June 2, 2022)).

Plaintiffs seek monetary and injunctive relief, contending that (i) the Rifle Bill facially violates the Second Amendment and (ii) the County Defendants violated the Second Amendment in implementing the Rifle Bill. In their as-applied challenge against the County Defendants, plaintiffs argue that Suffolk County's Pistol License Bureau ("PLB") did not comply with the Rifle Bill, thus abridging plaintiffs' Second Amendment rights. By refusing to issue semiautomatic rifle licenses or semiautomatic rifle endorsements to New York State pistol licenses, the PLB effectively foreclosed Suffolk County residents from purchasing semiautomatic rifles between September 2022 and September 2023.[1]

While the underlying facts are not in dispute, the County Defendants disagree that the PLB violated the Rifle Bill. Instead, they argue that the PLB "made [semiautomatic rifles] available to law-abiding citizens" despite the fact that the PLB's "outmoded computer system" rendered printing separate semiautomatic rifle licenses impossible. DE 101-7 at 19. Because "[t]he computer company PLB had been using no longer existed, and PLB's efforts to upgrade its system with a computer that could print a separate [semiautomatic rifle] license were unsuccessful," the PLB developed a workaround. *Id.* Reasoning that the requirements for obtaining a semiautomatic rifle and pistol license were identical, the PLB allowed firearms

---

[1] Plaintiff Giambalvo also seeks "prospective relief against the enforcement of the Rifle Bill because he has submitted to the state's licensing scheme, the discretionary eligibility factors for which are the same for pistols and [semiautomatic rifles]." DE 101-22 at 6. However, as discussed in this Opinion, Giambalvo's alleged harm is traceable to the state statute, not the County's enforcement.

dealers to transfer a semiautomatic rifle to a buyer once the PLB notated the back of the buyer's pistol license with the rifle's make, manufacturer, and serial number, and the buyer presented a PLB-issued purchase order to the dealer. *Id.* at 19-20.

Beginning in September 2023, following commencement of this lawsuit, the PLB endorsed the back of pistol licenses. DE 47 ¶ 120. Starting in October 2024, the PLB accepted applications for a semiautomatic rifle license. DE 79 at 2. Suffolk County residents purchasing semiautomatic rifles can do so either via an endorsement to a valid New York State pistol license or a properly issued semiautomatic rifle license.

### Discussion

#### *Summary Judgment Standard*

This motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed. App'x. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

#### *Second Amendment Facial Challenge*

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . . [and] the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17-19 (2022). Courts must determine whether the challenged regulation and purported historical tradition are "relevantly similar," by "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 28-29. The government must "identify a well-established and representative historical *analogue*" but need not show "a historical *twin*." *Id.* at 30.

However, the Second Amendment is not "trapped in amber." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). Just as "the reach of the Second Amendment is not limited only to those arms that were in existence at the founding … the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. "Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 692. "[C]ourts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Antonyuk v. James*, 120 F. 4th 941, 970 (2d Cir. 2024). "[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. After all, the Second Amendment does not provide "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

In this case, the "Second Amendment's plain text covers" plaintiffs' conduct of purchasing and owning semiautomatic rifles and thus, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. Accordingly, the State must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court finds no genuine dispute of fact that the Rifle Bill comports with the United States' history of firearm regulation.

As explained by the State's expert Robert Spitzer, states have imposed licensing requirements on firearm usage dating back to the colonial era. Several examples are instructive. In 1713, Philadelphia penalized "firing a Gun without license." DE 70-5 ¶ 44. A 1721 Pennsylvania colonial statute outlawed firing "any gun or other fire arm" absent "the governor's special license." *Id.* Prior to the Civil War, laws in South Carolina, New Hampshire, New York,

Ohio, Connecticut, Illinois, and Indiana imposed licensing requirements on the discharge of firearms within certain cities. *Id.* ¶ 45. Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming enacted similar laws after the Civil War. *Id.*

As handgun ownership increased in the nineteenth century, states began requiring licenses to possess and carry such weapons. An 1871 Missouri law required obtaining "written permission from the Mayor" before carrying a concealed handgun or "any other dangerous or deadly weapon" in St. Louis. *Id.* ¶ 20. An 1885 New York state law barred carrying or possessing "any pistol or other firearms of any kind" in a city absent a license, which would be granted for up to one year and revoked "at the pleasure of the mayor." *Id.* ¶ 28. Cities in Illinois, West Virginia, Minnesota, Utah, Connecticut, and California enacted ordinances requiring that residents obtain a license from the mayor or police commissioner prior to carrying a concealed handgun. *Id.* ¶¶ 24-33. In many of these instances, license holders were required to renew their licenses annually. *Id.* In 1892, the U.S. Congress passed a law for the District of Columbia criminalizing concealed carry of "any deadly or dangerous weapons," which included pistols, absent permission by a judge of the police court. *Id.* ¶ 34.

Despite plaintiffs' challenges to the good moral character requirement, *see* DE 91-2 at 22, licensing regimes in which a local official undertakes "certain individualized, discretionary determinations" regarding an applicant's moral character are consistent with historical traditions of firearm regulations, *Antonyuk*, 120 F.4th at 987. Such assessments "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). An 1871 Jersey City regulation required a local court to determine whether a license applicant was "temperate, of adult age, and

capable of exercising self-control" before granting a license for the concealed carry of a "gun, pistol, cannon, or fowling piece[2] or other fire-arms." *Id.* ¶¶ 23, 21. An 1881 New York City law stated that permits would be issued to "a proper and law abiding person," while an 1898 Oregon City law allowed magistrates to issue carry permits only if they believed it "necessary or prudent to grant such permission." *Id.* ¶ 17. In 1908, Virginia enacted a concealed carry permit law, in which permits could be granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant." *Id.* ¶ 40.

There is similarly ample historical evidence to support the Rifle Bill's registration provision, which requires that buyers of semiautomatic rifles amend their license to include the newly acquired rifle. Such a requirement is analogous to state mandates that firearms dealers record each sale for the state's inspection. *See* DE 94-1 at 20. In the nineteenth and twentieth centuries, "at least 17 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination." DE 70-5 ¶ 50. Many of these states modeled their statutes on an 1885 Illinois law, which required "[a]ll persons dealing in deadly weapons" to "keep a register of all such weapons sold," which would include the date of sale, the name and age of the buyer, the price of the weapon, and its intended use. *Id.* ¶ 51. The "register [was] to be kept open for inspection of the public." *Id.* A 1911 New York law required that sellers record such information at the time of purchase in addition to the firearm's "calibre, make, model, manufacturer's number or other mark of identification." *Id.* ¶ 53. The buyer needed to present a permit before taking possession of the firearm. *Id.*

---

[2] A fowling piece is "a shotgun for shooting birds or small animals," which suggests that this regulation extended to long guns. Fowling Piece, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/fowling%20piece.

Contrary to plaintiffs' assertions, DE 95 at 10-13, there is historical support for imposing licensing and registration requirements on long guns. In 1893, Florida made it "unlawful to carry or own a Winchester or other repeating rifle without first taking out a license from the County Commissioner," who would record the licensee's name, as well as the firearm's manufacturer, caliber, and number. DE 70-5 ¶ 35. By the 1920s and 1930s, when long guns began to pose public safety problems, at least 36 states imposed restrictions on such guns, including the Tommy gun, the Browning Automatic Rifle, and sawed-off shotguns, while 11 states restricted semiautomatic long guns. DE 94-1 at 17. During those two decades, Arkansas, Connecticut, Illinois, Minnesota, Montana, New Jersey, Ohio, South Carolina, South Dakota, Virginia, West Virginia, and Wisconsin extended licensing requirements to long guns, including machine guns and automatic rifles. DE 70-5 ¶ 40.

While the State, through its expert, engages in substantial historical analysis, plaintiffs respond with arguments devoid of evidence. The historical record is clear. From the colonial era through the twentieth century, states consistently imposed licensing and registration requirements on handguns and other dangerous weapons. Such regulations often required a public official to make determinations about a buyer's fitness to own and use a firearm. When long guns began to pose safety threats, states enacted licensing regimes.

The evolution of firearm regulations is not surprising when one considers technological advancements since the Founding when the most commonly owned firearms were muskets and flintlock pistols, both of which could fire only about three rounds per minute. Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, THE WASHINGTON POST, June 13, 2016. In contrast, the Buffalo shooter used a semiautomatic rifle to fire 60 rounds in two minutes. *See supra* Office of the New York State Attorney General. According to

one historian, guns "were not nearly as threatening or lethal as those available today" and "were so difficult to fire in the eighteenth century that the very idea of being accidentally killed by one was itself hard to conceive." Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV. 103, 110 (2000). Consequential advances in gun technology demonstrate that "[t]he regulatory challenges posed by firearms today are not … the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27.

The historical tradition of firearm regulation "confirm[s] what common sense suggests:" state and local authorities may implement licensing regimes to ensure that those bearing arms are law-abiding, responsible citizens. *Rahimi*, 602 U.S. at 698. Plaintiffs' argument that the State inappropriately cites regulations on handguns and automatic machine guns to justify regulating semiautomatic rifles is unavailing.[3] DE 95 at 18-20. While the Rifle Bill, which New York's legislature enacted in response to a horrific mass shooting, "is by no means identical to these founding era regimes … it does not need to be" since it is "'relevantly similar' to those founding era regimes in both how and why it burdens the Second Amendment right." *Rahimi*, 602 U.S. at 698 (quoting *Bruen*, 597 U.S. at 29). The record evidence and historical data show that the Rifle Bill's licensing, registration, and moral character requirements fit comfortably within three hundred years of state firearm regulations.

Accordingly, the Court denies plaintiffs' summary judgment motion seeking to facially invalidate the Rifle Bill and grants the State's summary judgment motion.

---

[3] Counsel's assertions that the State engaged in a "near-sanctionable overinclusion of immaterial and useless information," the State's analogy of semiautomatic rifles to Tommy Guns is "beyond the pale," and the State's expert acted "deceitfully" are gratuitous. DE 95 at 17-19. While legal arguments concerning the Second Amendment's scope can understandably become contentious, such ad hominem attacks do not help the Court resolve the issues at hand.

*The As-Applied Challenge Against the County Defendants*

Plaintiffs challenge the PLB's policy of not issuing semiautomatic rifle licenses or pistol license endorsements between September 2022 and September 2023. *See* DE 101-22. They concede that their claims for equitable relief are moot given that the PLB began endorsing pistol licenses in September 2023 and issuing semiautomatic rifle licenses in October 2024. *See id.* at 13 ("While the County's cessation of its policy has rendered Plaintiffs' request for prospective relief – the permanent injunction of the [p]olicy – moot, it does not affect Plaintiffs' claims for retrospective monetary damages for the past constitutional harms caused by the policy."). However, plaintiffs' claims for damages arising out of the PLB's policy between September 2022 and September 2023 are not moot. *See Van Wie v. Pataki*, 267 F.3d 109, 115 n.4 (2d Cir. 2001) ("We note that had the plaintiffs sought money damages in addition to their request for injunctive relief, this controversy would not be moot.").[4]

*Plaintiffs Giambalvo and Felice*[5]

Even though plaintiffs' claims for retrospective relief are not moot, plaintiffs still must satisfy Article III standing. *See Nat'l Rifle Ass'n of Am. v. Hochul*, No. 20-CV-3187, 2021 WL

---

[4] Even without plaintiffs' concession, the claims against the County Defendants for equitable relief are moot. Because "federal courts may only decide live cases or controversies," a suit seeking injunctive relief "becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *Irish Lesbian and Gay Org v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998). Here, Suffolk County residents can now apply for a semiautomatic rifle license or endorsement of an existing pistol license. This case does not fall under the "capable of repetition, yet evading review" exception to mootness. *Van Wie*, 267 F.3d at 114.

[5] Plaintiffs concede that because Olivieri "relocated outside of New York State" he has "no standing to challenge the Rifle Bill." DE 101-21 ¶ 85. Plaintiffs are not clear as to whether Olivieri lacks standing to sue solely for prospective relief or for both prospective and retrospective relief. For the avoidance of doubt, the Court finds that Olivieri lacks standing to sue not only for prospective relief, but also for retrospective relief, because he objected to obtaining a semiautomatic rifle license out of a belief that the Rifle Bill lacked any historical analogues. *Id.*; DE 81 at 4. This concern is not traceable to the PLB's enforcement.

5313713, at *2 (2d Cir. 2021) (holding that an organization seeking nominal damages for past alleged constitutional violations lacked constitutional standing). "To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (quoting *Spokeo, Inc. v. Robbins*, 578 US. 330, 338 (2016)).

Giambalvo and Felice lack standing to sue the County Defendants, because they cannot trace any alleged harm to the PLB's implementation of the Rifle Bill. Plaintiffs concede that the PLB denied Giambalvo's application for a pistol license in September 2023 after he failed to "submit the court disposition for each of his many arrests, despite being given ample time to do so." DE 101-21 ¶ 82. Neither side disputes that Giambalvo's refusal to provide details about his arrests would have also prevented him from obtaining a semiautomatic rifle license given that the Rifle Bill's standards for issuance of a semiautomatic rifle license are the same as those for a pistol license. *Id.* ¶ 84. Thus, Giambalvo's inability to obtain a pistol license—for the purpose of receiving a semiautomatic rifle endorsement—is traceable to the Rifle Bill's good character provision, not the PLB's policy from September 2022 to September 2023.

While plaintiffs provide few details about Felice's application process, the record is clear that his application was deficient and failed to comply with provisions in the Rifle Bill.[6] *See id.*

---

[6] Plaintiffs provided the Court with a copy of *Felice v. Waring*, Ind. No. 613381/2024, in which the New York State Supreme Court, Suffolk County denied the County's motion to dismiss Felice's Article 78 petition. *See* DE 81. Felice had sought an order compelling the County to accept his application for a semiautomatic rifle license after the PLB denied his pistol license for failure to provide a doctor's note and barred him from reapplying for two years. Following the state court's decision, the County (i) began accepting the state application for a semiautomatic rifle license; and (ii) did not place a time bar on the ability of an applicant whose pistol or semi-automatic license application had been denied from reapplying for a license. DE 79 at 2.

¶ 80 ("PLB denied Giambalvo's and Felice's applications for a pistol license because they failed to meet the eligibility requirements for a pistol license which are set forth in [the Rifle Bill].").

Accordingly, it is undisputed that Giambalvo and Felice trace their alleged harm to the enactment of the Rifle Bill rather than the PLB's implementation.  Thus, they lack standing to sue the County Defendants over the PLB's enforcement of the Rifle Bill.

*Plaintiffs McGregor and Newman/DSI*

McGregor may be able to show that the PLB's policy from September 2022 to September 2023 precluded him from buying a semiautomatic rifle.  If so, Newman and DSI could have derivative standing.  *See Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) ("Vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.").[7]

Regardless of standing, McGregor, Newman, and DSI encounter a separate hurdle: subject matter jurisdiction.  They argue that in failing to issue semiautomatic rifle licenses or pistol license endorsements between September 2022 and September 2023, the PLB did not comply with the Rifle Bill.  This alleged non-compliance, according to plaintiffs, constitutes a Second Amendment violation.  However, claims alleging violation of a state statute should have been brought in New York state court pursuant to Article 78 of the New York State Practice Law and Rules ("Article 78").

---

[7] Unlike here, where plaintiffs are suing for damages, *Gazzola* concerned a suit for injunctive relief.  The fact that plaintiffs can only sue the County Defendants for damages could suggest that such third-party standing cases are not on point.  However, because Newman and DSI sued the County Defendants in the wrong court, their standing is not dispositive.

"Article 78 provides a specific and exclusive remedy where a question raised by a party goes to "whether a determination was made in violation of lawful procedure, was affected by error of law or was arbitrary or capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed." *Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, No. 10-CV-8002 (RPP), 2011 WL 3427138, at *14 (S.D.N.Y. Aug. 5, 2011), *aff'd*, 678 F.3d 184 (2d Cir. 2012) (quoting CPLR § 7803(3)). As a district court in this Circuit observed:

> Proceedings under Article 78 can only be heard in the State Supreme Court. CPLR § 7804(b). A number of district courts have dismissed cases brought in federal court that should have been brought to State Supreme Court as an Article 78 proceeding. *See Brown v. Tomcat Elec. Sec., Inc.,* No. 03 CV 5175(FB), 2007 WL 2461823 at *3 (E.D.N.Y. Aug. 27, 2007) ("New York law vests jurisdiction over Article 78 proceedings solely in the state courts"); *Blatch v. Hernandez,* 360 F.Supp.2d 595, 637 (S.D.N.Y. 2005) ("This claim must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims."); *Cartegena v. City of New York,* 257 F.Supp.2d 708, 710 (S.D.N.Y. 2003) ("State law does not permit Article 78 proceedings to be brought in federal court, and hence I conclude that I do not have the power to exercise supplemental jurisdiction over [plaintiff's] Article 78 claims."); *see also Camacho v. Brandon,* 56 F.Supp.2d 370, 380 (S.D.N.Y. 1999); *Luchesi v. Carboni,* 22 F.Supp.2d 256, 258 (S.D.N.Y. 1998).

*Id.* "To determine whether Article 78 applies to a given dispute, a reviewing court must 'examine the substance of the action to identify the relationship out of which the claim arises and the relief sought.'" *Id.* (quoting *Solnick v. Whelan,* 49 N.Y.2d 224, 229 (1980)). "An Article 78 proceeding is the proper vehicle to determine whether the law has been lawfully applied, or the validity of certain government acts pursuant to a valid statute, rather than a vehicle for challenging the validity of a statute itself." *Jones-Bey v. Stanislov*, No. 23-CV-5599 (DEH), 2024 WL 3520636, at *3 (S.D.N.Y. July 23, 2024) (quoting *Bldg. Indus. Elec. Contractors Ass'n*, 2011 WL 3427138, at *14).

Here, plaintiffs allege that the County Defendants violated state law because the PLB "would not issue licenses, as required by [the Rifle Bill] … or endorse existing pistol licenses to reflect [semiautomatic rifle] authorization." DE 101-22 at 6. The "constitutional harm" according to plaintiffs, is premised on the County Defendants' "circumvention of state law between September 2022 and September 2023." *Id.* at 14. Plaintiffs also note that the PLB's policy "foreclosed the people within the PLB jurisdiction from purchasing [semiautomatic rifles]" within and outside of Suffolk County "because all [firearms dealers] throughout the state were bound by state law not to transfer a [semiautomatic rifle] in the absence of an endorsed pistol license." *Id.* The County Defendants, meanwhile, argue that because the "eligibility, application, and procedural requirements for purchasing and taking possession of a [semiautomatic rifle] would be the same as the requirements for purchasing and taking possession of a pistol," its policy was a reasonable interpretation of the Rifle Bill in light of the fact that the PLB was unable to print a separate semiautomatic rifle license. DE 101-7 at 19. Such arguments would have been integral to an Article 78 proceeding, in which a state court could assess whether the PLB's enforcement of the Rifle Bill complied with the state law.[8]

The record establishes beyond dispute that plaintiffs' core allegation against the County Defendants is that they violated the Rifle Bill. "The Court therefore joins a number of other

_____

[8] Because the Court lacks subject matter jurisdiction to adjudicate the claims of McGregor, Newman, and DSI against the County Defendants, it declines to assess the merits of the PLB's policy from September 2022 to September 2023. The Court has previously noted that McGregor's arguments regarding this policy "raise some concern," *McGregor I*, 690 F. Supp. 3d at 156, especially because the PLB's inability to endorse existing pistol licenses or "print a separate license for a [semiautomatic rifle]" seemed to disappear after plaintiffs filed this lawsuit, DE 101-7 at 19. This is not the only instance of the PLB's incompetence. Despite the County Defendants' "disingenuous" assertion that "[a] rifle can easily, quickly, and inexpensively be added to an existing pistol license," individuals generally had to "wait up to three years to obtain a pistol license in Suffolk County." *McGregor I*, 690 F. Supp. 3d at 156 n.10.

district courts that have dismissed cases brought in federal court that should have been brought to State Supreme Court as an Article 78 proceeding." *Jones-Bey*, 2024 WL 3520636, at *4 (internal quotation omitted). Accordingly, the Court finds that it lacks subject matter jurisdiction to adjudicate the claims of McGregor, Newman, and DSI against Suffolk County, Defendant Harrison, and Defendant Komorowski.

**Conclusion**

For the reasons set forth herein, the Court grants the motions for summary judgment from the State and the County Defendants and denies plaintiffs' motion for summary judgment.

**SO ORDERED.**

Dated: Central Islip, New York
     December 22, 2025

/s/ Gary R. Brown____
GARY R. BROWN
United States District Judge
